David Mark TEMPLE, Appellant,

v.

STATE of Texas, Appellee.

No. 14–08–00074–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 21, 2010.

Rehearing En Banc Denied May 24, 2011.

---

Dick DeGuerin, Stanley G. Schneider, Houston, for appellant.

Alan Curry, Houston, for appellee.

Panel consists of Justices YATES, SEYMORE, and BROWN.

## MAJORITY OPINION

CHARLES W. SEYMORE, Justice.

Appellant, David Mark Temple, was convicted of the murder of his wife, Belinda Temple, and sentenced to life imprisonment. Appellant challenges his conviction in eighty issues, which are grouped into the following categories:

(1) the evidence is legally and factually insufficient to support the jury's verdict (issues one and two);

(2) appellant's due-process rights were violated because of the State's *Brady* violations (issues three and four);

(3) the trial court erred by allowing the prosecutor to cross-examine appellant regarding the veracity of other witnesses (issues five through fourteen);

(4) the trial court erred by allowing the prosecutor to inject unsupported and inflammatory facts during cross-examination of appellant (issues fifteen through twenty-four);

(5) the trial court erred by allowing the prosecutor to engage repeatedly in improper jury argument (issues twenty-five through sixty-seven); and

(6) the trial court erred by overruling numerous hearsay objections (issues sixty-eight through eighty).

We affirm.

## I. BACKGROUND

Appellant was raised in Katy by Kenneth and Maureen Temple. Interstate 10 ("I–10") runs east-to-west through Katy. Kenneth and Maureen lived in a house north of I–10 and surrounded by fields in which appellant and his brothers, Darren and Kevin, hunted. At the time of Belinda's death, Kenneth and Maureen still lived in that house.

During the mid–1980s, appellant was a star linebacker on the Katy High School football team. After high school, appellant played football at Stephen F. Austin State University ("SFA") in Nacogdoches. During college, appellant met and began dating Belinda. While dating, appellant and Belinda acquired a Chow-mix dog they named Shaka. Appellant and Belinda married in 1992 and spent the next two years earning post-graduate degrees from SFA and teaching and coaching in Livingston.

In 1994, appellant and Belinda moved to Katy. Appellant was employed as an assistant football coach at Alief Hastings High School, and Belinda taught at Katy High School. They eventually bought a home south of I–10 in the Cimarron subdivision, an approximately fifteen-minute drive from Kenneth and Maureen's home. At the time of Belinda's death, appellant and Belinda had a three-year old son, E.T., and Belinda was almost eight-months pregnant, expecting a girl.

On Monday, January 11, 1999, Belinda was at work when she was informed E.T. was running a fever at daycare. During lunch, Belinda retrieved E.T. and took him home. At approximately 12:30 p.m., appellant arrived home to watch E.T., allowing Belinda to return to her school until around 3:30 p.m. Between 3:30 and 3:45 p.m., Belinda arrived at Kenneth and Maureen's home to retrieve soup. She briefly spoke with Kenneth and then drove home. Belinda arrived home sometime before 4:00 p.m. Appellant claims that, after Belinda arrived home, he and E.T. left so that Belinda could rest.

According to appellant, he drove his blue, short-bed pickup truck to the small park in his neighborhood, Cimarron Park. Appellant testified that shortly after arriving at the park, he and E.T. decided to go to a larger park, Peckham Park, several miles away, north of I–10. Appellant claimed he stopped at a Brookshire Brothers grocery store north of I–10 where he purchased drinks and cat food. Appellant and E.T. were videotaped entering the store at 4:32 and leaving at 4:38. Appellant testified he then decided to go to Home Depot to look at shelving for the baby's room. Appellant and E.T. were videotaped entering Home Depot at 5:14

p.m. but were not videotaped exiting the store.

Appellant and E.T. returned home and pulled into the garage. The Temples' garage was detached from their home and had a door leading into their backyard. Appellant testified that he left E.T. in the garage, went into the backyard, and noticed the back door to the house was open, and the door's window was broken. According to appellant, he immediately grabbed E.T. and took him across the street to the home of Michael and Peggy Ruggiero. Appellant banged on the door and yelled, "Mike, Mike, it's me, David. Let me in." Michael and Peggy opened the door, and appellant handed them E.T., told them his house had been burglarized, and asked them to call 911. Appellant then ran back to his house with Michael following. Appellant entered through the back gate and went into his house. Michael stopped at the gate when confronted by Shaka, but saw appellant enter his house and the back door close behind him.

Appellant testified that he went upstairs and found Belinda's body in the closet of the master bathroom. It is undisputed that Belinda was killed by a shotgun blast to the back of her head. At 5:38 p.m., appellant called 911. The 911 dispatcher instructed appellant to perform CPR on Belinda, but he responded, "I can't. Her head is just gone."

While Michael was still holding the back gate to prevent Shaka from escaping, law-enforcement personnel began arriving at the Temple home. Appellant exited his house through the back door and announced that Belinda was dead. He then placed Shaka in the garage.

More law-enforcement personnel arrived, and crime-scene investigators began processing the scene. Appellant was placed in the back of a patrol car. Kenneth and Maureen later arrived at the scene. That night, appellant and his parents were questioned at a local substation by detectives with the Harris County Sheriff's Office. Appellant gave a written statement regarding his and Belinda's activities that day. Detective Charles Leithner questioned appellant about several apparent inconsistencies in his statement. Appellant and his parents were informed that appellant was a suspect in Belinda's murder. Early the next morning, appellant left the substation and went to his parents' home. Appellant and E.T. resided with appellant's parents until the summer of 2001, when he remarried.

In 2005, appellant was indicted for Belinda's murder.[1] In November 2007, a jury found appellant guilty as charged in the indictment and assessed punishment at life imprisonment. The trial court denied appellant's timely filed motion for new trial.

## II. SUFFICIENCY OF THE EVIDENCE

In his first and second issues, appellant argues the evidence is legally and factually insufficient to support his conviction. While this appeal was pending, five judges on the Texas Court of Criminal Appeals held that only one standard should be used to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt: legal sufficiency. *See Brooks v. State*, 323 S.W.3d 893, 905–07 (Tex.Crim.App.2010) (plurality op.); *id.* at 926–28 (Cochran, J., concurring). Accordingly, we will apply the legal-sufficiency standard when addressing appellant's legal-sufficiency and factual-sufficiency arguments. *See Pomier v. State*, 326 S.W.3d 373, 378–79 (Tex.App.-Houston [14th Dist.]

---

1. In April 1999, a grand jury failed to indict appellant.

2010, no pet. h.) (applying single standard of review required by *Brooks* ).

## A. Applicable Law and Standard of Review

A person commits murder if he intentionally or knowingly causes the death of another person or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of another. Tex. Penal Code Ann. § 19.02(b)(1), (2) (West 2003). A person acts intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2003). A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. *Id.* § 6.03(b). A person also acts knowingly if he is aware his conduct is reasonably certain to cause the result. *Id.*

When reviewing sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Brooks,* 323 S.W.3d at 898–900 (plurality opinion). Following the admonitions of the Court of Criminal Appeals in *Brooks,* this court may not sit as a thirteenth juror and substitute its judgment for that of the fact finder by reevaluating the weight and credibility of the evidence. *Id.* at 904–05, 909–12; *Dewberry v. State,* 4 S.W.3d 735, 740 (Tex.Crim. App.1999); *see also Sharp v. State,* 707 S.W.2d 611, 614 (Tex.Crim.App.1986) (expressing the jury may choose to believe or disbelieve any portion of the testimony). We defer to the fact finder's resolution of conflicting evidence unless the resolution is not rational. *See Clayton v. State,* 235 S.W.3d 772 (Tex.Crim.App.2007). Our duty as a reviewing court is to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime. *Williams v. State,* 235 S.W.3d 742, 750 (Tex.Crim.App.2007).

Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State,* 214 S.W.3d 9, 13 (Tex.Crim.App.2007). The Court of Criminal Appeals has affirmed murder convictions based solely on inferences raised by circumstantial evidence. *See, e.g., Clayton,* 235 S.W.3d at 778–82; *Guevara v. State,* 152 S.W.3d 45, 49–52 (Tex. Crim.App.2004); *King v. State,* 29 S.W.3d 556, 564–65 (Tex.Crim.App.2000). An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Hooper,* 214 S.W.3d at 16. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. *Id.* A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *Id.* Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts are sufficient to support the conviction. *Id.* at 13.

## B. Analysis

It is undisputed that sometime after 3:30 p.m. on January 11, 2009, Belinda was shot in the back of her head at close range by a 12–gauge shotgun loaded with double-ought buckshot that was likely privately reloaded. This evidence inarguably supports a finding that someone intentionally and knowingly caused Belinda's death. We must examine the record to determine whether the evidence, viewed in the light

most favorable to the verdict, is legally and factually sufficient to support a finding that appellant was the killer.

■ Appellant argues that the State's case against him was premised solely on evidence of motive and opportunity and not on evidence actually supporting the elements of murder. He correctly notes that motive is not an element of any crime. *See Russo v. State*, 228 S.W.3d 779, 794 (Tex.App.-Austin 2007, pet. ref'd). However, evidence of motive is generally admissible because it is relevant as a circumstance tending to prove guilt. *See id.; see also Clayton*, 235 S.W.3d at 778–81; *Guevara*, 152 S.W.3d at 50; *Harris v. State*, 727 S.W.2d 537, 542 (Tex.Crim.App.1987).

A substantial portion of the State's case-in-chief consisted of the prosecutors' attempt to establish that appellant was a controlling and emotionally abusive husband who was involved in an extra-marital affair and, thus, had a motive for killing Belinda. As noted above, appellant was a football coach and teacher at Alief Hastings. He and Belinda were friends with fellow Alief Hastings football coach Quinton Harlan and his wife, Tammy. In the Fall of 1998, Alief Hastings coaches and teachers met every week for a "happy hour." Appellant testified that he attended four or five happy hours. Quinton testified that he did not attend many of the happy hours and that appellant would chide him when he did not attend. Quinton also testified that when he and appellant did socialize, appellant would think of stories for Quinton to tell his wife regarding his whereabouts. According to Quinton, appellant said he was in control of his house, and told Quinton that he needed "to take control of [his] house and control of [his] wife." On cross-examination, Quinton explained that appellant was not joking when he told Quinton to take control of his marriage. Quinton also testified that ap-

pellant could be volatile, had a controlling personality, and was meticulous in his planning.

In 1998, appellant attended a high school reunion. According to Quinton, appellant told him that he met a former girlfriend at the reunion and "[t]hey were on the couch and they kissed. And I asked him if he had sex with her and he said, [']No, everything but that.[']" Tammy testified that Belinda was uncharacteristically submissive when she was in appellant's presence. Tammy and Quinton testified that appellant called Belinda "fat" in front of them. Tammy explained that appellant made derogatory statements about the manner in which Belinda raised E.T. and kept the house and also called Belinda's family "crazy, white trash, fat" and would say "he didn't ever want her or [E.T.] around them." Additionally, Brenda Lucas, Belinda's twin sister, testified that, from her perspective, appellant was controlling. She also expressed that during her last visit to the Temple home, appellant made fun of Belinda's "big butt." This evidence supports a logical inference that appellant did not respect Belinda.

At the beginning of the 1998–1999 school year, appellant and Quinton met Heather Scott, who was teaching English at Alief Hastings. Both men began a flirtatious relationship with Heather and occasionally saw her after school. Heather knew that appellant and Quinton were married. Appellant testified that on two or three occasions, he drove Heather home from a happy hour and kissed her goodnight. Appellant testified that he and Heather had sex twice in the Fall of 1998. Heather's roommate, Tara Hall, testified that appellant was affectionate and polite toward Heather and "seemed to really care about her." Further, appellant bought Heather a gold necklace for Christmas in 1999. Quinton and Heather testi-

fied that they kissed each other but did not have sex.

Quinton testified that, in November 1998, appellant invited Quinton to appellant's house. When Quinton arrived, appellant entered Quinton's truck and they drove around the neighborhood. According to Quinton, he and appellant discussed their intentions with Heather. Appellant asked Quinton if he would leave his wife for Heather, to which Quinton responded, "No." When asked the same question, appellant responded, "I don't know."

In 1998, Heather invited appellant to a New Year's Eve party at her townhouse. Appellant attended the party and spent two nights with Heather, returning home January 2, 1999. Heather testified that she and appellant had sex on January 1; appellant testified he does not remember having sex that day. As an alibi, appellant told Belinda he was hunting.

Heather initially told police investigators that, on January 5, 1999, she informed appellant she did not want their "relationship to continue the way it had been." In her second police statement, Heather stated that, on January 8, 1999, appellant told her, "I have totally fallen in love with you." Furthermore, before a grand jury in 1999, Heather testified that appellant told her he was falling in love with her, and she replied, "I feel the same way...." At trial, Heather testified that the police interviewers were extremely abrasive and coerced her to add this information to her second statement and phrased it in their own words. She explained that when appellant told her that he loved her, it was playfully and "not an I-love-you-ah-ha-big moment." Appellant testified that he never told Heather he loved her. Detective Tracy Shipley drafted Heather's second police statement. Detective Shipley agreed that Heather did not want to sign the statement because it included that appellant

had stated he loved her, but that she "eventually got [Heather] to sign it." However, Detective Shipley denied that Heather signed "something she didn't want to sign." Additionally, Heather testified that for appellant to use the phrase "I love you" would be significant.

Accordingly, viewing the foregoing in the light most favorable to the verdict, appellant was involved in a sexual relationship with Heather, was unsure if he was willing to leave Belinda for Heather, and told Heather he loved her less than a week before Belinda's death. This evidence, coupled with evidence regarding appellant's treatment of Belinda, supports reasonable inferences that appellant was unhappy with his marriage and had a motive for killing Belinda. However, "although evidence of an affair during marriage may provide a motive, an affair alone is not enough to connect that person to his or her spouse's death." *Smith v. State*, 286 S.W.3d 412, 427 (Tex.App.-Corpus Christi 2008, pet. struck).

There was also evidence supporting an inference that appellant could have been present when Belinda was murdered. After appellant arrived home to care for E.T., Belinda returned to school for a meeting that lasted until between 3:20 p.m. and 3:30 p.m. Phone records indicate that Belinda called home at 3:32 p.m. Appellant's father, Kenneth, testified that Belinda arrived at his home to retrieve soup Maureen had prepared and left at around 3:45 p.m. The drive from appellant's parents' home to the Temples' home ordinarily took around fifteen minutes. In his statement to police, appellant indicated that Belinda arrived home at 3:45 p.m. At trial, he testified that she arrived home closer to 4:00 p.m. Several witnesses testified that Belinda was often tired and had swollen feet due to her pregnancy. Appellant testified, "I told Belinda to rest, I

would take [E.T.] to the park and we would be back in time for supper." Belinda had planned to meet with her girlfriends later that evening to play Bunco.

Appellant testified he and E.T. drove his truck to nearby Cimarron Park; however, no evidence corroborates this testimony. According to appellant, within minutes of arriving at Cimarron Park, he and E.T. decided to drive to Peckham Park, located north of I–10. Appellant testified that he and E.T. then stopped at a Brookshire Brothers north of I–10 to purchase drinks. At 4:32 p.m., appellant and E.T. were videotaped entering Brookshire Brothers. Hence, at least thirty minutes elapsed between the time Belinda arrived home and the time appellant entered Brookshire Brothers. A detective with the Harris County Sheriff's Office testified that, in 1999, it was a twelve-minute drive from appellant's home to Brookshire Brothers. If the jury disbelieved that appellant took E.T. to Cimarron Park, there were eighteen unaccounted-for minutes between when Belinda arrived home and appellant entered Brookshire Brothers. According to the medical examiner and appellant's medical expert, there were too many unknown variables to determine the time of Belinda's death. The only certainty is that she was killed sometime after her school meeting ended between 3:20 and 3:30 p.m.

Notably, appellant presented evidence that a gun was fired in his neighborhood at a time when he was videotaped at Brookshire Brothers. In January 1999, Alexander Roberts had three sons in elementary school. The Roberts family shared a back fence with appellant. On January 11, the Roberts brothers arrived home from school at around 3:57 p.m. According to the eldest brother, fifteen minutes after arriving home, they began watching a movie. Twenty-six minutes into the movie, the brothers heard what they believed

was a gunshot. According to their testimony, the time of the gunshot was around 4:38 p.m.—the same time that appellant was videotaped leaving Brookshire Brothers. Although the Roberts brothers' testimony supported appellant's defense, the jury was free to disbelieve it and rationally could have done so because the Roberts brothers were children and no other witness testified that a gunshot was heard that day. Accordingly, viewing the evidence in the light most favorable to the verdict, we conclude the evidence supports a reasonable inference that appellant could have been in his home when Belinda was murdered.

■ Evidence impeaching appellant's stated purpose for driving north of I–10 on the afternoon of Belinda's death was also a circumstance of his guilt. Appellant maintained that, after leaving Brookshire Brothers, he drove directly to Home Depot to look at shelving for the baby's room. Appellant testified he drove eastward toward Home Depot. Notwithstanding appellant's testimony that traffic was congested that afternoon, several witnesses testified that the drive time from Brookshire Brothers to Home Depot was ten to fifteen minutes. Appellant and E.T. were videotaped leaving Brookshire Brothers at 4:38 and videotaped entering Home Depot at 5:14 p.m. Thus, there was a thirty-six-minute gap between when appellant left the Brookshire Brothers and entered Home Depot. More significantly, Bernard Bindeman testified that between 4:50 and 5:00 p.m., he was in his truck stopped at the intersection of Morton Ranch Road (running east and west) and Katy Hockley Cutoff (running north and south) when he saw appellant in a blue pickup truck heading south on Katy Hockley Cutoff. Appellant was heading from a location near to where his parents and other relatives lived and where he was raised. This evidence,

viewed in the light most favorable to the verdict, supports a reasonable inference that appellant lied to police concerning his purpose for driving north of I–10. Lying to police is a circumstance of guilt. *See Guevara,* 152 S.W.3d at 50.

There was also evidence supporting an inference that appellant lied when he said he placed E.T. in a car seat before they drove north of I–10. Detective Holtke testified there was no child seat in appellant's truck when he processed it. Photographs taken of appellant's truck did not show a car seat. When asked at trial where the car seat was, appellant testified, "I have no idea." Appellant testified he always placed E.T. in his car seat when they drove together, and Quinton and Tammy testified that they never saw appellant put E.T. in his truck without using a car seat. Evidence that appellant always used a car seat, but did not on the day of Belinda's murder, supports a reasonable inference that appellant was in a hurry to drive away from his house.

Another circumstance of guilt was testimony and physical evidence that appellant's house was "staged" to give the impression a burglary occurred. Appellant testified that he noticed the window on his back door had been broken when he returned from Home Depot. The television in appellant's living room was lying sideways on the ground, and a buffet in the dining room had several drawers open. Further, appellant's mother later determined that several pieces of Belinda's jewelry were missing, including two necklaces, two watches, and three sets of earrings. Accordingly, appellant argued his house was burglarized sometime while he was at the park and stores. However, Sergeant Dean Holtke, who was an investigator with the Harris County Sheriff's Office at the time of the murder, testified that the burglary appeared to have been staged.

The back door of appellant's house opened to a small foyer. Directly beyond the foyer was a couch, and to the left of the foyer was a living room. A wooden hutch was against the wall directly to the left of the door. Officers found considerably more glass shards in the living room than in the foyer area and found none on the couch. Sergeant Holtke testified this finding was consistent with the door being open when the glass was broken. Detectives also did not see damage to the hutch or dents on the inside of the back door, which tended to discredit appellant's theory that glass was thrown into the living room when the back door slammed into the hutch.[2] Sergeant Holtke opined that the television was dragged off its stand and placed carefully on the ground because the stand had fresh scrapes and the television was still plugged into the wall. The contents of the open drawers were undisturbed, and appellant's jewelry was found on a tray in the master bedroom in plain view. Appellant agreed that, to the best of his knowledge, the burglar "didn't take one single thing that belonged to [him]." Additionally, the jewelry Belinda was wearing was not taken. Finally, the location and timing of the alleged burglary were suspicious: the Temples lived in a corner home, and the burglary allegedly occurred during the day at a time when persons typically return home from work and school. *See Routier v. State,* 273 S.W.3d 241, 258 (Tex.Crim.App.2008) (including in list of factors supporting "staging" that defendant's "house would not have been an inviting target for a home invader"). Accordingly, viewing the evidence in the light most favorable to the verdict, the jury could have concluded that

---

**2.** Additionally, Michael Ruggiero testified that the back door shut after appellant ran into his house, but he does not remember hearing the sound of glass "tinkling."

the burglary was staged and, thus, believed that Belinda's missing jewelry was not the result of a burglary.[3]

Next, evidence of appellant's behavior following Belinda's murder, when viewed in the light most favorable to the verdict, supports an inference of guilt. *See Guevara,* 152 S.W.3d at 50; *Hinojosa v. State,* 4 S.W.3d 240, 253 (Tex.Crim.App.1999) (relying on defendant's suspicious behavior following murder as a circumstance of guilt). First, law-enforcement personnel commented on appellant's lack of emotion on the day of the murder. Deputy Virginia Kathleen Johnson and her partner were the first law-enforcement personnel to arrive at appellant's house. According to Deputy Johnson, while she and her partner were standing outside the gate to appellant's backyard, appellant exited through the back door of his house and said calmly, "My wife has been shot. She's dead." Deputy Johnson further testified that appellant did not appear to be upset and she did not see him cry. Detective Charles Leithner testified that, when he interviewed appellant later that evening, appellant was "shaking and bouncing," did not look the detective in the eyes, never cried, and was hesitant in his answers. Additionally, Quinton testified that, a few weeks after Belinda's funeral, he asked appellant if he would like to find the murderer, to which appellant responded, "[W]hat difference is it going to make. It's not going to bring her back."

Second, appellant resumed his relationship with Heather shortly after Belinda's murder. On January 13, appellant's parents hosted a visitation at their house. Quinton and Tammy attended the reception. Quinton testified that, when he and appellant were alone, the first thing appellant asked was, "How's Heather?" and "Is she doing okay? How is she holding up? Has she said anything?" Quinton testified that appellant later called him and apologized that he and Heather had to "go through this" and asked him to tell Heather he was sorry. Heather testified she received flowers from appellant on Valentine's Day—a month after Belinda's murder. Tara also testified that appellant visited Heather several times that spring and he and Heather planted flowers on the patio. Appellant's neighbor, Natalie Scott, testified that she saw appellant at a steak-

3. We acknowledge that the State expended substantial effort to establish that appellant's dog, Shaka, was in the backyard at the time Belinda was murdered. This fact would support the State's contention that the burglary was staged because Shaka was ferocious and would not have allowed a burglar to access the back door. Appellant testified that he placed Shaka in the garage before leaving for the park. Although several of the State's witnesses testified they never saw the dog in appellant's garage, photographs taken by police on the night of the murder clearly show a dog blanket and bowls in the garage on the left side of Belinda's SUV. Further, several witnesses testified they did not hear Shaka barking on the afternoon of Belinda's murder, which is just as consistent with Shaka being in the garage as it is with no burglar entering the backyard.

Angela Vielma was the only witness who saw appellant enter the garage upon his return from Home Depot. She testified that she did not see a dog in the garage. Nevertheless, Vielma also testified she did not see another car in the garage and that, if there had been, she would not have been able to see what was on the other side of the car. Because it is undisputed Belinda's SUV was in the garage and Shaka's blanket and bowls were on the other side of the SUV, no rational jury could credit Vielma's testimony that there was no dog in the garage. The only evidence arguably supporting a finding that Shaka was in the backyard came from Detective Leithner, who testified appellant was unresponsive and irritated when asked how a burglar could have avoided Shaka. Nevertheless, the evidence is sufficient to support appellant's conviction without a finding that Shaka was in the backyard.

house in September 1999 and he had his arm around a "thin, blonde-haired woman ... in a red dress." Natalie explained that she attempted to talk to appellant, but he looked away. Kenneth testified he learned six months after Belinda's death that appellant was dating Heather. Kevin and his wife testified that they were very upset when they learned appellant was dating Heather and did not speak to him for several months. Appellant and Heather married in June 2001.

Third, appellant confronted Quinton and Tammy regarding their statements to the police and to a grand jury in April 1999. After testifying before the grand jury, they received a telephone call from appellant. When Tammy answered, appellant asked her what she had told the grand jury. Tammy responded, "We're not supposed to talk about this." When appellant posed the same question to Quinton, he responded, "I told the truth." Later, appellant asked Quinton what he was telling the grand jury and the police. When Quinton answered, "I'm just telling them the truth," appellant replied, "You know, you need to keep your mouth shut." Afterwards, Quinton was driving on I–10 when he noticed appellant following him. When they came to a stop, appellant exited his truck, approached Quinton, and asked, "What are you saying to the police?" Again, Quinton responded, "I'm just telling the truth," and appellant ordered, "You keep your damn mouth shut." Similarly, appellant followed Tammy one evening when she was driving to her place of business. When Tammy noticed appellant, she sped to the business, grabbed her gun, and ran inside. Appellant pulled in front of the business but did not stop. These three examples of appellant's behavior following Belinda's death are circumstances indicating guilt.

Appellant argues that no evidence supports a finding that he ever owned a 12–gauge shotgun, owned a reloader or reloaded double-ought shotgun shells, or handled a weapon on the day of the shooting. At trial, appellant and his family testified regarding the shotguns they owned during the 1980s. They were adamant Darren and Kevin owned 12–gauge shotguns but appellant owned only a 20–gauge shotgun. Kevin testified that in 1983 or 1984, the barrel on appellant's 20–gauge became clogged and split when it was fired, injuring appellant. Kevin testified that he later sawed off the split barrel and eventually discarded the gun.

 Clint Stockdick was Kevin's best friend during the 1980s. He testified that he began hunting with the Temples in 1984 or 1985, frequently hunted with Kevin, and hunted with appellant "[j]ust a couple of times." Clint testified that he never saw the Temples use 20–gauge shells, both Kevin and appellant used 12–gauge shotguns, Clint never saw either of them shoot a 20–gauge shotgun, and Kevin showed Clint a 12–gauge shotgun with a split barrel. Additionally, Clint testified that the gun he saw Kevin use most frequently was a Mossberg 12–gauge shotgun; Kevin, however, testified that the Temples never owned a Mossberg shotgun. Although this evidence did not tie appellant to a specific murder weapon, when viewed in the light most favorable to the verdict, it supported an inference appellant and his family were concealing information concerning their shotguns. Concealing incriminating evidence is a circumstance of guilt. *See, e.g., Wells v. State,* 578 S.W.2d 118, 119 (Tex.Crim.App.1979); *Tezino v. State,* 765 S.W.2d 482, 485 (Tex.App.-Houston [1st Dist.] 1988, pet. ref'd). Furthermore, although no evidence supported a finding that any member of the Temple family used double-ought buckshot or re-

loaded his own shotgun shells, the State need not connect appellant to a specific murder weapon or ammunition; a conviction may be based entirely on circumstantial evidence. *See Hooper,* 214 S.W.3d at 13.

In sum, viewing the evidence in the light most favorable to the verdict, we conclude the evidence is legally and factually sufficient to support beyond a reasonable doubt that appellant murdered Belinda. *See Brooks,* 323 S.W.3d at 898–900 (plurality op.). The evidence supports a finding that appellant had motive and opportunity to murder Belinda, lied about the reason he was driving north of I–10 on the afternoon of the murder and about placing E.T. in a car seat, had a questionable demeanor immediately following Belinda's death, quickly resumed his relationship with Heather following Belinda's death, confronted Quinton and Tammy regarding their statements to police and the grand jury, appellant's house was "staged" to appear as if a burglary had occurred, and appellant and his family were untruthful regarding their shotguns. "While each piece of evidence lacked strength in isolation, the consistency of the evidence and the reasonable inferences drawn therefrom, provide the girders to strengthen the evidence and support a rational jury's finding the elements beyond a reasonable doubt." *Swearingen v. State,* 101 S.W.3d 89, 97 (Tex.Crim.App.2003). Accordingly, we overrule appellant's first and second issues.

### III. Alleged *Brady* Violation

▮ In his third issue, appellant contends his due-process rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were violated because the State did not disclose exculpatory evidence regarding his next-door neighbor, teenager R.J.S., until after trial had begun.

Additionally, in issue four, appellant contends the trial court erred by denying his motion for continuance in which he sought a reasonable time to utilize the untimely disclosed *Brady* material.

▮ A *Brady* complaint must be made as soon as its grounds become apparent or should be apparent. *See Wilson v. State,* 7 S.W.3d 136, 146 (Tex.Crim.App.1999); *see also* Tex.R.App. P. 33.1(a)(1).

Appellant asserted that he first learned of the undisclosed evidence regarding R.J.S. on October 22, 2007, a week into trial, when Detective Leithner testified and appellant was first allowed to review Detective Leithner's police report. However, appellant waited twenty-one days to file a motion for continuance—after the State rested and appellant had presented evidence for four days. We hold that appellant did not complain regarding the State's untimely disclosure as soon as grounds for an objection or complaint were apparent. Consequently, appellant did not preserve his *Brady* complaint. *See Wilson,* 7 S.W.3d at 146.

▮ Nevertheless, even assuming appellant preserved his *Brady* complaint, we conclude he has not established reversible error. Under *Brady,* a defendant must show (1) the State failed to disclose evidence, regardless of the prosecution's good or bad faith, (2) the withheld evidence is favorable to the defendant, and (3) the evidence is material, i.e., there is a reasonable probability had the evidence been disclosed, the outcome of the trial would have been different. *Hampton v. State,* 86 S.W.3d 603, 612 (Tex.Crim.App. 2002). The defendant bears the burden of showing that, in light of all the evidence, it is reasonably probable the outcome of the trial would have been different had the prosecutor made a timely disclosure. *Id.* The mere possibility that an item of undisclosed information might have helped the

defense or affected the outcome of the trial does not establish materiality in the constitutional sense. *Id.*

In January 1999, R.J.S. was a high school student who lived with his parents next door to the Temples. In his motion for continuance, appellant complained that the State failed to timely disclose the following facts: (1) R.J.S. lied about skipping school on the day Belinda was murdered; (2) R.J.S. gave three conflicting statements to the police and failed three polygraphs; (3) R.J.S. and his friends were in appellant's neighborhood around the time of the murder, had smoked marijuana that afternoon, and were looking for more marijuana; (4) R.J.S. saw appellant driving in the neighborhood sometime before 4:30; and (5) a 12–gauge shotgun containing a spent double-ought buckshot shell and belonging to R.J.S.'s father was found after the murder. With the exception of R.J.S.'s polygraph failures, the remainder of these facts were presented to the jury. During redirect-examination, defense counsel asked appellant whether he believed R.J.S. could have been involved in Belinda's murder. Through a methodical series of questions emphasizing the above facts, appellant answered affirmatively. The State called R.J.S. as its sole rebuttal witness, and appellant thoroughly cross-examined him regarding these facts. Further, during closing argument, appellant focused on R.J.S.'s alleged participation. Therefore, the jury considered the aforementioned untimely disclosed facts. Considering the heavy emphasis he placed on R.J.S. during trial, appellant has not established that there is a reasonable probability the outcome of the trial would have been different had the State disclosed these facts earlier. *See Shpikula v. State,* 68 S.W.3d 212, 220 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd) ("If the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might or should have been."). Accordingly, we overrule appellant's third and fourth issues.

## IV. EVIDENTIARY AND JURY-ARGUMENT RULINGS

Appellant presents seventy-five issues in which he complains about the trial court's rulings and the prosecutors' alleged misconduct during the evidentiary and jury-argument phases of trial. We first determine whether the court's rulings were erroneous. We then determine the cumulative effect of any errors on the jury's verdict. We begin with those issues pertaining to admission of evidence.

### A. Evidentiary Rulings

■ We review a trial court's decision to admit evidence under an abuse-of-discretion standard. *Shuffield v. State,* 189 S.W.3d 782, 793 (Tex.Crim.App.2006). Under this standard, if the trial court's ruling was within the zone of reasonable disagreement, we will not disturb the ruling. *Bigon v. State,* 252 S.W.3d 360, 367 (Tex.Crim.App.2008).

■ To preserve error for appellate review, a defendant must timely object to the error during trial. *See* Tex.R.App. P. 33.1(a). If the objection is overruled, the defendant has preserved error. When the objection is sustained, and the defendant desires to preserve argument that the error incurably infected his right to a fair trial, he should request an instruction to disregard and move for a mistrial. *See Jackson v. State,* 287 S.W.3d 346, 353–54 (Tex.App.-Houston [14th Dist.] 2009, no pet.). Failure to request additional relief after an objection is sustained preserves nothing for review. *See Caron v. State,* 162 S.W.3d 614, 617 (Tex.App.-Houston [14th Dist.] 2005, no pet.).

Several issues pertain to the prosecutor's cross-examination of appellant. The parameters of cross-examination are within the trial court's discretion, and its decision is not subject to reversal on appeal absent a clear abuse of discretion. *Chambers v. State*, 866 S.W.2d 9, 27 (Tex.Crim.App.1993). A defendant who exercises his right to testify is subject to the same rules governing examination and cross-examination as any other witness. *Felder v. State*, 848 S.W.2d 85, 99 (Tex. Crim.App.1992). The scope of cross-examination is wide open, and once the defendant testifies at trial, he opens himself up to questioning by the prosecutor on any subject matter that is relevant. *Caron*, 162 S.W.3d at 617.

### 1. Questions Regarding Witness Veracity

In issues five, seven, nine, eleven, and thirteen, appellant contends the trial court erred by allowing the prosecutor to question appellant regarding the veracity of other witnesses' testimony.[4] We first describe the testimony about which appellant was asked to comment.

Tammy testified she heard appellant call Belinda "fat," criticize her clothing, house work, and how she raised E.T., and express that her family was "crazy, white trash, fat, and ... he didn't ever want her or [E.T.] around them." Quinton testified he heard appellant call Belinda fat and that appellant told him Belinda used to be an aerobics instructor and "looked good" but "[n]ow she's fat." Tammy also testified she witnessed between twenty and thirty times Belinda's routine when returning home and that Belinda would remove her shoes when she arrived home.

Brenda Lucas visited the Temples from December 27, 1998, until January 1, 1999. Brenda testified that appellant "was making fun of Belinda's big butt" during the first evening of the visit. On December 30, Brenda and Belinda celebrated their thirtieth birthday. Brenda testified she did not see appellant give Belinda a birthday gift. Brenda further testified that, during her visits to the Temples' home, she observed Belinda remove her shoes when she arrived home.

Appellant vehemently denied ever calling Belinda "fat" or making derogatory statements about her family. Appellant explained that he and Belinda jokingly referred to her "butt," but "for no stretch of the imagination would I ever seriously call my wife fat ever, without a doubt." He testified that he gave Belinda perfume and pajamas for her birthday, as well as gifts for Christmas and their anniversary. Finally, he testified that Belinda did not take her shoes off when she arrived home.

On the first day of appellant's cross-examination, the prosecutor asked appellant whether Tammy "just made all that up" regarding his ridiculing Belinda's weight. The trial court overruled appellant's objection to the form of the question, and appellant answered, "I know she made it up." Cross-examination continued the next day, and the following exchanges occurred:

4. In issues six, eight, ten, twelve, and fourteen, appellant contends that the State's questions relative to witness veracity abrogated his due-process rights. When objecting to these questions, appellant did not object on the basis that the questions violated his due-process rights. Thus, appellant has waived his due-process complaints. *See* Tex.R.App. P. 33.1 (general rule is that party must make timely and specific objection at trial to preserve issue for appellate review); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex.Crim.App. 1995) ("[E]ven constitutional errors may be waived by failure to object at trial."); *Boulware v. State*, 542 S.W.2d 677, 682 (Tex.Crim. App.1976) (same). Accordingly, we overrule appellant's sixth, eighth, tenth, twelfth, and fourteenth issues.

[Prosecutor:] So did Brenda try to mislead this jury when she told them that she never saw you give her sister a birthday present?

[Defense Counsel:] Object to the form of the question.

[Court:] That's sustained.

[Prosecutor:] Did Brenda lie?

[Defense Counsel:] And I object to the form of the question.

[Court:] That's overruled.

[Defense Counsel:] It's asking one witness to comment on ... the truth of the testimony of another.

[Court:] That's overruled.

[Prosecutor:] Mr. Temple, did Brenda lie?

[Appellant:] Yes ma'am, she did.

. . . .

[Prosecutor:] Well, do you recall Quinton Harlan telling the truth and admitting to this jury that he went over to Heather's house and kissed her?

[Defense Counsel:] I object to the form of the question, telling the truth and admitting to something.

[Court:] That's sustained.

[Prosecutor:] Do you remember Quinton Harlan telling this jury that he went over to Heather's house and kissed her?

[Appellant:] I remember that, and Quinton told me that himself. I knew that.

[Prosecutor:] And so he told the truth?

[Defense Counsel:] I object to the form of the question.

[Court:] That's overruled.

[Appellant:] On that statement, yes, ma'am.

[Prosecutor:] Are you saying he lied on other ones, Mr. Temple?

[Defense Counsel:] I object to asking the witness to use the term "lied." There are many reasons for incorrect testimony.

[Court:] That's overruled.

[Prosecutor:] Are you saying that Quinton Harlan lied on anything, Mr. Temple?

[Appellant:] If you could ask me single-by-single, I could tell you which ones are truth and which ones are not. Him kissing Heather, I know for a fact that that happened and he told me about it himself.

. . . .

[Prosecutor:] And the things that Tammy Harlan told this jury the names that you used to call your wife, making fun of her weight, making fun of how she looked, those things were the truth, weren't they?

[Appellant:] They were not. I answered that question yesterday.

[Prosecutor:] So Tammy Harlan lied about that?

[Defense counsel:] I object to terming it a lie.

[Court:] That's overruled.

[Appellant:] Tammy and Quinton both lied several times.

[Prosecutor:] So we've got Tammy lying, Quinton lying, Brenda Lucas lying, right?

[Appellant:] I would agree with that, yes.

. . . .

[Prosecutor:] And you had a wife who liked to take her shoes off the minute she hit the door anyway, didn't you?

[Appellant:] I would not agree with that.

[Prosecutor:] So when Brenda Lucas and Tammy Harlan said that, they lied about that, too?

[Defense counsel:] Excuse me. I object to the form of the question.

[Court:] And that's overruled.

[Appellant:] I don't know if that's what they think they saw.... I'm not calling them a liar about that. I know and spent every day with my wife. I know that when she came in the door, she would not flip her shoes off.

It is well-settled that an attorney may not impeach one witness's testimony with the testimony of other witnesses. *See Lopez v. State,* 200 S.W.3d 246, 257 (Tex. App.-Houston [14th Dist.] 2006, pet. ref'd) (citing *Ex parte McFarland,* 163 S.W.3d 743, 755 n. 37 (Tex.Crim.App.2005)). Thus, we hold that the trial court erred by overruling appellant's objection to the prosecutor's veracity questions and will consider this error in our harm analysis.

### 2. Appellant's Cross–Examination

In issues fifteen through twenty-four, appellant contends the State asked him irrelevant and inflammatory questions in an attempt to demonize him in front of the jury. Appellant argues that these questions abrogated his right to a fair trial.

■ During cross-examination, the prosecutor asked appellant whether the reason the Harlans "stopped being you all's best friends was because Tammy Harlan got tired of the way you were treating Belinda?" The prosecutor also asked appellant how the second night of his high school reunion could have been a "wonderful night" when Tammy "had to tell Belinda afterwards 'It's okay, Belinda. You're a beautiful girl. Don't let all that bother you.'" The trial court sustained appellant's objection to these questions, but appellant did not request an instruction to disregard or move for a mistrial. Thus, the trial court committed no error because it granted appellant all the relief he requested. *See Young v. State,* 137 S.W.3d 65, 69 (Tex.Crim.App.2004). We overrule appellant's fifteenth and sixteenth issues.

■ In issues seventeen and eighteen, appellant complains about the prosecutor's questions regarding his unborn daughter. On direct-examination, appellant testified that he loved his unborn daughter and "wanted her more than anything." On cross-examination, the prosecutor asked appellant whether he and Belinda argued regarding his not wanting a daughter.

[Prosecutor:] And you all had many, many arguments about the fact that you didn't want a baby daughter, didn't you, Mr. Temple?

[Defense counsel:] That's a lie and I object to it and it's improper. There's no evidence to support that.

[Court:] That's sustained.

[Prosecutor:] Didn't you have arguments about that, Mr. Temple?

[Appellant:] Absolutely not.

[Prosecutor:] Didn't you argue about the fact that you were not excited about the idea of a baby daughter when Brenda Lucas was visiting at your house?

[Defense counsel:] This is improper cross-examination, injecting facts.

[Court:] That's overruled.

[Appellant:] I never argued with my wife about not wanting my daughter. It was planned from the very beginning and the first day.

Appellant did not request that the jury be instructed to disregard the prosecutor's initial question after the trial court sustained his objection and did not object when the prosecutor ignored the court's ruling. However, appellant preserved his complaint regarding the prosecutor's question concerning appellant's argument with Belinda when Brenda was visiting.

■ "[T]he prosecution cannot attempt to establish a theory of appellant's action by questions alone, with no basis of fact." *Hartman v. State,* 507 S.W.2d 553, 556 (Tex.Crim.App.1974); *see also Keener*

*v. State,* 164 Tex.Crim. 439, 442, 300 S.W.2d 85, 87(1957) ("[U]nless the questions are propounded in good faith, the attorneys for the State should refrain from attempting to establish their theory by [questions] alone."). Prior to appellant's testimony, no evidence had been presented indicating that appellant did not want his daughter. Nevertheless, the trial court had informed the parties: "I'm going to assume both of you lawyers are asking your questions in good faith until someone tells me otherwise." During the hearing on appellant's motion for new trial, defense counsel questioned the prosecutor regarding her basis for these questions.[5] The prosecutor testified that she received information from members of the Temple family and Belinda's girlfriends that the Temples argued about their unborn daughter; the prosecutor was not asked whether Brenda was included in this group. Consequently, we cannot discern from the record whether the prosecutor asked the subject question without a basis in fact. *See Hartman,* 507 S.W.2d at 556; *Keener,* 300 S.W.2d at 87.[6] We also note that appellant opened the door by testifying on direct-examination that he wanted his daughter

"more than anything." Accordingly, we overrule appellant's seventeenth and eighteenth issues.

 In issue twenty,[7] appellant complains about the following question:

> [Prosecutor:] [Y]ou didn't give a flip about the Lucases, did you?
>
> [Defense counsel:] I object to the form of the question and injecting unsworn testimony from the prosecutor.
>
> [Court:] That's overruled.

After the objection was overruled, appellant did not answer, and the prosecutor posed a different question. There was testimony that appellant called Belinda's family (the Lucases) "crazy, white trash, fat, and ... he didn't ever want her or [E.T.] around them." Thus, there was an evidentiary basis for this question. Furthermore, whether the form of this question was actually argumentative may have turned on the prosecutor's tone and demeanor when she asked it. Nevertheless, we will assume *arguendo* that the question was argumentative and consider its effects in our harm analysis.

---

5. Perhaps the best way for defense counsel to preserve this type of issue would be to request to take the prosecutor on voir dire at the time the question is posed in order to reveal the factual basis for the question. *Cf. Cavender v. State,* 547 S.W.2d 601, 603 (Tex.Crim.App. 1977) (explaining that trial court held hearing to determine good-faith basis for prosecutor's question); *Gailey v. State,* 671 S.W.2d 123, 124 (Tex.App.-Houston [1st Dist.] 1984, pet. ref'd) (explaining that trial court held hearing outside jury's presence after prosecutor asked question allegedly in bad faith). The proper time to challenge the basis for a question is before or when the question is asked.

6. In *Cavender,* 547 S.W.2d at 602–03, the prosecutor admitted that the factual basis for her questions stemmed from a string of hearsay statements. The Court of Criminal Appeals held this factual basis was "bottomed

on hearsay several times removed, far too tenuous to justify the question." *Id.* Here, based on the prosecutor's explanation at the new trial hearing, it is possible Belinda told Brenda she and appellant were arguing about their daughter. We do not believe this information would be too tenuous a basis for the prosecutor's question.

7. In his nineteenth issue, appellant contends this question abrogated his right to a fair trial. Assuming he is arguing this question violated his due-process rights, we overrule issue nineteen; appellant did not object on the basis of due-process violation and it was not apparent from the context that appellant was objecting because this question abrogated his right to a fair trial. *See* Tex.R.App. P. 33.1(a)(1)(A); *Broxton,* 909 S.W.2d at 918; *Boulware,* 542 S.W.2d at 682.

In his twentieth and twenty-first issues, appellant complains that the following exchange abrogated his right to a fair trial, necessitating a mistrial:

[Prosecutor:] Who have you ever told that Shaka was in the garage and that's how the burglar got past him?

[Defense counsel:] Is she asking what he said to me. I want to know what she's trying to—

[Court:] That's overruled.

[Prosecutor:] Mr. Temple, you just said you have. Well, who have you told?

[Appellant:] I've told [Defense counsel]. It was not something that was dreamed up.

[Prosecutor:] *No, it's just lied about.*

[Defense counsel:] Excuse me. Now that's—Judge, you've got to stop that kind of stuff.

[Court:] Members of the jury, remember your admonitions. Step to your jury room for a moment, please.

(Outside presence of the jury)

[Court:] All right. Everyone be seated. [Prosecutor], that last question was uncalled for. We cannot have that type of conduct.

[Prosecutor:] Yes, sir. Could you please instruct the witness to answer my questions.

[Court:] I will do that also.

[Defense counsel:] Now—

[Court:] Now just a minute, [Defense counsel]. Mr. Temple, I want you to listen to the questions that each lawyer asks you, answer the question, answer it directly. Most of them can be answered yes or no. You don't volunteer any additional information, but listen to the questions and answer them. Now, [Defense counsel].

[Defense counsel:] Judge, that last question by [Prosecutor] cannot be attributed to lack of experience, it can't be attributed to ignorance, it can't be attributed to negligence. She is one of the finest prosecutors in the state, and that was calculated, it's improper, it goes beyond the record, it is highly inflammatory, and we object to it.

[Court:] Well, your objection was sustained, and I will certainly admonish the jury that they can't consider it in any way.

[Defense counsel:] Yes, sir. And I don't think any admonishment—with all due respect, I don't think any admonishment can cure the harm. What we have is a prosecutor, who holds the office of assistant district attorney, making a statement about a lie in front of this jury. Now, the jury may put far more weight on that than it is due, far more than it deserves. It deserves absolutely no weight at all. She can holler and scream in argument, but it is improper and clearly improper and she knows better to do that in a cross-examination; and, therefore, we move for a mistrial.

[Court:] Okay. And that's denied, sir.

[Defense counsel:] Do I need to do all that in front of the jury?

[Court:] No. The record has you exactly—your motion, and it can go up on appeal on that issue. Bring me the jury and I will admonish them to totally disregard.

(Jury seated)

[Court:] All right. Everyone be seated. Members of the jury, the last question by [the prosecutor] you will totally disregard and not consider it for any purpose whatsoever.

(emphasis added).

Accordingly, the prosecutor accused appellant of being a liar, not indirectly through a question, but as a matter-of-fact assertion. This action was clearly prosecutorial misconduct. *See Stein v. State,* 492

S.W.2d 548, 551 (Tex.Crim.App.1973) (explaining prosecutors should not make improper arguments or sidebar remarks because defendant should be convicted upon evidence presented, without attempts to inflame or prejudice the minds of the jurors). The trial court sustained appellant's objection and instructed the jury to disregard the comment, but denied appellant's request for a mistrial. We will consider in our harm analysis whether the court erred by denying mistrial.

■ Appellant testified that, on January 13, 1999, he and his father and brothers convened a family meeting at appellant's parents' house, during which appellant informed his family that he had been unfaithful to Belinda. In his twenty-third issue, appellant complains that the following questions were without factual basis:

[Prosecutor:] [W]as the real discussion in the family meeting about all those shotguns, Mr. Temple?

[Defense counsel:] You know, that's bad faith. There's no—

[Court:] That's overruled.

[Defense counsel:] We object to it. It's injecting unsworn testimony from the prosecutor.

[Prosecutor:] Judge, that's a speaking objection.

[Court:] That's overruled.

[Prosecutor:] We've got a Winchester, a Mossberg, a Savage and a Remington. In your family meeting that you had with your brothers, with the Temple men, on January the 13th, did you all talk about those shotguns?

[Appellant:] Absolutely not. There was no reason to.

[Prosecutor:] Did you all talk about the sawed-off shotgun?

[Appellant:] There's—no.

Prior to these questions, nothing in the record reflected that the Temple men discussed shotguns at their January 13, 1999 meeting. Instead, all evidence indicated the subject matter of the meeting concerned appellant's unfaithfulness to Belinda. However, appellant has not established that the questions were asked in bad faith without factual basis. At the time the questions were posed, he did not request to take the prosecutor on voir dire. Further, at the motion-for-new-trial hearing, the prosecutor was not asked if she had a factual basis for making this inquiry. Hence, we cannot determine from the record whether the prosecutor asked the question in bad faith without a basis in fact. *See Keener,* 300 S.W.2d at 87; *Gailey,* 671 S.W.2d at 124. We overrule appellant's twenty-third issue.

■ In issue twenty-four, appellant argues the trial court erred by denying his motion for mistrial after the prosecutor expressed that appellant's entire family stopped speaking with him after the murder. Kevin and Rebecca "Becky" Temple testified that there was a period following Belinda's murder when they did not speak with appellant. Later, the prosecutor posed the following question to appellant:

[Prosecutor:] Why did your own family quit speaking to you?

[Defense counsel:] Now, wait a minute.

[Court:] That's sustained.

[Prosecutor:] You heard—

[Defense counsel:] Please, Judge, please control her.

[Prosecutor:] Judge—

[Court:] Members of the jury, remember your admonitions. Step to your jury room for a moment.

(Outside presence of the jury)

[Court:] [Prosecutor], you're going to have to refrain from continuing to ask legally objectionable questions. You can

ask that question, did you and your family stop speaking, and then go into the why, but you're interjecting things into the case that just aren't in evidence.

[Prosecutor:] Judge, Becky Temple testified that there came a time where she and her husband quit speaking to the defendant and Heather. That's in evidence.

[Court:] Your question was the family. If you want to talk about Becky Temple, you can do that, but your question said the family.

[Prosecutor:] Yes, sir.

[Court:] Bring me a jury.

[Defense counsel:] I ask that the jury be instructed to disregard.

[Court:] I will.

[Defense counsel:] And because it was deliberate, we ask for a mistrial.

[Court:] That's denied. Bring me a jury, please.

(Jury seated)

[Court:] Members of the jury, you will totally disregard the last question of the prosecutor and not consider it for any purpose whatsoever.

Thus, the trial court sustained appellant's objection to the prosecutor's overly broad reference to his entire family, instructed the jury to disregard the question, but denied appellant's motion for mistrial. We conclude the foregoing question was not so "clearly calculated to inflame the minds of the jury" that the instruction to disregard was futile. *Huffman v. State,* 746 S.W.2d 212, 219 (Tex.Crim.App.1988) (quoting *Carter v. State,* 614 S.W.2d 821, 824–25 (Tex.Crim.App.1981)). Although the prosecutor referred to matters outside

the record when she asked appellant why his entire family, instead of just Kevin and Rebecca, stopped speaking to him following Belinda's murder, the error was quickly remedied by the court's instruction to disregard and we presume the jury followed the instruction. *See Colburn v. State,* 966 S.W.2d 511, 520 (Tex.Crim.App. 1998). Thus, we conclude the trial court did not abuse its discretion by denying appellant's motion for mistrial *See Archie v. State,* 221 S.W.3d 695, 699 (Tex.Crim. App.2007). We overrule appellant's twenty-fourth issue.

**3. Hearsay–by–Inference Contentions**

We next consider issues sixty-eight through eighty, in which appellant contends the trial court erred by overruling his objections to certain "back-door" hearsay.[8]

"[W]here there is an inescapable conclusion that a piece of evidence is being offered to prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly." *Schaffer v. State,* 777 S.W.2d 111, 114 (Tex.Crim.App.1989). Whether the disputed testimony violates the hearsay prohibition necessarily turns on how strongly the content of the out-of-court statement can be inferred from context. *Head v. State,* 4 S.W.3d 258, 261–62 (Tex. Crim.App.1999).

In his sixty-ninth and seventy-first issues, appellant argues the trial court erred by allowing Detective Leithner to testify regarding statements made by Heather Scott.

---

**8.** In issues sixty-eight, seventy, seventy-two, seventy-four, seventy-six, seventy-eight, and eighty, appellant contends his due-process rights were abrogated by the hearsay statements. However, appellant did not object at

trial on the basis of violation of due process. *See* Tex.R.App. P. 33.1; *Broxton,* 909 S.W.2d at 918; *Boulware,* 542 S.W.2d at 682. Accordingly, we overrule these issues.

[Prosecutor:] When you were interviewing Heather Scott the day you took her first statement, did she have any other concerns about all of this that she voiced to you? Yes or no?

[Defense counsel:] Excuse me. This calls for hearsay.

[Court:] That's overruled.

[Sgt. Leithner:] Yes.

[Prosecutor:] Did you try to reassure her?

[Sgt. Leithner:] Yes.

[Prosecutor:] What did you tell Heather Scott?

[Defense counsel:] Well, that's hearsay by implication.

[Court:] That's overruled.

[Sgt. Leithner:] I told her that we were not going to disclose this information with her employers.

[Prosecutor:] With who?

[Sgt. Leithner:] Her employers.

[Prosecutor:] At the school?

[Sgt. Leithner:] Yes, ma'am.

[Prosecutor:] Because she worked there?

[Sgt. Leithner:] Because she worked at the same school that Coach Temple did.

Assuming the trial court erred by overruling appellant's objection, we conclude that this testimony did not substantially affect the jury's verdict; notwithstanding the accusations against appellant, the jury could have determined there were other obvious reasons why Heather would not want her employers to learn about her extra-marital relationship with appellant. Thus, we overrule appellant's sixty-ninth and seventy-first issues.

 In his seventy-third issue, appellant complains about Tammy Harlan's testimony:

[Prosecutor:] Did you ever have discussions and conversations with Belinda about that difference or change [in her demeanor] you observed [when she was in the appellant's presence]?

[Tammy Harlan:] Yes.

[Prosecutor:] Did you ever say anything to her about that?

[Tammy Harlan:] Yes.

[Defense counsel:] Again, I am going to object because this is obviously hearsay by implication.

[Court:] That's overruled.

[Prosecutor:] You understand, because we have talked about this, you are not allowed to tell this jury anything Belinda ever said to you. You understand that?

[Tammy Harlan:] I do, yes, ma'am.

[Prosecutor:] And you're not going to try and slip that in in one of my questions or one of his, are you?

[Tammy Harlan:] No, ma'am.

[Prosecutor:] You understand the rules?

[Tammy Harlan:] Yes.

[Prosecutor:] What did you say to Belinda in those discussions about the change in personality you saw in her from when she was with her husband versus when she was not?

[Defense counsel:] And that necessarily implicates a response and we object to it. It's hearsay by implication.

[Court:] Overruled.

[Tammy Harlan:] I would tell her to stand up to him and to tell him how she felt and don't allow him to treat her that way.

The above exchange does not lead us to an inescapable conclusion that this question was asked in an effort to prove the truth of hearsay statements. *See Schaffer,* 777 S.W.2d at 114. Immediately before the question, Tammy testified that Belinda was uncharacteristically submissive when she was in appellant's presence. The trial court could have reasonably determined

the purpose of this question was simply to inquire whether Tammy ever brought Belinda's behavior change to her attention or offered her advice. Furthermore, Tammy later testified that appellant ridiculed Belinda's appearance, house work, and child-drearing. Tammy also expressed, "[W]e would be in the middle of a game and he would snap at her and say things to her and I would always say, [']Stand up. Tell him stand up for yourself.[']" We conclude that this testimony rendered harmless any hearsay violation. *See Anderson v. State,* 717 S.W.2d 622, 628 (Tex.Crim. App.1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove."). We overrule appellant's seventy-third issue.

■ In issues seventy-five and seventy-seven, appellant complains about Tammy's testimony regarding appellant's class reunion. First, the prosecutor asked Tammy whether she advised Belinda regarding the reunion:

[Prosecutor:] I want to change gears with you just a little bit, Ms. Harlan. Do you recall in the summer of 1998 having a conversation with Belinda Temple about David Temple's class reunion?

[Tammy Harlan:] Yes.

[Prosecutor:] Did you give some advice to Belinda Temple in regards to the class reunion?

[Tammy Harlan:] Yes.

[Prosecutor:] What did you tell Belinda?

[Defense counsel:] That necessarily implies the other party's conversation. It's hearsay by implication.

[Court:] That's overruled.

[Tammy Harlan:] I told her that yes, she was going to go to the reunion and that I would keep [E.T.] and that she needed

to go get a dress and that she needed to be there.

The same evidence was earlier admitted without objection when Quinton testified that Belinda did not attend the first night of the reunion and appellant did not want her to attend the second night. Hence, any error was rendered harmless. *See Anderson,* 717 S.W.2d at 628. We overrule appellant's seventy-fifth issue.

The Prosecutor then asked Tammy the following question:

[Prosecutor:] Tell the jury what you told Belinda after the high school reunion.

[Defense counsel:] That will be hearsay by implication.

[Court:] That's overruled.

[Tammy Harlan:] I told her that she was an incredible woman and beautiful and to not let what happened there—

[Defense counsel:] Excuse me.

[Court:] Now, that's sustained.

The trial court sustained appellant's objection, but appellant did not request an instruction to disregard or move for a mistrial. Thus, the trial court committed no error because it granted appellant all the relief he requested. *See Young,* 137 S.W.3d at 69. We overrule appellant's seventy-seventh issue.

■ In his seventy-ninth issue, appellant argues the prosecutor injected hearsay when she asked Rebecca Temple whether she remembered a period when appellant and Belinda discussed divorce.

[Prosecutor:] Do you remember the time in 1998 when David and Belinda started talking about getting a divorce?

[Defense counsel:] Well, that's not true. In the first place, it's not true.

[Prosecutor:] Judge, he's arguing.

[Defense counsel:] In the second place, it calls for hearsay.

[Prosecutor:] An objection is a one-word response to you, Your Honor.

[Court:] Do you have an objection?

[Defense counsel:] I do. I object.

[Court:] Okay. What grounds?

[Defense counsel:] I object because it's injecting false statements into the record that there's no basis for. If it had been true, the only way she would know about it is hearsay.

[Prosecutor:] Judge, that's a speaking objection.

[Court:] That's overruled.

[Prosecutor:] Do you remember that, Ms. Temple?

[Rebecca Temple:] Could you repeat the question?

[Prosecutor:] Yes, ma'am. Do you remember in 1998 when David and Belinda started speaking about getting a divorce?

[Rebecca Temple:] No.

The prosecutor asked Rebecca whether she remembered when appellant *and Belinda* discussed divorce, necessarily inquiring about Belinda's statements; thus, the prosecutor sought an answer implying hearsay. *See Head*, 4 S.W.3d 258. Nevertheless, no hearsay was presented because Rebecca answered, "No." The prosecutor later asked appellant, without objection, whether he and Belinda ever "had discussions and arguments about getting divorced...." Appellant replied, "No ma'am, not at all." Finally, during jury argument, the State did not make any reference to discussions between appellant and Belinda regarding divorce.[9] Accordingly, we conclude the prosecutor's improper question was harmless. We overrule appellant's seventy-ninth issue.

## B. Jury Argument

In his twenty-fifth through sixty-seventh issues, appellant argues that the trial court erred by overruling his objections to the State's jury argument and the State engaged in prosecutorial misconduct during argument. According to appellant, the improper argument included (1) injecting unsupported facts, (2) lessening the burden of proof, (3) commenting on witnesses' credibility, and (4) accusing the Temple family of perjury.

 The purpose of closing argument is to facilitate the jury's analysis of evidence presented at trial to arrive at a just and reasonable conclusion based on the evidence alone and not on facts that were not admitted into evidence. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim.App. [Panel Op.] 1980). The four permissible areas of jury argument are (1) summation of the evidence, (2) reasonable deductions drawn from the evidence, (3) answer to opposing counsel's argument, and (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim.App.2008). The State is allowed wide latitude in drawing inferences from the evidence as long as the inferences drawn are reasonable and offered in good faith. *Cantu v. State*, 939 S.W.2d 627, 633 (Tex.Crim.App.1997). A prosecutor may argue her opinion concerning issues in the case so long as the opinion is based on the evidence in the record and does not constitute unsworn testimony. *McKay v. State*, 707 S.W.2d 23, 37 (Tex.Crim.App.1985).

 Even when a jury argument exceeds these approved areas, it will not constitute reversible error unless the argu-

---

**9.** We note the prosecutor admitted during the motion-for-new-trial hearing that her basis for this question was "someone told [her] Belinda said they had discussed divorce." Hence, this question was not without factual basis but was, as appellant suspected, based on hearsay.

ment is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex.Crim.App.2000). When reviewing alleged error in allowing improper jury argument, the appellate court must analyze the statement in light of the entire argument and not on isolated sentences. *DeLarue v. State*, 102 S.W.3d 388, 405 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd). Error in allowing improper argument is generally non-constitutional error that must be disregarded unless it affects the defendant's substantial rights. *See* Tex.R.App. P. 44.2(b); *Brown*, 270 S.W.3d at 572.

 To complain on appeal about an improper jury argument, a defendant must object at trial and pursue his objection to an adverse ruling. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex.Crim.App. 1996); *Johnson v. State*, 233 S.W.3d 109, 114 (Tex.App.-Houston [14th Dist.] 2007, no pet.). A defendant must object each time an improper argument is made, or he waives his complaint, regardless of how egregious the argument. *See Valdez v. State*, 2 S.W.3d 518, 521–22 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd); *Wilson v. State*, 179 S.W.3d 240, 249 (Tex. App.-Texarkana 2005, no pet.). In examining challenges to jury argument, we consider a prosecutor's remark in the context in which it appears. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex.Crim.App.1988).

**1. Unsupported–Argument Contentions**

 Appellant contends that the prosecutor persistently injected facts out-

side the record during argument in an attempt to vilify appellant. In his twenty-sixth issue, appellant argues the trial court erred by overruling his objection to the prosecutor's reference to certain inadmissible hearsay statements.[10]

> [Prosecutor:] And you got a small glimpse into their marriage. You got a small glimpse, because, see, Belinda's not here to tell you, is she? And the rules of evidence prohibit Belinda's girlfriends from telling you anything Belinda ever told them. That's the way—
>
> [Defense counsel:] Excuse me. That's implying that there's other evidence, and we object to it. That the evidence is what it is.
>
> [Court:] And that's overruled.
>
> [Prosecutor:] That's the way the rules work.

 We agree with appellant that this argument improperly referred the jury to evidence outside the record, namely, that Belinda's friends had information about appellant and Belinda's marriage. Argument that attempts to introduce matters not in the record is clearly improper. *See Berryhill v. State*, 501 S.W.2d 86, 87 (Tex. Crim.App.1973). Argument inviting the jury to speculate about possible evidence that is not in the record is even more dangerous because "it leaves to the imagination of each juror whatever extraneous 'facts' may be needed to support the conviction." *Id.* Here, "[t]he argument of the prosecutor entered the impermissible area of conveying to the jury that there was evidence of guilt other than that which was before the jury." *Boyde v. State*, 513

---

10. In his twenty-fifth issue, appellant contends the prosecutor committed misconduct by making this argument. Because appellant did not object on the basis of prosecutorial misconduct, he has not preserved this issue. *See Hajjar v. State*, 176 S.W.3d 554, 566 (Tex. App.-Houston [1st Dist.] 2004, pet. ref'd) (recognizing prosecutorial misconduct is an independent basis for objection that must be specifically urged in order for error to be preserved). We overrule issue twenty-five.

S.W.2d 588, 591 (Tex.Crim.App.1974). Accordingly, the trial court erred by overruling appellant's objection, and we will consider this error in our harm analysis.

In his twenty-seventh issue, appellant contends the prosecutor engaged in misconduct by arguing that appellant never took E.T. to the park on the day of the murder. However, the following evidence supports a reasonable inference that appellant did not take E.T. to the park.

- E.T. was retrieved from school around noon because he was sick with a fever, and appellant testified that he bathed E.T. shortly before Belinda arrived home.
- According to appellant, he and E.T. traveled in rapid succession from Cimarron Park to Brookshire Brothers to Home Depot and back to his house, but never went to Peckham Park.
- Bernard Bindeman testified he saw appellant driving south from an area near appellant's parents' house, which was inconsistent with appellant's testimony that he went directly to Home Depot after leaving Brookshire Brothers.
- Officer Leithner testified, "So I basically just asked him if he can identify [the parks he went to] and he initially said Peckham County Park, I guess, but it wasn't long, within seconds, he changed that and said, [']No, it was, I think, [Cimarron] Park,['] which is a neighborhood park in his subdivision."
- Detective Schmidt testified that officers went to both parks with a photograph of appellant's truck, but nobody remembered seeing the truck on Monday.

Accordingly, we conclude the State's argument was reasonably deduced from the evidence. We overrule appellant's twenty-seventh issue.

In his twenty-eighth and twenty-ninth issues, appellant contends the trial court erred by allowing the prosecutor to argue that appellant's expert, Max Courtney, opined none of the recovered shotguns was the murder weapon.

[Prosecutor:] Max Courtney, their own expert, agrees that of the five shotguns that were recovered, not one of them had blood or tissue on the shotguns. Not one.

[Defense counsel:] Wait a minute. I object to that. That's not his testimony. He didn't examine the shotguns for that.

[Court:] That's overruled.

[Prosecutor:] Dean Holtke testified only yesterday, the same thing, the shotguns, no blood, no tissue. There is no blood or tissue. Max Courtney talked about one of the defense exhibits, the shell that was found in this weapon right here, and I had—I said to him, "Is that shell consistent with the wadding we found?" He said "No." He examined 37 separate shells related to all different types of cases, and I asked him "Did you find any shell, any of the waddings, any of the shells that you cut open that matched the wadding in this case?" And he said "No. It did not." The fact is, their own expert has agreed that none of the weapons recovered come back to anything about a murder weapon. Where is the murder weapon?

[Defense counsel:] That's not correct.

[Court:] That's overruled.

During the presentation of evidence, Courtney agreed that, "[i]n every single one of the shotguns that we've talked about for the last four-and-a-half weeks, there was no blood or no glass found in any of those shotguns." Thus, the prosecutor's argument—that none of the shotguns stands out as the murder weapon—was based on the evidence. We overrule

appellant's twenty-eighth and twenty-ninth issues.

In his thirtieth and thirty-first issues, appellant contends the trial court erred by allowing the prosecutor to argue that appellant's family made a conscious decision to forgive him for murdering his wife.

> [Prosecutor:] The Temple family, what's really going on here, you figured it out, if you use your common sense, like Craig said, that you never check at the door when you become a juror. What's going on here is that family has decided they have the right to grant absolution to this defendant.
>
> [Defense counsel:] Excuse me. That's an assertion of fact not based on evidence. We object to it.
>
> [Court:] That's overruled, sir.

Immediately following the court's ruling, the prosecutor explained what she meant by "grant absolution."

> [Prosecutor:] That family has decided that in their mind they're going to overlook, forgive, forget and deny that he executed his pregnant wife because he might be a good father to [E.T.], and they're going to forget about it and they're going to lie about it and they want you to do the same thing. The problem with that is, it overlooks the truth and it denies justice to Belinda and [her unborn daughter].

Appellant did not object to this argument. Nor did appellant object when the prosecutor argued, "And why did [the Temple family] deny everything? You know why. Because that family knows him and that family knows what happened" and "[the Temple family] had already committed to their lies and their

story back [in April 1999, when they testified before the grand jury]." Because appellant failed to object each time the prosecutor argued that the Temple family conspired to lie on his behalf, appellant has waived any error. *See Valdez*, 2 S.W.3d at 521–22. We overrule appellant's thirtieth and thirty-first issues.

In his thirty-second and thirty-third issues, appellant contends the trial court erred by overruling his objection to the prosecutor's argument that he hid the murder weapon.

> [Prosecutor:] You knew from the get-go in this case that there were going to be problems and you've heard all the problems. Do we have the murder weapon ? No. Did we ever try to hide that from you? No. Why don't we have the murder weapon? Because he got rid of it.
>
> [Defense counsel:] Now, that's—that's not a reasonable deduction from the evidence. It is an assertion of fact.
>
> [Court:] That's overruled.
>
> [Defense counsel:] It's improper.
>
> [Court:] That's overruled.

The following syllogism illustrates how this argument was reasonably deduced from the evidence: a) appellant killed Belinda by shooting her with a shotgun [11]; b) no shotgun was identified as the murder weapon; therefore, c) appellant "got rid of" the murder weapon. We overrule appellant's thirty-second and thirty-third issues.

In his thirty-fourth and thirty-fifth issues, appellant contends the trial court erred by allowing the prosecutor to argue the jury should not underestimate appellant's ability to have committed the murder.

---

11. At least the evidence, taken as a whole and viewed in the light most favorable to the ver-

dict, is sufficient to support such a finding.

[Prosecutor:] [I]f you think David Temple is not capable of it, you underestimate him.

[Defense counsel:] Object to that. That's beyond the record.

[Court:] That's sustained.

[Defense counsel:] Assertion of fact.

[Court:] That's sustained.

[Defense counsel:] And ask the jury to disregard the last statement.

[Court:] The jury will disregard the last statement and not consider it for any purpose.

[Defense counsel:] And that's improper argument and we move for a mistrial.

[Court:] That's denied.

Arguing that appellant was capable of murdering his wife was not so "clearly calculated to inflame the minds of the jury . . . as to suggest the impermissibility of withdrawing the impression produced." *See Huffman,* 746 S.W.2d at 219 (quoting *Carter,* 614 S.W.2d at 824–25). Accordingly, we presume the jury adhered to the trial court's instruction, *see Colburn,* 966 S.W.2d at 520, and conclude the trial court did not abuse its discretion in denying appellant's motion for mistrial. *See Archie,* 221 S.W.3d at 699. We overrule appellant's thirty-fourth and thirty-fifth issues.

■ In his thirty-sixth issue, appellant contends the prosecutor engaged in misconduct by speculating that Belinda did not want to spend every holiday with appellant's family. Appellant's objection was sustained, and the trial court instructed the jury to disregard, but appellant did not move for a mistrial. Thus, the trial court committed no error because it granted appellant all the relief he requested. *See Young,* 137 S.W.3d at 69. We overrule appellant's thirty-sixth issue.

■ In his thirty-seventh and thirty-eighth issues, appellant contends the trial court erred by allowing the prosecutor to argue that appellant was the "stud" of Katy High School and SFA.

[Prosecutor:] Mr. Temple told you he was difficult to discipline at a young age. Using your common sense, you know he was the stud of Katy High School and he went on to be the stud of Stephen F. Austin University.

[Defense counsel:] Excuse me. I object to that language and to that assertion. That's not in the record. We ask that she stay in the record.

[Court:] That's overruled.

Multiple witnesses testified that appellant was a standout football player both in high school and in college. For example, when asked about appellant's football career at SFA, appellant's father testified, "He was a true asset to the team and received a lot of publicity." Accordingly, notwithstanding the colloquialism, arguing that appellant was the "stud" of high school and college was a reasonable deduction from the evidence. We overrule appellant's thirty-seventh and thirty-eighth issues.

■ In issues thirty-nine through forty-two, appellant contends the trial court erred by overruling his objections to the prosecutor's arguments that appellant treated Belinda poorly when others were not around.

[Prosecutor:] And that second night when he took her to the reunion, what did Tammy Harlan tell you she told Belinda after that second night? "It's okay, Belinda. You're a beautiful lady. Don't let it bother you." How do you think he treated Belinda when Tammy and Quinton weren't around?

[Defense counsel:] Now that's an assertion of fact. It's not based on the evidence. We object to that.

[Court:] And that's overruled.

[Prosecutor:] Why do you think Tammy Harlan, when they began out—started out being best friends with David and Belinda grew to dislike David Temple so much? He didn't do anything to Tammy. He didn't do anything to Quinton. It was how he saw—she saw how he treated Belinda. Do you think Tammy Harlan got up there and made up that David Temple called the Lucases white trash? And if he could call Belinda's family white trash in front of Tammy and Quinton, what do you think he said about the Lucases to Belinda when they were home alone and what do you think that did to her self-esteem? And, more importantly, what does that—

[Defense counsel:] There's no evidence of that.

[Court:] That's overruled.

[Prosecutor:] What does that say about how he really felt about Belinda?

■ Rhetorical questions are generally within the scope of jury argument as long as they are based upon a reasonable deduction from the evidence. *See Wolfe v. State,* 917 S.W.2d 270, 280 (Tex.Crim.App. 1996). It was reasonable for the prosecutor to infer that if appellant derided Belinda and her family when others were present, he did so to a greater extent when he and Belinda were alone; Quinton testified that appellant boasted he was "in control" of his house. Furthermore, the prosecutor's statement that appellant's comments affected Belinda's self-esteem was also a reasonable deduction from the evidence; Tammy testified that when Belinda was in appellant's presence she "was submissive and meek and wasn't the person that she exhibited to be around me." We overrule

appellant's thirty-ninth through forty-second issues.

■ In his forty-third and forty-fourth issues, appellant contends the trial court erred by allowing the prosecutor to argue that appellant was under "a lot of pressure."

[Prosecutor:] Heather Scott also told you back at that time in her life she craved attention. Her words, not mine. So where all do you think the sources of pressure were coming from on David Temple? A little bit from Heather, a lot from Belinda, a new baby was coming, arguments in the household. There was a lot of pressure on David Temple.

[Defense counsel:] Excuse me. That's beyond the record. There's no evidence of that.

[Court:] That's sustained.

[Defense counsel:] Ask that the jury disregard it.

[Court:] The jury will disregard that last portion and not consider it for any purpose.

[Defense counsel:] Judge, that's the kind of assertion of fact that's improper and we move for a mistrial.

[Court:] That's denied.

[Defense counsel:] Under *Berger v. United States.*

[Court:] That's denied.

The argument that appellant was under "a lot of pressure" had evidentiary support; there was evidence appellant was struggling with an extra-marital relationship weeks before his daughter would be born and that he had told Quinton Harlan he was not sure if he was willing to leave his wife in order to continue this extra-marital relationship. Furthermore, even if erroneous, this argument was not so egregious that it could not have been disregarded by the jury. *See Huffman,* 746 S.W.2d at 219 (quoting *Carter,* 614 S.W.2d

at 824–25). Accordingly, the trial court did not abuse its discretion by denying appellant's motion for mistrial. *See Archie*, 221 S.W.3d at 699. We overrule appellant's forty-third and forty-fourth issues.

■ Appellant next contends that the prosecutor engaged in misconduct by arguing that Shaka always barked and jumped against the fence whenever someone walked past appellant's house. However, several witnesses' testimony supported this argument. We overrule appellant's forty-fifth issue.

■ In his forty-sixth through forty-ninth issues, appellant contends the trial court erred by allowing the prosecutor to argue that appellant failed to let Shaka in the house and closed the door behind him when he thought a burglar was in the house.

[Prosecutor:] Why didn't he take anything inside with him? If he ran across to get help from Ruggiero and to drop [E.T.] off, why didn't he take anything in there with him? Nothing from the garage, not Mike Ruggiero and not the dog. The dog, who was their protective watch dog, who was there to protect, the one chance he had to do something, David Temple didn't let him in the house. The little things tell you the truth.

[Defense counsel:] Excuse me. There's no such evidence, Judge. I object to that.

[Court:] And that's overruled.

[Defense counsel:] An assertion without basis of evidence.

[Court:] That's overruled.

[Prosecutor:] And why did David Temple close the door to the house if he thought a burglar might be inside? Wouldn't you leave the door wide open

in case there's somebody inside? But David Temple shut the door.

[Defense counsel:] No. Judge, that's not the evidence.

[Prosecutor:] It is the evidence.

[Defense counsel:] The evidence of Ruggiero—

[Court:] That's overruled.

We conclude that both of these arguments were reasonably deduced from the evidence. It is undisputed that Shaka remained in the backyard when appellant entered his house. Further, Mike Ruggiero testified that, although the back door could have shut because it "bounced off of something," the door slammed shut and he did not hear the sound of glass breaking, shattering, or tinkling. Thus, we overrule appellant's forty-sixth through forty-ninth issues.

■ In his fiftieth issue, appellant contends that the prosecutor engaged in misconduct by explaining why and how burglaries are committed. Because appellant did not object on the basis of prosecutorial misconduct, he has not preserved these issues. *See Hajjar*, 176 S.W.3d at 566. Nevertheless, we would overrule this issue even if preserved. The prosecutor merely made the following common-sense statements about burglaries: (1) persons commit burglaries to steal; (2) burglars act quickly so they do not "get caught"; and (3) burglars "take everything they possibly can that's valuable." *See Wright v. State*, 178 S.W.3d 905, 932 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd) (holding that appeals to common knowledge during jury argument are not improper). We overrule appellant's fiftieth issue.

■ In his fifty-second issue, appellant contends the trial court erred by overruling his objection to the prosecutor's argument that appellant removed his jewelry

and washed his hands after killing Belinda.[12]

[Prosecutor:] Why is that jewelry in that tray? That jewelry is in that tray because when David Temple got finished firing that shotgun in the back of Belinda's head, he had some blood on his hands and he washed his hands and he took all of his jewelry off.

[Defense counsel:] There's no evidence of that, Judge.

[Court:] That's overruled.

[Defense counsel:] We object to that. That's pure assertion of fact.

[Court:] That's overruled, sir.

The State presented evidence appellant's jewelry was found in a tray, and damp towels were found in the bathroom. However, this evidence, without more, did not support a reasonable inference that appellant washed Belinda's blood from his hands; thus, the prosecutor's argument was merely speculative. We hold that the trial court erred by overruling appellant's objection and will consider the effect of this error in our harm analysis.

■■■ Finally, in issues fifty-three and fifty-four, appellant contends the trial court erred by allowing the prosecutor to argue that E.T. was either in the backyard or garage when Belinda arrived home shortly before her murder.

[Prosecutor:] But you do know that when she got home that day, [E.T.] was not in the house. He was probably in the garage or in the backyard. And as soon as—

[Defense counsel:] There's no such evidence like that.

[Court:] That's overruled.

[Prosecutor:] [E.T.] didn't hear anything.

[Defense counsel:] There's no such evidence like that.

[Prosecutor:] [E.T.] didn't hear anything, Judge.

[Court:] Overruled.

The prosecutor did not assert as fact that E.T. was in the garage or the backyard. Instead, her point was that E.T. was not in the house at the time of the murder. The State and appellant stipulated that the doctors who interviewed E.T. following the murder "found no evidence that [E.T.] had been a witness to the murder," and this stipulation was presented to the jury. It was therefore reasonable to argue that E.T. neither saw nor heard the fatal gunshot. However, it was also reasonable to argue E.T. must have been nearby because no evidence indicated that E.T. was with someone other than Belinda or appellant from the time Belinda arrived home from school until appellant arrived home from Home Depot. Consequently, the prosecutor did not stray from the record by arguing that E.T. was not in the house but probably in the backyard or garage at the time of Belinda's murder. We overrule appellant's fifty-third and fifty-forth issues.

**2. Argument Regarding Burden of Proof**

■■■ In issues fifty-five through fifty-seven, appellant contends the following arguments from the State invited the jury to convict him on less than "beyond a reasonable doubt":

[Prosecutor:] When you all got picked to be put on this jury a month ago .... [, we] talked about the fact that problems

---

12. In issue fifty-one, appellant contends the prosecutor committed misconduct by making this argument. Because appellant did not object on the basis of prosecutorial misconduct, he has not preserved this issue. *See Hajjar*, 176 S.W.3d at 566. We overrule issue fifty-one.

come up with cold cases. That's why they become cold.

[Defense counsel:] Excuse me. I object to that. That's also improper argument.

[Court:] And that's overruled.

[Defense counsel:] Comparing other cases, Your Honor.

[Court:] That's overruled.

[Prosecutor:] And your common sense tells you that if a case becomes cold, it's not going to be a case with overwhelming evidence. That's pretty common sense and basic, and we agreed and you're on this jury because you told me that you understand that there will never be a case where every single one of your questions is answered. That would be impossible.

[Defense counsel:] Excuse me. That's asking the jury to disregard the burden of proof being beyond a reasonable doubt.

[Court:] That's overruled, sir.

. . . .

[Prosecutor:] What is the burden of proof? What is beyond a reasonable doubt ? If you believe after hearing all this evidence for five weeks with your heart and your gut and your mind that David Temple is guilty of the murder of Belinda Temple, what more could we ask you to do?

[Defense counsel:] Excuse me. That lowers the burden of proof beyond a reasonable doubt.

[Court:] That's overruled.

First, the prosecutor's statements that "cold cases" do not have overwhelming evidence of guilt and there are no cases where every question is answered were simply appeals to common sense. *See Wright*, 178 S.W.3d at 932.

■■■ Second, assuming the prosecutor's statement that "beyond a reasonable

doubt" should be determined by "your heart and your gut" was improper, the error was waived because the State had previously made substantially the same argument without objection. *See Greenwood v. State*, 740 S.W.2d 857, 860 (Tex.App.-Dallas 1987, no pet.) ("There is no reversible error where the same . . . argument is presented elsewhere during trial without objection."). Accordingly, we overrule appellant's fifty-fifth through fifty-seventh issues.

### 3. Argument Regarding Witness Credibility

■■■ In his fifty-eighth through sixty-third issues, appellant contends the trial court erred by allowing the State to vouch for its witnesses' credibility during jury argument. In issues fifty-eight and fifty-nine, appellant argues the prosecutor improperly bolstered Detective Holtke's credibility by arguing he did not lie about the absence of a car seat in appellant's truck. However, appellant waived any error because he did not object to this argument. *See* Tex.R.App. P. 33.1(a); *Valdez*, 2 S.W.3d at 521–22. We overrule appellant's fifty-eighth and fifty-ninth issues.

■■■ In his sixtieth and sixty-first issues, appellant complains about the following:

[Prosecutor:] [Y]ou need to appreciate that for nine years these men [law-enforcement personnel] sitting right here have known all those little details, all of them, for nine years, and for nine years these people right here have been waiting for a courtroom to be an open forum where all this evidence—

[Defense counsel:] I object to the inflammatory argument.

[Court:] That's overruled.

[Defense counsel:] And going outside the record, Your Honor.

[Court:] That is overruled.

[Prosecutor:] They've been waiting nine years to have a jury like you sitting in a box to finally be told all the little details of the truth, and that's why I need to say them all to you all today.

■ We disagree that the prosecutor's first statement was inflammatory. It was undisputed that many detectives and officers from several branches of law enforcement had been investigating Belinda's murder since 1999. The prosecutor later argued without objection, "There is no such thing as a perfect investigation. You already know that. They already know that. They tried their hardest for the last nine years in this case." Moreover, appellant waived any complaint regarding the prosecutor's argument that the investigating officers wanted the jury to "be told all the little details of the truth" because he failed to object. *See* Tex.R.App. P. 33.1(a); *Valdez*, 2 S.W.3d at 521–22. We overrule appellant's sixtieth and sixty-first issues.

■ In his sixty-second and sixty-third issues, appellant argues the prosecutor engaged in misconduct by improperly vouching for Clint Stockdick's credibility.

[Prosecutor:] What did Clint Stockdick tell you, circumstantial evidence that he is? They never even had a 20–gauge. There was never a yellow hull shot around the Temples. They were all 12 gauges. Clint Stockdick has more honor in his little finger than that family has in the whole mess of them.
[Defense counsel:] Excuse me. I object to that. That's—that's inflammatory.
[Court:] That's overruled.

Although Clint's and the Temple family members' testimony regarding shotguns contradicted at points, this argument was unnecessarily exaggerated. Because great importance is placed on convicting the accused based on the evidence and not on emotion, we agree that the trial court erred in overruling appellant's objection. *See Stein*, 492 S.W.2d at 551–52. We will consider the effects of this error in our harm analysis.

### 4. Accusing Temple Family of Perjury

■ Finally, in his sixty-fourth and sixty-fifth issues, appellant contends the prosecutor engaged in inflammatory argument by asserting that the whole Temple family committed aggravated perjury.

[Prosecutor:] Because no matter how much you try to deceive and manipulate and lie, nobody can do it perfectly. That's why circumstantial evidence, all the little things that go together and tell the story are what the truth is. And when you have a family like the Temple family who pretend to be the paragon of Katy, Texas, and they get up here—one, two, three, four, five of them—and they make a mockery of the criminal justice system and they commit more aggravated perjury in this trial than this building has heard in a decade.
[Defense counsel:] Excuse me, Judge. That's an inflammatory, improper argument.
[Court:] That's overruled, sir.

■ We hold that the trial court erred by overruling appellant's objection to the prosecutor's argument. Although there was evidence supporting an inference that the Temple family witnesses conspired to lie to protect appellant, arguing that the Temple family committed "more aggravated perjury in this trial than this building has heard in a decade" was a theatrical statement intended to inflame the jury. "[We] reassert the critical importance of convicting an accused only upon that evidence presented, without attempting to inflame or prejudice the minds of the jurors." *Id.; see also Elliott v. State*, 117 Tex.Crim. 180, 182, 36 S.W.2d

513, 514(1931) ("Complaint is made of some remarks of counsel for the state . . . that some of the witnesses for the appellant had perjured themselves, which remarks should have been withdrawn at the request of the appellant."). Thus, we will consider this error in our harm analysis.[13]

## C. Harm Analysis

Having determined that the trial court committed several errors, we now consider the *cumulative effect* of these errors. *See Stahl v. State*, 749 S.W.2d 826, 832 (Tex.Crim.App.1988); *Martin v. State*, 151 S.W.3d 236, 242 (Tex.App.-Texarkana 2004, pet. ref'd); *Harris v. State*, 56 S.W.3d 52, 59 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). We will not consider the effect of any waived errors. *Cf. Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex.Crim.App.1999) ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error.").

### 1. Standard of Review

We review the trial court's erroneous evidentiary and jury-argument rulings for harm under rule 44.2(b) of the Texas Rules of Appellate Procedure. Tex. R.App. P. 44.2(b). We must disregard non-constitutional errors that do not affect a criminal defendant's "substantial rights." *Id.* We may not reverse for non-constitutional errors if, after examining the record as a whole, we have fair assurance that the errors did not have a substantial and injurious effect or influence in determining the jury's verdict, or had but a slight effect. *Casey v. State*, 215 S.W.3d 870, 885 (Tex. Crim.App.2007); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

Stated differently, if we have "a grave doubt" that the result was free from the substantial influence of the error, we must treat the error accordingly. *Burnett v. State*, 88 S.W.3d 633, 637–38 (Tex.Crim. App.2002) (citation omitted). "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* (citation omitted).

In assessing the likelihood that a jury's decision was adversely affected by the errors, we consider everything in the record, including any testimony or physical evidence admitted, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App.2002). We may also consider statements made during voir dire, jury instructions, the State's theory, any defensive theories, closing argument, and whether the State emphasized the errors. *Id.* at 355–56. We are also cognizant that a trial court's overruling of a defendant's objections puts a "stamp of approval" on the prosecutor's improper cross-examination or jury argument, increasing the risk of harm. *See Lee v. State*, 971 S.W.2d 130, 131 (Tex.App.-Houston [14th Dist.] 1998, pet. ref'd).

### 2. Analysis

As determined *supra*, the trial court erroneously allowed the prosecutor to ask appellant several improper questions and to make improper jury argument. Although these errors were pre-

---

**13.** In issues sixty-six and sixty-seven, appellant complains that the prosecutor accused the family of conspiring to commit perjury; appellant did not object to this argument. Despite appellant's contention that an objection would have been futile because the trial court had just overruled the prosecutor's argument that the Temple family committed aggravated perjury, we conclude he waived any error by failing to object. *See Valdez*, 2 S.W.3d at 521–22. Thus, we overrule issues sixty-six and sixty-seven.

cipitated by overzealous prosecution, we conclude that, in light of the whole record, they did not have a substantial and injurious effect or influence in determining the jury's verdict.

We begin by considering the nature and amount of evidence presented by both sides. There was no eyewitness, DNA, or other physical evidence directly connecting appellant to Belinda's murder. Nonetheless, despite the absence of direct evidence, the circumstantial evidence presented was not negligible.

- Appellant was involved in an extramarital affair with Heather, had left his pregnant wife and son during the New Year's holiday to spend two nights with Heather, and resumed his relationship with Heather a relatively short time after Belinda's death, including sending Valentine's Day flowers a month later.
- There was evidence supporting a finding that appellant criticized Belinda's weight, housekeeping, and childrearing, and that he detested Belinda's family.
- There was evidence supporting a finding that the burglary was staged.
- There was evidence supporting a finding that the Temple family conspired to protect appellant, including concealing truth about the family's shotguns and appellant's affair.
- Appellant's explanation for his trip to Brookshire Brothers and then eastward to Home Depot was refuted by the length of time it took him to enter Home Depot after leaving Brookshire Brothers and Bernard Bindeman's testimony that he saw appellant heading south from an area near appellant's parents' house.
- Appellant's behavior and demeanor immediately following Belinda's death.
- Appellant's untruthfulness regarding taking E.T. to a park and placing E.T. in a child seat.
- Testimony from Quinton and Tammy that, following Belinda's death, appellant aggressively confronted them regarding their statements to the police and grand jury, even following them in his truck.

When viewed in total, the circumstantial evidence supports a finding that appellant had a motive for killing Belinda and attempted to conceal facts by staging a burglary and lying. We cannot conclude the prosecutor's speculative argument that the tray holding appellant's jewelry indicates he washed Belinda's blood from his hands was significant enough to substantially affect the jury's verdict. Moreover, the prosecutor's exaggerated question "[Y]ou didn't give a flip about the Lucases, did you?" merely emphasized evidence already before the jury and did not affect whether the jury believed Tammy and Quinton (who testified that appellant derided Belinda and her family) or appellant's family (who testified appellant never disparaged Belinda's family).

Appellant contends the prosecutor injected harmful and unsupported evidence by arguing that Belinda's girlfriends were prevented by rule from revealing what Belinda had told them about her marriage. Appellant relies on *Fant–Caughman v. State*, in which the Amarillo Court of Appeals reversed the defendant's aggravated sexual-assault conviction because of the prosecutor's improper jury argument. 61 S.W.3d 25 (Tex.App.-Amarillo 2001, pet. ref'd). We believe this case is distinguishable. In *Fant–Caughman*, the complainant was a thirteen-year-old girl who was allegedly sexually-assaulted by the defendant. *Id.* at 27. The court of appeals concluded the prosecutor's argument that "I could have been here with witnesses for

**614**

several more days, because there are a lot of people who know about these allegations" had a substantial effect on the jury's verdict. *Id.* at 32. Because the credibility of a minor who claims sexual assault is always a significant issue in such cases, allowing the prosecutor to inject this unsupported testimony, not subject to cross-examination, unfairly bolstered the victim's outcry.

Here, the question of whether appellant and Belinda had a strong marriage, although important, was quite different. There was an undisputed fact that strongly inferred appellant and Belinda were having marital difficulties: appellant was involved in an extra-marital affair while Belinda was pregnant. Additionally, Tammy and Quinton testified that appellant ridiculed Belinda, was controlling, and was unsure if he was willing to leave Belinda for Heather. Moreover, most of the witnesses who testified that appellant and Belinda appeared to have a happy marriage were Temple family members or persons not as familiar with the Temples as the Harlans. In light of this evidence, we hold that the prosecutor's reference to information possibly possessed by Belinda's girlfriends did not substantially affect whether the jury believed appellant and Belinda had marital problems.

We acknowledge there was some evidence supporting an inference that R.J.S. was involved in Belinda's murder, most significantly that a 12–gauge H & R shotgun owned by R.J.S.'s father was recovered and contained a spent, reloaded double-ought buckshot shell (a shell was never recovered at the crime scene). However, R.J.S. testified that, shortly before Belinda's murder, he and several friends went to a field to shoot shotguns, and he brought the H & R shotgun and reloaded double-ought buckshot shells. Based on this testimony, the jury could have dismissed the H & R shotgun as the murder weapon. Further, the jury could have also concluded that the motive evidence relative to R.J.S. (Belinda confronted his parents several times regarding his non-attendance at school and pranking her house) paled in comparison to the motive evidence implicating appellant. Moreover, the jury could directly evaluate the testimony of appellant and R.J.S. because both testified. Succinctly, based on the evidence, the jury could have reasonably concluded R.J.S. was not the murderer.

We also recognize that, if the jury believed the three Roberts brothers' testimony that they heard a shotgun blast around the time appellant was at Brookshire Brothers, it could have substantially affected whether the jury had a reasonable doubt regarding appellant's culpability. However, none of the errors substantially affected the credibility of the Roberts brothers' testimony.

Admittedly, witness credibility was crucial because of the lack of direct evidence. Several of the prosecutor's improper questions and comments pertained to the truthfulness of appellant and his family. The prosecutor was persistent in asking appellant to comment on witnesses' veracity. She also overzealously argued that the Temples were perjurers. Further, the prosecutor called appellant a liar during cross-examination, after which the trial court instructed the jury to disregard the comment but denied appellant's motion for a mistrial. Nevertheless, considering these improprieties in light of the whole record, we conclude they did not substantially influence the jury or require a mistrial.

Appellant argues that "he was repeatedly asked to comment on the veracity of other witnesses [, giving the jury] a choice to believe Appellant or believe that he was a liar and therefore a murderer." He

relies primarily on *United States v. Geston,* in which the Ninth Circuit Court of Appeals concluded that similar questioning was prosecutorial misconduct impacting the defendant's due-process rights and resulting in reversible error because "witness credibility was paramount." 299 F.3d 1130, 1137 (9th Cir.2002).

Under Texas precedent, however, improper veracity questions are generally held harmless because they merely emphasize the obvious: that the defendant disagrees with the State's witnesses' factual assertions. *See, e.g., Streff v. State,* 890 S.W.2d 815, 820–21 (Tex.App.-Eastland 1994, pet. ref'd) (holding error caused by State's improper veracity question was harmless because there was contradicting testimony). In *Creech v. State,* the Court of Criminal Appeals agreed that the prosecutor's question regarding whether the arresting officer was lying was improper, but concluded that such error was harmless because "[w]hen the appellant said that the officer was lying, he was merely saying that his version of the affair was correct and that of the officer incorrect. We see nothing in such answer which would tend to bring him into disrepute with the jury." 168 Tex.Crim. 422, 424, 329 S.W.2d 290, 291 (1959); *see also McKinney v. State,* 491 S.W.2d 404, 408 (Tex.Crim.App.1973) (concluding error caused by State's improper veracity questions was not reversible); *Mason v. State,* 449 S.W.2d 47, 49 (Tex.Crim.App.1970) (same); *Ayala v. State,* 171 Tex.Crim. 687, 689, 352 S.W.2d 955, 956 (1962) (same); *Salcido v. State,* 170 Tex.Crim. 572, 574, 342 S.W.2d 760, 761 (1961) (per curiam) (same). By denying that he ever made derogatory statements regarding Belinda's appearance or family, appellant necessarily implied that Tammy, Quinton, and Brenda were lying.

The prosecutor's questions, albeit improper, served primarily to stress contradictions in the testimony.

Similarly, we conclude that the prosecutor's inflammatory arguments that the Temple family committed "more aggravated perjury in this trial than this building has heard in a decade" and "Clint Stockdick has more honor in his little finger than [the Temple] family has in the whole mess of them," did not substantially influence the jury. The prosecutor aggressively cross-examined the Temple witnesses regarding inconsistencies between their trial and grand-jury testimonies. For example, despite the meeting on January 13, 1999 at which appellant informed his family that he had been unfaithful to Belinda, at the April 1999 grand jury hearings, appellant's brothers and mother denied knowledge of an affair. At trial, appellant's brothers explained that they did not lie to the grand jury because they believe "affair" means long-term unfaithfulness. In fact, although they testified they were devastated by appellant's revelations at the family meeting, appellant's brothers testified that they were not sure what appellant's unfaithfulness entailed, including whether he engaged in sexual infidelity. These types of semantic prevarications, along with the Temple witnesses' testimony that appellant had a wonderful marriage and never owned a 12–gauge shotgun despite evidence to the contrary, supported an inference that the Temples conspired to misrepresent the truth in order to protect appellant.

By arguing that members of the Temple family were aggravated perjurers, the prosecutor did not inject unsupported and harmful facts,[14] comment on appellant's

---

14. *See Jackson v. State,* 17 S.W.3d 664, 673–74 (Tex.Crim.App.2000) ("To constitute reversible error, the argument must be mani-

failure to testify,[15] or attack appellant over the shoulders of defense counsel,[16] but suggested a reasonable inference from the evidence, albeit in an inflammatory manner. These statements were not pleas for the jurors to abandon objectivity and convict appellant based on their emotions. *See Torres v. State*, 92 S.W.3d 911, 920 (Tex. App.-Houston [14th Dist.] 2002, pet. ref'd) (citing *Brandley v. State*, 691 S.W.2d 699, 712 (Tex.Crim.App.1985)). Furthermore, before making these statements, the prosecutor argued without objection:

> [Y]ou heard no less than five Temples tell you the loving relationship. The perfect marriage. No problems. Everything was just fine. . . . The truth is in what was being said that is untrue. It's a false picture, a false light that's being given to you.

The prosecutor later argued without objection:

> [Prosecutor:] That family has decided that in their mind they're going to overlook, forgive, forget and deny that he executed his pregnant wife because he might be a good father to [E.T.], and they're going to forget about it and they're going to lie about it and they want you to do the same thing. The problem with that is, it overlooks the truth and it denies justice to Belinda and [her unborn daughter].

> . . . .

> [Prosecutor:] And to the grand jury it wasn't about little inconsistencies and it wasn't about a time lapse of nine years. It was about a—a deliberate, collaborative, conspiratorial lie the Temple family told, trying to say David Temple never had a 12–gauge shotgun, and the story they dreamed up to justify the only one he ever had was about the day he got hurt when mud got stuck in the barrel. They didn't get their injuries consistent way back then to the grand jury, and it was only because of Clint Stockdick coming forward and talking about the reality of the shotguns in the Temple family that we know for sure that they're liars.

Hence, the prosecutor made several proper arguments regarding the Temple family's deceitfulness that were supported by the evidence. Accordingly, it is unlikely the prosecutor's inflammatory arguments substantially influenced the jury.

■ Finally, we consider whether the trial court erred by denying appellant's motion for mistrial when the prosecutor commented, "No, it's just lied about." The prosecutor uttered this statement after appellant testified that his assertion Shaka was in the garage at the time of the murder was "not something that was dreamed up." The trial court instructed the jury to disregard but denied appellant's motion for mistrial.

festly improper or *inject new, harmful facts into the case.*" (emphasis added)).

**15.** *See Bustamante v. State*, 48 S.W.3d 761, 764 (Tex.Crim.App.2001) ("Neither the trial judge nor the prosecutor can comment on the failure of an accused to testify. Such a comment violates the privilege against self-incrimination and the freedom from being compelled to testify contained in the Fifth Amendment of the United States Constitution and Article I, § 10, of the Texas Constitution." (citations omitted)).

**16.** *See Davis v. State*, 329 S.W.3d 798, 821 (Tex.Crim.App.2010) ("We have consistently held that argument that strikes at a defendant over the shoulders of defense counsel is improper."); *Cockrell*, 933 S.W.2d at 101 ("For many years this Court has recognized prosecutor's arguments which personally attack defense counsel are manifestly improper because they serve to inflame the minds of the jury to the accused's prejudice.").

A mistrial is the trial court's remedy for improper conduct that is so prejudicial that expenditure of further time and expense would be wasteful and futile. *Ocon v. State,* 284 S.W.3d 880, 884 (Tex.Crim.App.2009). The standard of review for the denial of a motion for mistrial is abuse of discretion. *Archie,* 221 S.W.3d at 699. The reviewing court should uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.* (citing *Wead v. State,* 129 S.W.3d 126, 129 (Tex.Crim.App.2004)).[17]

Whether a mistrial should have been granted involves most, if not all, of the considerations that attend a harm analysis. *Id.* at 700. Therefore, a reviewing court balances the three factors first enunciated in *Mosley v. State,* 983 S.W.2d 249, 259 (Tex.Crim.App.1998):(1) the severity of the misconduct (the magnitude of the prejudicial effect of the prosecutor's remarks); (2) the measures adopted to cure the misconduct (the efficacy of any cautionary instruction by the trial judge); and (3) the certainty of conviction absent the misconduct (the strength of the evidence supporting the conviction). *Id.*

We recognize a prosecutor's sidebar comment that the defendant or a witness is a liar may be incurable error. *See Wright v. State,* 112 Tex.Crim. 214, 215–16, 16 S.W.2d 126, 127 (1929) (reversing because, after defendant objected to prosecutor's asking major defense witness if he had robbed a gas station, prosecutor responded, "I want to show that he is not only a liar but also a thief"); *Roberts v.*

*State,* 107 Tex.Crim. 139, 146–48, 295 S.W. 609, 613 (1927) (op. on reh'g) (reversing, despite instruction to disregard and apology from prosecutor, because prosecutor called defendant a "damn liar" when defendant testified he had previously told the prosecutor that the victim had a gun, a conversation about which the prosecutor had personal knowledge); *but see Seaton v. State,* 564 S.W.2d 721, 724–25 (Tex. Crim.App. [Panel Op.] 1978) (affirming, despite prosecutor's comment, "[T]hat is a lie and you know it," in response to defense witness's testimony that prosecutor was not present when witness's statement was notarized, because instruction to disregard cured error and witness was not material), *overruled on other grounds by Rucker v. State,* 599 S.W.2d 581 (Tex.Crim.App. 1979). In the present case, however, we do not believe the prosecutor's statement incurably infected the jury.

We acknowledge that the prosecutor's comment was highly improper; she stated as fact that appellant was lying about Shaka's location at the time of the murder. Further, the trial court's instruction to disregard the prosecutor's *"last question"* could have been made clearer, i.e., it was not a *question,* but a sidebar comment that necessitated appellant's objection. Nevertheless, immediately following the improper comment, defense counsel objected, "Excuse me. Now that's—Judge, you've got to stop that kind of stuff," and the jury was sent out of the room. When the jury was brought back, the court gave its instruction. Thus, it is reasonable to assume

---

17. We note that appellant contends the prosecutor's outburst abrogated his right to a fair trial. Presumably, appellant is arguing the prosecutor's misconduct was so egregious that it violated his constitutional right to due process, and, thus, harm should be determined under a Rule 44.2(a) harmless-error analysis. We need not decide whether this particular outburst was constitutional or non-constitutional error because the trial court sustained appellant's objection and denied his motion for mistrial; the Court of Criminal Appeals recently explained that denials of a motion for mistrial are not subjected to a harm analysis but are reviewed for abuse of discretion. *See Archie,* 221 S.W.3d at 699–700; *id.* at 701–02 (Keller, P.J., concurring).

the jury understood that they were to disregard the prosecutor's comment.

This case is distinguishable from *Roberts*, in which the prosecutor called the defendant a "damn liar" relative to an issue about which the prosecutor had personal knowledge and, thus, actually knew if the defendant was lying. *See Roberts*, 295 S.W. at 613; *see also Hanson v. State*, 139 Tex.Crim. 233, 242, 139 S.W.2d 573, 578 (1940) (explaining that the harmfulness of the prosecutor's statement in *Roberts* was that he actually had personal knowledge regarding whether the defendant was lying). Instead, the prosecutor's sidebar is more akin to the situation addressed in *Williams v. State*, 549 S.W.2d 183 (Tex. Crim.App.1977). In *Williams*, the complainant alleged defendant raped her at gun point. *Id.* at 185. During cross-examination, the prosecutor asked the defendant if he and the complainant "went the night together." *Id.* at 187. When the defendant responded, "We have had a relationship together," the prosecutor commented, "All right. I can agree with that, at pistol point." *Id.* at 188. The Court of Criminal Appeals held that the trial court's instruction to disregard cured the improper sidebar remark. *Id.; see also Jones v. State*, 504 S.W.2d 906, 907 (Tex.Crim.App. 1974) (holding instruction to disregard sufficient when prosecutor responded, "I suspect you have, with good cause," after defendant testified he had been put in fear for his life many times).

We appreciate the prosecutor commented that appellant was lying about an important issue: whether Shaka was in the backyard when Belinda was murdered. If the jury believed Shaka was in the backyard, the State's "staged-burglary" theory would be greatly strengthened because Shaka would have made it very difficult for a burglar to access the back door. As explained in footnote 3, there was no credible eyewitness testimony that Shaka was in the backyard at the time of the murder. However, Detective Leithner testified that on the night of the murder, he asked appellant how a burglar could have avoided Shaka. According to Detective Leithner, appellant did not answer but became more irritated. This testimony supported an inference that appellant was deceitful regarding Shaka's location at the time of Belinda's murder. During opening statement, the prosecutor stated that it seems unlikely a burglar could have "got past that dog" but did not express that appellant lied about the dog's location. In his opening statement, appellant explained that Shaka was in the garage. During jury argument, the prosecutor argued *without objection* that appellant recently fabricated his assertion Shaka was in the garage at the time of the murder. The prosecutor also argued the fact Shaka would have barked if a burglar had come into the backyard is "a circumstance [appellant] and his lying family cannot change." Hence, the issue regarding Shaka's location was contested from the beginning to the end of trial, and the jury was well aware that the State disagreed with appellant's account. Accordingly, the trial court's determination that its instruction to disregard sufficiently cured the prosecutor's outburst was within the zone of reasonable disagreement. Thus, the court did not abuse its discretion by denying appellant's motion for mistrial.

In sum, we cannot conclude that the trial court's errors had a substantial and injurious effect or influence on the jury's verdict. *See* Tex.R.App. P. 44.2(b). We note that appellant cites several cases in which the Court of Criminal Appeals reversed a defendant's conviction because of persistent prosecutorial misconduct. *See Stahl v. State*, 749 S.W.2d 826 (Tex.Crim. App.1988); *McClure v. State*, 544 S.W.2d 390 (Tex.Crim.App.1977); *Boyde v. State*,

513 S.W.2d 588 (Tex.Crim.App.1974). In these cases, the prosecutors ignored trial court rulings, injected unsupported and harmful facts, and sought to inflame the jury against the accused. *See Stahl v. State*, 749 S.W.2d 826, 831 (Tex.Crim.App. 1988) (reversing after victim's mother exclaimed, "May he rest in hell. May he burn in hell. Oh, my baby," when identifying a morgue photograph of victim because court determined prosecutor intended, and repeatedly referred to, the outburst); *McClure*, 544 S.W.2d at 393–94 (reversing after prosecutor contravened trial court's rulings by persistently arguing punishment during guilt-innocence stage); *Boyde*, 513 S.W.2d at 591 (holding prosecutor's course of repeatedly ignoring the court's rulings was reversible error despite repeated jury instructions to disregard); *see also, e.g., Cook v. State*, 537 S.W.2d 258, 261 (Tex.Crim.App.1976) (reversing because prosecutor went outside the record by arguing severed co-defendant will likely blame defendant in subsequent trial just as defendant blamed co-defendant in current case); *Renn v. State*, 495 S.W.2d 922, 924 (Tex.Crim.App.1973) (reversing because prosecutor repeatedly called defendant epithets, despite twenty-six sustained objections to such remarks); *Grant v. State*, 738 S.W.2d 309, 311 (Tex.App.-Houston [1st Dist.] 1987, pet. ref'd) (reversing because prosecutor persistently contravened trial court's rulings and jury charge by arguing defendant's breath-test refusal was evidence of guilt).

We do not perceive the same type of relentless misconduct in the present case. During the emotionally charged, four-week trial, the prosecutors occasionally exceeded proper questioning and argument when at-tacking the credibility of appellant and his family and also apparently disobeyed or ignored a few of the trial court's rulings. While we certainly condemn such tactics, in light of the whole record, we cannot conclude that these errors were so prejudicial, or so inflamed the jury, that appellant was deprived of his substantial rights or a fair trial. *See* Tex.R.App. P. 44.2(b); *Johnson v. State*, 604 S.W.2d 128, 135 (Tex.Crim.App.1980) ("A reading of the transcription of the court reporter's notes does not disclose a willful and calculated effort on the part of the prosecution to deny appellant a fair and impartial trial."). Accordingly, we overrule appellant's remaining issues. We affirm the trial court's judgment.

SEYMORE, J., concurs.

CHARLES W. SEYMORE, Justice, concurring.

I have serious concern that this Court has deprived appellant of the protection afforded under Article V, section 6 of the Texas Constitution by failing to review his factual-sufficiency challenges as questions of fact.

> [T]he decision of [Texas Courts of Appeals] shall be conclusive on all questions of fact brought before them on appeal or error.

Tex. Const. art. V, § 6(a).

In previous opinions,[1] this Court has acceded to a recent pronouncement of the law by five judges on the Court of Criminal Appeals in *Brooks v. State*, 323 S.W.3d 893, 894–912 (Tex.Crim.App.2010) (Hervey, J., joined by Keller, Keasler, & Cochran, JJ., plurality op.) & *id.* at 913–

---

1. *See, e.g., Romero v. State*, 331 S.W.3d 82, 83 (Tex.App.-Houston [14th Dist.] 2010, no pet. h.); *Shaw v. State*, 329 S.W.3d 645, 649 (Tex. App.-Houston [14th Dist.] 2010, no pet. h.); *Pomier v. State*, 326 S.W.3d 373, 378–79 (Tex. App.-Houston [14th Dist.] 2010, no pet. h.); *see also Nwosoucha v. State*, 325 S.W.3d 816, 829–31 (Tex.App.-Houston [14th Dist.] 2010, no pet. h.) (noting that legal-sufficiency standard of review remains after *Brooks* ).

26 (Cochran, J., joined by Womack, J., concurring) (discarding the factual-sufficiency standard of review in criminal cases which had been consistent with Texas Supreme Court precedent and articulated in *Clewis v. State*, 922 S.W.2d 126, 134–36 (Tex.Crim.App.1996)). After acknowledging that its review of a court of appeals' factual-sufficiency decision is limited to determining whether the courts properly applied "rules of law," the five judges effectively abolished factual-sufficiency review when "determining whether the evidence is sufficient to support each element of a criminal offense ... beyond a reasonable doubt." *Brooks*, 323 S.W.3d at 909 n. 35, 912.

I first expressed disagreement with this Court's reticence to assert its exclusive jurisdictional prerogatives relative to factual sufficiency of the evidence in *Romero*, 331 S.W.3d at 84–87 (Seymore, J., concurring). If this Court had not followed *Brooks* in previous opinions, I would employ the traditional factual-sufficiency review and weigh all of the evidence in a neutral light to determine whether the circumstantial evidence supporting conviction is so against the great weight and preponderance of the evidence that the jury's verdict is clearly wrong and manifestly unjust. *See Clewis*, 922 S.W.2d at 134–36 & n. 16. The *Brooks* plurality and concurring opinions purport to require this Court, when reviewing evidence for factual sufficiency, to employ the *Jackson v. Virginia* standard of review for legal sufficiency and review all the evidence in the light most favorable to the verdict to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 894 (plurality op.); *id.* at 913, 914–15 (Cochran, J., concurring) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

This Court's previous decisions adopting the *Brooks* standard of review for factual-sufficiency of the evidence render any effort to conduct a traditional factual-sufficiency review of the evidence moot. *See Caddell v. State*, 123 S.W.3d 722, 726–27 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd) (explaining this Court is bound to follow its own precedent). However, as the author of the majority opinion in this case, I take the unusual step of writing separately because of my concern that the plurality and concurring opinions in *Brooks* are derogative of this Court's *conclusive* jurisdiction relative to all questions of fact. I am also reminded that intermediate appellate courts have no inherent power to ignore an express constitutional mandate. *Queen v. State*, 842 S.W.2d 708, 711 (Tex.App.-Houston [1st Dist.] 1992, no pet.). Notwithstanding the imperatives of vertical *stare decisis* and whatever extent the plurality and concurring opinions in *Brooks* are binding on this Court, it is my considered opinion that this Court is duty-bound to contravene disgorgement of its exclusive jurisdiction to determine questions of fact. It is true that the Court of Criminal Appeals has final appellate jurisdiction relative to questions of law in criminal cases. Tex. Const. art. V, § 5. However, only the four judges of the *Brooks* plurality expressed that they would eliminate the factual-sufficiency standard pursuant to Article V, section 5 of the Texas Constitution. *Brooks*, 323 S.W.3d at 907–12 (plurality op.). The concurring opinion did not mention Article V, sections 5 and 6 or article 44.25 of the Code of Criminal Procedure. *See* Tex.Code Crim. Proc. Ann. art. 44.25 (entitled "Cases remanded," and expressing, "The courts of appeals or the Court of Criminal Appeals may reverse the judgment in a criminal action, as well upon the law as upon the facts."). Hence, a majority of judges in *Brooks* did not agree that eliminating fac-

tual-sufficiency review passed constitutional muster under Article V, section 5.

Considering the fundamental question of whether a court has subject-matter jurisdiction, it is surprising that the *Brooks* plurality and concurring opinions do not adhere to several Court of Criminal Appeals opinions wherein more than a plurality acknowledged the constitutional imperative that intermediate courts of appeals have conclusive jurisdiction over factual-sufficiency issues. *See Laster v. State*, 275 S.W.3d 512, 518–19 (Tex.Crim.App.2009); *Bigby v. State*, 892 S.W.2d 864, 872–75 & n. 3 (Tex.Crim.App.1994); *Ex parte Schuessler*, 846 S.W.2d 850, 852 (Tex.Crim. App.1993); *Meraz v. State*, 785 S.W.2d 146, 153 (Tex.Crim.App.1990); *see also Brooks*, 323 S.W.3d at 931 (Price, J., joined by Meyers, Johnson, & Holcomb, JJ., dissenting) (expressing that the plurality ignored *stare decisis* ).

The Supreme Court of the Republic of Texas recognized "the defendant in a criminal prosecution in the district court has the right of appeal to this court from the judgment, or sentence of the court below, and *to have the facts* as well as the law, at his own election, *opened for re-examination.*" *Republic v. Smith*, Dallam 407, 410–11 (Tex.1841) (emphasis added). Texas courts have long recognized that a party on appeal may challenge as erroneous a fact finding on the grounds the jury's verdict was against the preponderance of the evidence, i.e., the evidence was factually insufficient. *See, e.g., Choate v. San Antonio & A.P. Ry. Co.*, 91 Tex. 406, 44 S.W. 69 (1898). This exclusive jurisdiction was recently acknowledged by the Texas Supreme Court: "[A] review of the evidence for factual sufficiency is a power committed *exclusively* to the court[s] of appeals." *Regal Fin. Co. v. Tex. Star Motors*, — S.W.3d ——, ——, 2010 WL 3277132, (Tex. 2010) (emphasis added). Pursuant to its

constitutionally delineated duty under the factual-conclusivity clause, and its statutorily delineated duty under the Texas Code of Criminal Procedure article 44.25, this Court should neutrally consider and weigh all the evidence in the record to determine whether a rational jury was justified in finding guilt beyond a reasonable doubt. *See Watson v. State*, 204 S.W.3d 404, 414– 17 (Tex.Crim.App.2006). Query, how could a court of appeals ever decide a question of fact and remand a case for a new trial pursuant to the Texas Constitution and Code of Criminal Procedure article 44.25 if it is limited to reviewing legal sufficiency of the evidence ? Actually, the Court of Criminal Appeals previously cautioned against what happened in *Brooks:*

> [I]t [is] not appropriate for this Court to create a standard of review which is in conflict with the language of our State Constitution.

*Meraz*, 785 S.W.2d at 152.

The Court of Criminal Appeals previously opined that the only way to preclude a Texas court of appeals from "determin [ing] if a jury finding is against the great weight and preponderance of the evidence," i.e., determining a question of fact, is for "the people of the State of Texas to amend the Constitution." *Id.* at 154. I agree. However, in contravention of this correct statement of the role of courts relative to the constitution, the *Brooks* plurality concludes: "As the Court with final appellate jurisdiction in this State, we decide that the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 323 S.W.3d at 912 (plurality op.). Consequently, the *Brooks* plurality and concurring opinions did not simply refine or edit the standard of review for

factual sufficiency; a criminal defendant's constitutional right to factual-sufficiency review of the evidence supporting elements of the offense has been abolished.

In reaching its decision, the *Brooks* plurality expressed deep concern[2] that the Court of Criminal Appeals' evolved articulation of the standard of review for factual sufficiency in Texas is indistinguishable from the standard of review for legal sufficiency prescribed by the United States Supreme Court in *Jackson v. Virginia, Brooks,* 323 S.W.3d at 901–02 (plurality op.); *see also id.* at 913–15 (Cochran, J., concurring) (expressing that legal-sufficiency review is the only "logical" sufficiency-of-the-evidence review). Under *Jackson,* all the evidence is viewed "in the light most favorable to the prosecution," and a reviewing court is required to defer to a jury's determination of credibility and weight. 443 U.S. at 319, 99 S.Ct. 2781. The *Brooks* plurality referred to its decision in *Lancon v. State,* 253 S.W.3d 699 (Tex.Crim.App.2008), as the final nail in the coffin for factual-sufficiency review. *Brooks,* 323 S.W.3d at 901–02 (plurality op.); *see also id.* at 925–26 (Cochran, J., concurring). The plurality opined that requisite deference to the jury as the sole judge of a witness's credibility and the weight to be given their testimony eliminates viewing the evidence in a "neutral light." *Brooks,* 323 S.W.3d at 902 (plurality op.). After reaching this conclusion, the plurality warned that a criminal defendant might be in position to claim double jeopardy if a court reversed due to factual insufficiency of the evidence and remanded for a new trial. *Id.* at 902–06. For reasons outlined below, I respectfully suggest that the *Brooks* plurality and concurring opinions purport to resolve their conundrum by eliminating a criminal defendant's constitutional right to appellate review of questions of fact.

I agree with the dissent in *Brooks* and acknowledge that the deference contemplated in a factual-sufficiency review is not absolute but a qualified deference to the jury's apparent assessment of the weight, credibility, or reliability of the admittedly legally-sufficient evidence. *Brooks,* 323 S.W.3d at 928 (Price, J., dissenting). When viewing the evidence in a neutral light, an appellate court need not resolve every conflict in the evidence, or draw every inference from ambiguous evidence in favor of the defendant's guilt just because a rational jury could have drawn such an inference; qualified deference does not convert factual-sufficiency review into legal-sufficiency review. *See id.* at 929. Accordingly, there is no conflict in the factual-sufficiency standard of review when an appellate court is "deferential" to the jury's verdict while neutrally considering and weighing all of the evidence in the record; such a standard actually serves to "harmonize" the right to trial by jury with the courts of appeals' constitutional duty to conclusively resolve the questions of fact presented to it on appeal. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634–35 (Tex.1986). Moreover, "the fact that the court of appeals might engage in 'thought processes' akin to the jury's ... does not establish a violation of the right of trial by jury." *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651 (Tex.1988). This is true because a court of appeals is not

---

**2.** However, in a direct appeal that involved capital murder of law enforcement officers, the court recognized and invoked the two different standards of review. *Vodochodsky v. State,* 158 S.W.3d 502 (Tex.Crim.App.2005). After concluding that the evidence was legally

sufficient to uphold the conviction, the court reversed the conviction and remanded for further proceedings, concluding the largely circumstantial evidence was factually insufficient. *Id.* at 508–11.

substituting its judgment for that of the jury by sustaining a challenge to a question of fact, but is simply remanding the case for a new trial. *Id.* at 651–52 (quoting *Hopson v. Gulf Oil Corp.*, 150 Tex. 1, 237 S.W.2d 352, 358 (1951)).

I also submit that the *Brooks* plurality is unnecessarily concerned about risks of double jeopardy. First, the *Jackson* standard does not incorporate the constitutional duty of an intermediate courts of appeals to decide questions of fact by considering and weighing all the evidence because the *Jackson* standard "impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781. Under the *Jackson* standard, the evidence is not weighed, and a successful challenge to legal sufficiency of the evidence results in acquittal, not a new trial. *See Tibbs v. Florida,* 457 U.S. 31, 41–42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Whether the evidence is legally sufficient under *Jackson* "is of course wholly unrelated to the question of how rationally the verdict was actually reached . . . . [T]he standard announced today . . . does not require scrutiny of the reasoning process" used by the fact-finder. *Id.* at 319 n. 13, 99 S.Ct. 2781 (emphasis added). Second, the risks for double jeopardy after reversal based on factual insufficiency of the evidence were fully clarified by the United States Supreme Court:

> [T]he Double Jeopardy Clause precludes retrial [of an accused] "once the reviewing court has found the evidence legally insufficient" to support conviction. This standard, we explained, "means that the government's case was so lacking that *it should not have even been submitted* to the jury." A conviction will survive review . . . whenever "the evidence and inferences therefrom *most favorable to the prosecution* would warrant the jury's

finding the defendant guilty beyond a reasonable doubt." In sum, we noted that the rule barring retrial would be "confined to cases where the prosecution's failure is clear."

> . . . . [T]he Double Jeopardy Clause attaches special weight to judgments of acquittal. A verdict of not guilty, whether rendered by the jury or directed by the trial judge, absolutely shields the defendant from retrial. A reversal based on the [legal] insufficiency of the evidence has the same effect because it means that no rational factfinder could have voted to convict the defendant.

*Tibbs,* 457 U.S. at 40–41, 102 S.Ct. 2211 (citations and footnotes omitted) (emphasis added). Succinctly, evidence is legally insufficient where the "only proper verdict" is acquittal. *Id.* at 42, 102 S.Ct. 2211. Conversely,

> A reversal on [a factual-sufficiency] ground, unlike a reversal based on [legally] insufficient evidence, *does not mean that acquittal was the only proper verdict.* Instead, the appellate court sits as a "thirteenth juror" and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves. A deadlocked jury, we consistently have recognized, does not result in an acquittal barring retrial under the Double Jeopardy Clause. Similarly, an appellate court's disagreement with the jurors' *weighing of the evidence* does not require the special deference accorded verdicts of acquittal.

> A reversal based on the *weight of the evidence,* moreover, can occur *only after the State both has presented [legally-]sufficient evidence to support conviction and has persuaded the jury to convict.* The reversal simply affords the

defendant a second opportunity to seek a favorable judgment. An appellate court's decision to give the defendant this second chance does not create "an unacceptably high risk that the Government, with its superior resources, [will] wear down [the] defendant" and obtain conviction solely through its persistence. *Id.* at 42–43, 102 S.Ct. 2211 (citations and footnotes omitted) (emphasis added). Thus, the United States Supreme Court expressly rejected the argument posited by the plurality and concurring opinions in *Brooks* that a "distinction between the weight [ (factual sufficiency) ] and [legal] sufficiency of the evidence is unworkable," noting that "trial and appellate judges commonly distinguish between the weight [ (factual sufficiency) ] and [legal] sufficiency of the evidence" and the Due Process Clause "sets a *lower limit* on an appellate court's definition of evidentiary sufficiency." *Id.* at 44–45, 102 S.Ct. 2211 (emphasis added). In *Tibbs,* the United States Supreme Court provided ample support for the appellate judiciary in Texas to *protect and defend* Article V, section 6 the Texas Constitution. The Texas appellate judiciary should fashion legal doctrines, including standards of appellate review, that serve to "protect, and defend the Constitution and laws of the United States and of this State." [3]

In conclusion, I write separately to express my frustration with our Court's unnecessary acquiescence to the *Brooks* plurality and concurring opinions.

Justice BROWN filed a concurring opinion to the denial of en banc rehearing, in which Justice BOYCE joins.

Justice McCALLY filed a dissenting opinion to the denial of en banc rehearing.

Justice SEYMORE filed a dissenting opinion to the denial of en banc rehearing, in which Justice ANDERSON joins.

Rehearing En Banc Denied.

JEFFREY V. BROWN, Justice, concurring to denial of rehearing en banc.

Both as a member of the original panel and of the en-banc court, I have voted against rehearing this cause. I write separately to respond to my colleagues who have dissented from our refusal to rehear. I will address each in turn.

I

Appellate courts rarely overturn jury verdicts. When they do, the reason for reversing often has more to do with trial-judge error than a conclusion that the jury just got it wrong.[1] Yet in this case Justice McCally would have us reverse the conviction below and render a judgment of acquittal because, in her judgment, the verdict is "irrational." Such a leap would supplant the jury's evaluation of the evidence with our own—a gross invasion by the judiciary upon the right to trial by jury, a right that Texas has held "inviolate" since the days of the Republic.[2]

---

**3.** Quote excerpted from the oath of office for Texas judges.

**1.** Trial-judge errors that lead juries into reversible verdicts range from submitting wrongful-death cases when there is simply no evidence of causation, *see, e.g., Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 730 (Tex.1997), to allowing inadmissible confessions or extraneous offenses in criminal cases. *Pitts v. State,* 614 S.W.2d 142, 143–44 (Tex.

Crim.App. [Panel Op.] 1981) (inadmissible confession); *Fox v. State,* 283 S.W.3d 85, 95 (Tex.App.-Houston [14th Dist.] 2009, pet. ref'd) (inadmissible extraneous-offense evidence).

**2.** Repub. Tex. Const. of 1836, Declaration of Rights, Ninth, *reprinted in* 1 H.P.N. Gammel, *The Laws of Texas* 1822–1897, at 1069, 1083 (Austin, Gammel Book Co. 1898) ("the right of trial by jury shall remain inviolate"); *ac-*

But I do not write to quarrel with Justice McCally over the merits. Like Justice Seymore, I believe the panel opinion appropriately addresses the evidence upon which a rational jury could have rendered the verdict rendered below. Instead, I write to dispel Justice McCally's contention that this court has issued inconsistent messages about the meaning of *Brooks v. State*. Respectfully, she is wrong when she contends that the court has stated "two different standards of review" arising from *Brooks*. In this case, as in others, we held that after *Brooks* "only one standard should be used to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt: legal sufficiency." *Temple v. State*, No. 14–08–0074–CR, 342 S.W.3d 572, at 583–84, 2010 WL 5175018, at *2 (Tex.App.-Houston [14th Dist.] Dec. 21, 2010, no pet. h.) (relying on *Brooks v. State*, 323 S.W.3d 893, 905–07) (Tex.Crim.App.2010) (plurality op.); *id.* at 926–28 (Cochran, J., concurring)); *see also Pomier v. State*, 326 S.W.3d 373, 378 (Tex.App.-Houston [14th Dist.] 2010, no pet. h.) (courts of appeals should apply the legal-sufficiency standard when addressing legal-sufficiency and factual-sufficiency arguments in appeals from criminal convictions).

Justice McCally is correct that in some opinions this court has also noted that *Brooks* "does not alter the constitutional authority of the intermediate courts of appeals to evaluate and rule on questions of fact." *See, e.g., Muhammed v. State*, 331 S.W.3d 187, 191 n. 3 (Tex.App.-Houston [14th Dist.] 2011, no pet.) And indeed it does not. Under *Brooks*, "[t]he *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support *each element of a criminal offense that the State is required to prove beyond a reasonable doubt.*" *Brooks*, 323 S.W.3d at 894 (plurality op.) (emphasis added). *Brooks* does not say that the courts of appeals' authority to review cases for factual sufficiency is dead. It says, rather, that the *Clewis v. State* factual-sufficiency standard is indistinguishable from a properly applied *Jackson v. Virginia* standard. *Id.* at 898–902.[3]

That still leaves a lot of factual review for the courts of appeals. We review for factual sufficiency in civil cases, of course, but also in criminal cases where the burden of proof is less than beyond a reasonable doubt. *See, e.g., Ulloa v. State*, No. 14–10–00102–CR, 14–10–00101–CR, —— S.W.3d ——, 2011 WL 1283115, at *3 n. 1 (Tex.App.-Houston [14th Dist.] Apr. 5, 2011, pet. filed) (distinguishing *Brooks* and conducting a factual-sufficiency review in an appeal from a trial court's denial of habeas-corpus relief in which the burden of proof on the defendant is a preponderance of the evidence); *Bernard v. State*, No. 14–10–00044–CR, —— S.W.3d ——, 2011 WL 1375570, at *2 (Tex.App.Houston [14th Dist.] Apr. 12, 2011, pet. filed) (distinguishing *Brooks* and reviewing the factual sufficiency of a jury's punishment-phase negative finding on a special issue concerning sudden passion in which the

cord Tex. Const. art. I, § 15; Tex. Const. of 1869, art. I, §§ 8, 12; Tex. Const. of 1866, art. 4, § 20; Tex. Const. of 1861, art. I, § 12; Tex. Const. of 1845, art. I, § 12; *see also* Repub. Tex. Dec. of Indep., *reprinted in* 1 Gammel, *supra*, at 1065 (describing the right to trial by jury as "that palladium of civil liberty, and only safe guarantee for the life, liberty, and property of the citizen").

3. *See also* Ricardo Pumarejo, Jr., *Clueless over Clewis or: How I Learned to Stop Worrying and Welcome Brooks v. State*, 23 The Appellate Advocate: State Bar of Texas Appellate Section Report 246, 258 (Winter 2010).

burden of proof is a preponderance of the evidence).

When a court of appeals is called upon to review factual sufficiency on an issue that a criminal defendant must prove by a preponderance, it should consider all the relevant evidence to determine whether the finding is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990). As a panel of this court held in *Bernard v. State*, "[t]he five judges in *Brooks* did not overrule or disapprove of this part of *Meraz;* in fact, the two concurring judges expressly stated that this part of Meraz was correctly decided." *Bernard*, —— S.W.3d at ——, 2011 WL 1375570, at *2 (citing *Brooks*, 323 S.W.3d at 895; *id.* at 924 & n. 67 (Cochran, J., concurring); *Ervin v. State*, 331 S.W.3d 49, 53 n. 2 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd)).

So when this court says *Brooks* has done away with factual-sufficiency review in some criminal cases, it is not inconsistent for us also to say that Brooks has not altered our constitutional authority "to evaluate and rule on questions of fact." *See, e.g., Muhammed*, 331 S.W.3d at 191 n. 3. *Brooks* did not abolish factual-sufficiency review in all criminal cases. Instead, the Court of Criminal Appeals announced that in cases where the burden of proof is beyond a reasonable doubt, the factual-sufficiency and legal-sufficiency standards are the same. This court has faithfully followed *Brooks* where appropriate, and faithfully conducted an old-fashioned factual-sufficiency review where *Brooks* does not apply.

Because there is no conflict among the rulings from this court on the interpretation of *Brooks v. State*, there is no reason for an en-banc rehearing of the panel opinion in this case. *See* Tex.R.App. P. 41.2(c).

## II

Justice Seymore also has dissented from the court's failure to conduct an en-banc rehearing. But the thrust of his dissent is the allegation that *Brooks* has deprived the intermediate courts of appeals of their ability to carry out their constitutional duty to review facts. I dispute that the Court of Criminal Appeals has invaded our constitutional province. I further believe that in his dissent, Justice Seymore advocates a violation of the doctrine of hierarchical precedent.

## A

There is no doubt—the factual-conclusivity clause in Article V, Section 6, of the Texas Constitution makes intermediate appellate courts' factual-sufficiency decisions "final and conclusive" upon the Court of Criminal Appeals. *Roberts v. State*, 221 S.W.3d 659, 662 & 663 n. 2 (Tex.Crim.App. 2007); *see also* Tex. Const. art. V, § 6(a) (providing that an intermediate appellate court's decision "shall be conclusive on all questions of fact brought before them on appeal or error"). But the factual-sufficiency clause does not prohibit the Court of Criminal Appeals from taking jurisdiction to decide, as a matter of law, whether an intermediate court of appeals applied the correct standard of review in addressing a party's factual-sufficiency claim. *See Roberts*, 221 S.W.3d at 663 (relying on *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634–35 (Tex.1986)).[4]

---

4. The *Pool* court held that *In re King's Estate* established that "the supreme court might take jurisdiction, notwithstanding the finality of judgments of the courts of civil appeals on

fact questions, in order to determine if a correct standard has been applied by the intermediate courts." *Pool*, 715 S.W.2d at 634–35.

The factual-conclusivity clause allows the Court of Criminal Appeals to review an intermediate court's factual-sufficiency decision insofar as necessary to determine whether the intermediate court "properly applied 'rules of law.'" *Roberts*, 221 S.W.3d at 663 & n. 3 (citing *Choate v. San Antonio & A.P. Ry. Co.*, 91 Tex. 406, 44 S.W. 69, 69–80 (1898); *Dyson v. Olin Corp.*, 692 S.W.2d 456, 457 (Tex.1985); *Harmon v. Sohio Pipeline Co.*, 623 S.W.2d 314, 314–15 (Tex.1981)). But no more than that is exactly what the *Brooks* court did— it laid out the legal boundaries of a proper factual-sufficiency review. And though they have no jurisdiction themselves to perform a factual-sufficiency review, it has been the legitimate realm of our state's courts of last resort to tell the courts of appeals how factual sufficiency should be reviewed. *See Pool*, 715 S.W.2d at 635 ("Even as to factual insufficiency, it has been the supreme court that has delineated the role of the courts of appeals.") (citing *In re King's Estate*, 150 Tex. at 666, 244 S.W.2d at 662); *see also* Tex. Const. art. V, § 5(a) (granting "final appellate jurisdiction" to the Court of Criminal Appeals "in all criminal cases of whatever grade").

I already have explained that *Brooks* did not do away with factual-sufficiency review; it simply recognized that when the burden of proof is beyond a reasonable doubt, factual sufficiency and legal sufficiency are one and the same. *Brooks*, 323 S.W.3d at 898–202; *see also Watson v. State*, 204 S.W.3d 404, 415 (Tex.Crim.App. 2007) (holding that factual-sufficiency review is "barely distinguishable" from *Jackson v. Virginia* standard). And the Court

of Criminal Appeals, under its authority to verify that intermediate courts adhere to "rules of law," was completely within its rights to do so. *Roberts*, 221 S.W.3d at 663. Justice Seymore's exhortation notwithstanding, factual-conclusivity—the constitutional prerogative of the intermediate courts—remains intact.

## B

In his dissent, Justice Seymore does not merely lambaste the constitutional foundation of *Brooks*—he urges a refusal to "adhere to" it. He sees *Brooks* as such an "affront to the Texas Constitution" that we have no obligation to follow it. I do not agree that *Brooks* is so sinister. But even if it were, we would be no less compelled to go where it leads us.

Justice Seymore concedes that "[o]stensibly, this court is required to follow the dictates of vertical stare decisis by acceding to the opinions and mandates of the Court of Criminal Appeals." There's no "ostensibly" to it. "The Court of Criminal Appeals is the highest tribunal on matters pertaining to the enforcement of criminal laws, and when it has deliberately and unequivocally interpreted the law in a criminal matter, we must adhere to its interpretation." *Southwick v. State*, 701 S.W.2d 927, 929 (Tex.App.Houston [1st Dist.] 1985, no pet.); *see also* Tex. Const. art. V, § 5(a); *Robinson v. City of Galveston*, 51 Tex.Civ.App. 292, 297, 111 S.W. 1076, 1079 (Galveston 1908, no writ) (holding that even "if we were disposed to doubt the soundness of [the Court of Criminal Appeals'] decisions, we would yet feel constrained to follow them").[5]

5. *Accord State ex rel. Vance v. Clawson*, 465 S.W.2d 164, 168 (Tex.Crim.App.1971) (" 'The Court of Criminal Appeals is the court of last resort in this state in criminal matters. This being so, no other court of this state has authority to overrule or circumvent its deci-

sions, or disobey its mandates.' " (quoting *State ex rel. Wilson v. Briggs*, 171 Tex.Crim. 479, 351 S.W.2d 892, 894 (Tex.Crim.App. 1961)); *Gabriel v. State*, 290 S.W.3d 426, 436 n. 5 (Tex.App.-Houston [14th Dist.] 2009, no pet.) (stating that "[a]s an intermediate court

Issues of hierarchical precedent are not child's play. "Inferior courts are absolutely bound to follow the decisions of the courts having appellate or revisory jurisdiction over them. In this aspect, precedents set by the higher courts are imperative in the strictest sense. They are conclusive on the lower courts, and leave to the latter no scope for independent judgment or discretion." Henry Campbell Black, Law of Judicial Precedents 10 (1912).

"[U]nless we wish anarchy to prevail" within our halls of justice, lower courts must follow higher-court precedent "no matter how misguided the judges of those courts may think it to be." *Hutto v. Davis,* 454 U.S. 371, 375, 102 S.Ct. 703, 706, 70 L.Ed.2d 556 (1982) (per curiam). The judges of the inferior courts "must either obey the orders of higher authority or yield up their posts to those who will." *Weber v. Kaiser Aluminum & Chem. Corp.,* 611 F.2d 132, 133 (5th Cir.1980) (Gee, J.).

Even if *Brooks* were an abomination, it is not the role of lower courts to rein in our courts of last resort when they go *ultra vires.* When the Supreme Court of Texas and the Court of Criminal Appeals interpret our state's constitution, we must follow. That's how our system works. To do otherwise—to defy the authority of our state's highest courts—is to forswear the rule of law.

SHARON McCALLY, Justice, dissenting to denial of rehearing en banc.

I respectfully offer my dissent to this court's denial of appellant's motion for rehearing en banc.

### INTRODUCTION

A jury convicted appellant David Mark Temple of murdering his wife Belinda Temple on January 11, 1999, with a 12–gauge shotgun blast to the back of her head. This court, Justice Charles Seymore for the unanimous panel, affirmed the conviction. Justice Seymore, however, also authored a concurring opinion criticizing the majority for abdicating its responsibility to perform a constitutionally required factual-sufficiency review.

I suggest that en banc reconsideration is required in this case because: (1) opinions of this court conflict about whether *Jackson v. Virginia* requires a factual-sufficiency review; (2) we should resolve the conflict en banc and hold that a rigorous and proper application of *Jackson v. Virginia,* including analysis of whether a rational jury could have found the elements of the crime beyond a reasonable doubt, embodies a factual-sufficiency review; (3) the panel did not perform an appropriate *Jackson v. Virginia* sufficiency review of the evidence in appellant's case; and (4) a full *Jackson v. Virginia* sufficiency analysis in this case mandates reversal.[1]

---

of appeals, we are bound by controlling authority from the Court of Criminal Appeals"); *Villarreal v. State,* 267 S.W.3d 204, 209 (Tex. App.-Corpus Christi 2008, no pet.); *State v. Stevenson,* 993 S.W.2d 857, 867 (Tex.App.-Fort Worth 1999, no pet.); *Horton v. State,* 986 S.W.2d 297, 300 (Tex.App.-Waco 1999, no pet.); *Contreras v. State,* 915 S.W.2d 510, 522 (Tex.App.-El Paso 1995, pet. ref'd) ("As an intermediate appellate court, we are duty[-]bound to follow the law declared by the Texas Court of Criminal Appeals on matters pertaining to the enforcement of criminal

laws."); *Flores v. State,* 883 S.W.2d 383, 385 (Tex.App.-Amarillo 1994, pet. ref'd); *Pettigrew v. State,* 822 S.W.2d 732, 734 (Tex.App.-Dallas 1992, pet. ref'd).

1. I also suggest that en banc reconsideration is appropriate in the case because of the flawed *Brady* and cumulative-error analysis performed by the *Temple* panel. Specifically, an "alternate suspect" RJS was the subject of the *Brady* point of error. On the fifth day of trial, one of the State's witnesses revealed to appellant's counsel for the first time that:

CONFLICT AMONG PANELS AND COURTS:
FACTUAL SUFFICIENCY REQUIRED?

The Texas Court of Criminal Appeals recently changed the standard of appellate review on legal and factual sufficiency in *Brooks v. State*, 323 S.W.3d 893 (Tex.Crim. App.2010). According to the *Brooks* plurality, the legal and factual-sufficiency standards had become "essentially the same standard" and there was "no meaningful distinction between them that would justify retaining them both." *Id.* at 894–95. So, it is beyond debate the *Brooks* court held that the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 895; *id.* at 926 (Cochran, J., concurring).

The new standard is easily stated: Intermediate appellate courts are to review all of the evidence (not just the evidence that favors the conviction) in the light most favorable to the prosecution (not a neutral light) and affirm if the evidence is legally sufficient for a rational jury (not just "a jury") to find all of the elements beyond a reasonable doubt. *Id.* at 899 (plurality opinion) ("It is fair to characterize the *Jackson v. Virginia* legal-sufficiency standard as: Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt.").

However, this court and other appellate courts have applied the standard inconsistently. First, this court has stated two different standards of review. According to the author of the majority opinion in *Temple*, the panel held that *Brooks* eliminated a factual-sufficiency review in Texas criminal cases. *See Temple v. State*, No. 14–08–0074–CR, 342 S.W.3d 572, at 619–20, 2010 WL 5175018, at *38 (Tex.App.-Houston [14th Dist] Dec. 21, 2010, no pet.

RJS, the Temples' sixteen-year-old neighbor, lied to the police about skipping school on the day of the murder; RJS failed three polygraph tests; RJS had access to a 12–gauge shotgun and reloaded shells (the gun and ammunition used to murder Belinda) that the police had recovered; and RJS had recently shot that gun. The *Temple* panel held this *Brady* error was not preserved and was harmless. Yet, the record clearly reflects that (1) prior to trial the court assured appellant's counsel that he had read grand jury transcripts, which included RJS's testimony, and they contained no *Brady* materials, (2) appellant's counsel did not learn of the new information about RJS until several days after the beginning of trial, (3) appellant's counsel attempted to find RJS during trial but was unsuccessful, so he sought a continuance before resting his evidence—it was denied, and (4) the State, though it remained silent about RJS's location during the continuance hearing the day before, called RJS as a rebuttal witness. Regarding error preservation, the panel's reliance upon *Wilson* is misplaced on its face as appellant met the *Wilson* standard.

*See Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim.App.1999) (holding that when the appellant learned of the exculpatory material five days before testimony began, his *Brady* complaint was not preserved by his failure to seek a continuance "before testimony began *or before he rested his case in chief"* (emphasis added)). Further, at a minimum, applying the cumulative error test of *Harris v. State*, this *Brady* error, along with the plethora of evidentiary and jury-argument errors the Temple panel specifically **found,** has eliminated integrity in the trial that led to appellant's conviction. *See Harris v. State*, 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989) (holding that the reviewing court must focus upon the integrity of the process leading to the conviction and should "always examine whether the trial was an essentially fair one"); *see also Kelly v. State*, 321 S.W.3d 583, 602 (Tex.App.-Houston [14th] 2010, no pet.). However, as I conclude herein that the evidence is legally insufficient and that a judgment of acquittal is appropriate, I do not write separately on this legal error.

h.) (Seymore, J., concurring). Other panels of this court have concluded that Brooks did not eliminate the factual-sufficiency review, holding specifically that the Brooks decision "does not alter the constitutional authority of the intermediate courts of appeals to evaluate and rule on questions of fact." *Muhammed v. State*, 331 S.W.3d 187, 191 n. 3 (Tex.App.-Houston [14th Dist.] Jan. 11, 2011, no pet. h.) (Anderson, J.).[2]

A difference of opinion on the meaning and application of *Brooks* exists within the First and Second Courts of Appeals, as well. *See Mosley v. State*, Nos. 01–08–00937–CR, 01–08–00938–CR, —— S.W.3d ——, 2010 WL 5395655, at *15 (Tex.App.-Houston [1st Dist.] Dec. 30, 2010, pet. filed) (Jennings, J., concurring) (stating that the *Brooks* plurality eliminated factual-sufficiency appellate review); *Ervin v. State*, 331 S.W.3d 49, 67 n. 4 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd) (Alcala, J.) (disagreeing with recent court of appeals' decisions that suggest *Brooks* abolished[3] factual-sufficiency challenges); *Wise v. State*, 340 S.W.3d 818 (Tex.App.-Fort Worth Mar.3, 2011, no pet. h.) (Livingston, C.J., dissenting and concurring) (noting the majority's flawed application of the *Brooks* standard of review due to its failure to give the requisite deference to

the jury's province to disbelieve even uncontradicted evidence).

Although en banc consideration of matters is disfavored, this case presents a textbook example of an en banc-worthy issue under Texas Rule of Appellate Procedure 41.2(c): uniformity of the court's decisions. *See* TEX.R.APP. P. 41.2(c). Appellant's entitlement to a full and constitutionally protected review of the evidence in this murder case should not depend upon which panel of the court is randomly assigned his case.

## A RIGOROUS AND PROPER *JACKSON v. VIRGINIA* ANALYSIS

### EMBODIES A FACTUAL-SUFFICIENCY REVIEW

Courts of the view that *Brooks* eliminated a factual-sufficiency review hold that opinion because the *Brooks* court unquestionably eliminated a "neutral light" handling of evidence on a sufficiency review. However, the plain language of *Brooks* belies a conclusion that the court has relieved appellate courts of their obligation to review **all of the evidence** for factual sufficiency. Because the *Brooks* plurality holds that a factual-sufficiency review is part of a *Jackson v. Virginia* legal-sufficiency review, and because the *Brooks* plurality demonstrates the difference between reviewing and weighing evidence, this

---

**2.** *Accord Quintanilla v. State*, No. 14–10–00011–CR, 2011 WL 665328, at *5 n. 2 (Tex.App.-Houston [14th Dist.] Feb. 24, 2011, no pet. h.) (mem. op., not designated for publication); *Serrato v. State*, No. 14–09–00764–CR, 2011 WL 345635, at *3 n. 3 (Tex.App.-Houston [14th Dist.] Feb. 1, 2011, no pet. h.) (mem. op., not designated for publication); *Ivey v. State*, No. 14–09–00698–CR, 2011 WL 303893, at *2 n. 1 (Tex.App.-Houston [14th Dist.] Jan. 27, 2011, no pet. h.) (mem. op., not designated for publication); *Wilson v. State*, No. 14–09–00731–CR, 2011 WL 166901, at *1 n. 1 (Tex.App.-Houston [14th Dist.] Jan. 11, 2011, no pet. h.) (mem. op., not designated for publication); *Shepard v. State*, No. 14–08–

00970, 2011 WL 166893, at *13 n. 10 (Tex. App.-Houston [14th Dist.] Jan. 11, 2011, no pet. h.) (mem. op., not designated for publication); *Quinn v. State*, No. 14–09–00914–CR, 2010 WL 4891410, at *2 n. 1 (Tex.App.-Houston [14th Dist.] Dec. 2, 2010, no pet. h.) (mem. op., not designated for publication).

**3.** There is no doubt, however, that in holding that factual and legal-sufficiency reviews are indistinguishable, the Court of Criminal Appeals has eliminated or abolished "factual sufficiency" as an independent point of error on appeal. *See Howard v. State*, 333 S.W.3d 137, 138 n. 2 (Tex.Crim.App.2011).

court should hold uniformly that *Brooks* and *Jackson v. Virginia* require a factual-sufficiency review. The *Brooks* plurality was emphatic: "a rigorous and proper application of the *Jackson v. Virginia* legal-sufficiency standard is as exacting a standard as any factual-sufficiency standard." 323 S.W.3d at 906.

### 1. *Brooks holds that the "no-rational-jury" analysis is a factual-sufficiency review.*

The *Brooks* plurality explicitly stated that a factual-sufficiency review under *Jackson v. Virginia* is embodied in the determination of whether " 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "[4] *Brooks*, 323 S.W.3d at 902 n. 19 (quoting *Jackson*, 443 U.S. at 319) (holding that the "rational-trier-of-fact" component is "the portion of the *Jackson v. Virgina* standard that essentially incorporates a factual-sufficiency review"); *see also Clewis v. State*, 876 S.W.2d 428, 438–39 (Tex. App.-Dallas 1994) (explaining that the "*Jackson v. Virginia* standard necessarily encompasses a factual-sufficiency review"), *vacated*, 922 S.W.2d 126 (Tex.Crim.App. 1996), *overruled by Brooks*, 323 S.W.3d at 902 n. 19.

### 2. *Brooks requires reweighing for sufficiency of evidence, not for weight of evidence.*

Again, the plain language of the *Brooks* decision states that "viewing the evidence

in 'the light most favorable to the verdict' under a legal-sufficiency standard means that the reviewing court is required to defer to the jury's credibility and weight determinations." 323 S.W.3d at 899. The *Brooks* decision does not authorize a reviewing court to disregard evidence merely because the jury may have disregarded it. Stated differently, although the *Brooks* decision acknowledges that the court has never articulated precisely how much deference is due the jury's credibility and weight determinations, "total deference" is not required. *See id.* at 902 n. 19 (rejecting the suggestion from the dissenting opinion in *Lancon v. State*, 253 S.W.3d 699 (Tex.Crim.App.2008), that "total deference" is the standard). It bears repeating. *Brooks* says total deference is not the standard.

Therefore, it is clear that the *Jackson v. Virginia* sufficiency standard requires Texas appellate courts:

(1) to review all of the evidence;

(2) to review that evidence in the light most favorable to the verdict; and

(3) to give deference to the jury on credibility and conflicts in the evidence.

Thus, *Brooks* forbids the reviewing court to (1) disregard any evidence,[5] or (2) neutrally (without deference) reweigh the evidence for the purpose of examining the jury's credibility determinations or resolution of conflicts in the evidence.

---

4. Justice Seymore's dissent from the denial of en banc reconsideration suggests this court would likely conclude the evidence in this case is factually insufficient upon a neutral weighing of the evidence, which is mandated by the Texas Constitution. As I conclude that, when viewed in the light most favorable to the conviction, the evidence is legally insufficient and no rational juror could have found the elements of this offense beyond a reasonable doubt, I necessarily agree that the evi-

dence would be insufficient under a neutral-light review.

5. The command to review all of the evidence on a criminal-sufficiency challenge stands in contrast to the civil standard, rejected by *Brooks*, which authorizes the reviewing court to disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

Significantly, however, we know from both *Jackson v. Virginia* and *Brooks* that there is some quantity or quality of evidence that a rational jury cannot disregard or disbelieve. The *Brooks* plurality was specific about that point:

> A hypothetical that illustrates a proper application of the *Jackson v. Virginia* legal-sufficiency standard is robbery-at-a-convenience-store case: The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on *all* the evidence the jury's finding of guilt is not a rational finding.

323 S.W.3d at 906–07. As the hypothetical states, the jury is free to believe or disbelieve evidence, but after a review of all of the evidence by the appellate court, it may become apparent that the jury's ultimate finding of guilt is not rational.

To emphasize the appellate court's role in this regard, *Brooks* refers the reader directly to *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982), to decipher the difficult distinction between evidentiary sufficiency (legal) and evidentiary weight (factual). *See Brooks*, 323 S.W.3d at 899–901. The evidentiary-sufficiency standard gives " 'the prosecution the benefit of all inferences reasonably to be drawn in its favor from the evidence,' " whether from direct or circumstantial evidence, and without the necessity of excluding every reasonable hypothesis except that of guilt. *Tibbs*, 457 U.S. at 38 n. 11, 102 S.Ct. 2211 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1316 (8th Cir. 1980). *Tibbs* further provides that the evidentiary-weight standard reconsiders the credibility of the witnesses and evaluates whether the "evidence preponderates suffi-

ciently heavily against the verdict that a serious miscarriage of justice may have occurred." *Id.* (citing *Lincoln*, 630 F.2d at 1119).

Thus, the plain language of *Brooks* demonstrates that, although the light in which we view the evidence has changed, the court has not eliminated the requirement that appellate courts review all of the evidence and, **"albeit to a very limited degree,** to act in the capacity of a so-called 'thirteenth juror' " to perform a factual-sufficiency review. *Brooks*, 323 S.W.3d at 901 (quoting *Watson v. State*, 204 S.W.3d 404, 417 (Tex.Crim.App.2006)).

## APPELLANT DID NOT RECEIVE A RIGOROUS AND PROPER *JACKSON V. VIRGINIA* SUFFICIENCY REVIEW

The *Temple* majority did not provide appellant an appropriate *Jackson v. Virginia* sufficiency review. As previously outlined, we know the *Temple* majority did not perform a factual-sufficiency ("no-rational-jury") analysis because the opinion's author, Justice Seymore, tells us so in his concurring opinion. *See Temple*, 2010 WL 5175018, at *38 (Seymore, J., concurring) (stating that this court "fail[ed] to review [appellant's] factual sufficiency challenges as questions of fact").

The face of the *Temple* opinion reveals Justice Seymore's observations to be accurate. The *Temple* panel demonstrably failed to apply a proper *Jackson v. Virginia* standard in two, independently flawed regards. First, the panel did not review all of the evidence. Second, the only "no-rational-jury" analysis applied by the panel in any way was not to all of the evidence, but rather to individual pieces of evidence.

### A. The panel failed to review all of the evidence.

Instead of reviewing all of the evidence in the *Temple record*, the panel disregard-

ed substantial evidence. In the name of deference to the jury, the panel concluded that any evidence favorable to the defense must have been disregarded by the jury, and therefore we, the reviewing court, must disregard it as well.

For example, when witnesses who lived adjacent to the Temple home testified that they heard a noise that sounded like a gunshot at 4:38 p.m., a time when appellant was not home, the panel concluded that "the jury was free to disbelieve it and rationally could have done so because [the witnesses] were children and no other witness testified that a gunshot was heard that day." *Id.* at *6 (majority opinion). This analysis falls short of an analysis of "all of the evidence" in two ways. First, there was no conflict in the testimony for the jury to resolve—according to Detective Schmidt, who interviewed the adjacent neighbors, no neighbor other than the Roberts children heard a gunshot at all, and yet, we know **there was a gunshot;** and we know from conclusive evidence that it occurred between 3:32 p.m. and 5:36 p.m. Second, the panel does not even mention the testimony of two other witnesses—also adjacent neighbors—who corroborated a disturbance in their location at that time; their dogs inexplicably "went crazy" at the time.

Although an appellate court is not required to detail all of the evidence admitted at trial, a proper sufficiency review should discuss the most important and relevant evidence that supports the appellant's complaint on appeal. *See Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App. 2003) (referring to factual sufficiency analysis). Appellant, in his brief, urges that the timeline "made it impossible for him to have committed the crime" because at the same time neighbors heard gun shots, appellant was documented to be in another location. To disregard the timeline of sounds and absence of sounds relied upon by appellant is to disregard, without commentary, uncontradicted evidence simply because the jury may have disregarded it.

Although *the jury* is free to disbelieve any or all of the evidence, we cannot disregard it for purposes of a "no-rational-jury" analysis. *See Redwine v. State,* 305 S.W.3d 360, 366 n. 12 (Tex.App.-Houston [14th Dist.] 2010, pet. ref'd) ("[D]isregarding all contrary evidence, no matter how mountainous or compelling it may be, appears incongruous with the reviewing court's task of deciding whether a rational factfinder could have found a defendant guilty *beyond a reasonable doubt* given that it is the evidence *contrary* to the verdict that commonly injects the element of 'reasonable doubt' into the jury's deliberations."). In deferring to the jury, the *Temple* panel incorrectly disregarded all evidence that does not support the verdict.

**B. The panel misapplied a "no-rational-jury" standard to pieces of evidence.**

There is further indication in the *Temple* opinion that the panel confused the standard. *Jackson v. Virginia* commands that the appellate court determine, upon review of all of the evidence, whether no rational jury could have found the elements of the crime beyond a reasonable doubt. The only two times the *Temple* panel mentions a "rational jury" in its analysis of the evidence, the panel determines whether a rational jury could have believed particular pieces of evidence. *See Temple,* 2010 WL 5175018, at *6, *8 n. 3 (stating that "the jury was free to disbelieve [the children's testimony] and rationally could have done so," and "no rational jury could credit Vielma's testimony"). That is contrary to the proper standard. The court is not to substitute its judgment witness-by-witness to determine whom the jury rationally be-

lieves or disbelieves. Instead, the jury, to whom we defer on pieces of evidence, can only become irrational after a review of all of the evidence. *See Brooks,* 323 S.W.3d at 906–07.

For an appellate court to abdicate its responsibility to look at evidence that the jury may have disbelieved or disregarded deprives a defendant of the constitutionally mandated, minimum-sufficiency review. And for an appellate court to confuse "no rational jury could believe" a piece of evidence for a standard that requires examination of whether "no rational jury could convict based upon all of the evidence" highlights the absence of a proper standard of review in this case. This court should grant en-banc review to harmonize its statement and application of the *Jackson v. Virginia* sufficiency-of-evidence review.

**A Rigorous and Proper *Jackson v. Virginia* Sufficiency Review Mandates Reversal in this Case**

The *Temple* case is, according to the panel, a purely circumstantial-evidence case. However, an examination of the status of circumstantial evidence for all types of criminal cases, in context, as well as the specific homicide cases relied upon by the *Temple* panel, reflects a significant departure from the rigorous analysis Texas requires of such evidence. Further, the rigorous analysis contemplated by *Brooks,* giving deference to the jury as directed, still reveals that this conviction rests upon no evidence that would permit a rational jury to find, beyond a reasonable doubt, that appellant intentionally or knowingly caused the death of Belinda Temple. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2003).

**A. Murder convictions should not rest upon less circumstantial evidence than contraband-possession convictions.**

Until 1983, when the Court of Criminal Appeals decided *Hankins v. State,* 646 S.W.2d 191 (Tex.Crim.App.1983) (op. on reh'g), trial courts in criminal cases *instructed juries* not to convict on circumstantial evidence unless the jury excluded "every other reasonable hypothesis except the defendant's guilt." *Id.* at 197 (abolishing the requirement of a circumstantial-evidence charge); *see also Carlsen v. State,* 654 S.W.2d 444, 449 (Tex.Crim.App. 1983) (op. on reh'g) ("[I]f the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding."). Then, in 1991, the Court of Criminal Appeals officially eliminated that same "reasonable hypothesis" construct from the evidence sufficiency review, as well. *Geesa v. State,* 820 S.W.2d 154, 161 (Tex. Crim.App.1991), *overruled on other grounds by Paulson v. State,* 28 S.W.3d 570, 571 (Tex.Crim.App.2000).

Meanwhile, in the context of crimes involving possession of contraband, the Court of Criminal Appeals coined the phrase "affirmative links" (and later, just "links") to describe the method for evaluating the circumstantial evidence linking an accused to contraband, such as drugs or firearms. *See, e.g., Evans v. State,* 202 S.W.3d 158, 161–62 & n. 9 (Tex.Crim.App. 2006); *Haynes v. State,* 475 S.W.2d 739, 742 (Tex.Crim.App.1972). Stated differently, when the contraband is not in the exclusive control of the defendant in the place or premise where it is found, the State must make a showing of links [6] be-

---

6. Ultimately the nonexclusive list of links suggested by the Court of Criminal Appeals has evolved into the following: (1) whether the

defendant was present when a search was conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to

tween the accused and the contraband. *Evans*, 202 S.W.3d at 161–62 & n. 9 (noting that the term "links" is used "merely as a shorthand catch-phrase for a large variety of circumstantial evidence that may establish the knowing 'possession' or 'control, management, or care' of some item such as contraband"). Thus, had appellant been charged with possession of the firearm used to murder Belinda, the State would have had to establish links between such firearm and appellant. *See, e.g., Williams v. State*, 313 S.W.3d 393, 397 (Tex.App.-Houston [1st Dist.] 2009, pet. ref'd) ("If the firearm is not found on the defendant or is not in his exclusive possession, the evidence must link him to the firearm.").

The elimination of the "reasonable hypothesis" construct created tension with the line of cases requiring links to eliminate the reasonable hypothesis that the defendant was an innocent simply in the wrong place. *See Humason v. State*, 728 S.W.2d 363, 367 (Tex.Crim.App.1987), *overruled by Geesa*, 820 S.W.2d 154. In 1995, the Court of Criminal Appeals addressed the collision between its elimination of the "reasonable hypothesis" standard and its retention of the "affirmative links" analysis. In *Brown v. State*, 911 S.W.2d 744 (Tex.Crim.App.1995), the court determined that each defendant must still be affirmatively linked with the contraband he or she allegedly possessed, but this link need no longer be so strong that it excludes every other outstanding reasonable hypothesis except the defendant's guilt. *Id.* at 748–49.

Today, more than fifteen years later, in a circumstantial-evidence case involving contraband, the State must still bring evidence that affirmatively links the accused to the contraband at issue. *See, e.g., Roberts v. State*, 321 S.W.3d 545, 549 (Tex. App.-Houston [14th Dist.] 2010, pet. ref'd). The court is not to look for a bright-line number of links answered affirmatively; instead, the court is to consider all of the links and determine "the logical force of all of the evidence, direct and circumstantial." *Evans*, 202 S.W.3d at 162. And still, the goal of the analysis of links is to protect an "innocent bystander—a relative, friend, or even stranger to the actual possessor—from conviction merely because of his fortuitous proximity to someone else's drugs." *Id.* at 161–62. All of these affirmative links require a focus on both the existence of circumstantial link and the absence of circumstantial link.

The circumstantial evidence in this case received nothing that resembles the analysis afforded a defendant in a case involving possession of a narcotic or a firearm. But, it should have. Absent a confession, eyewitness, accomplice, or recovered weapon, a nonexclusive list of affirmative links in murder cases could be:

> (1) whether any of the defendant's DNA or other forensic evidence was tied to the crime or the scene, *see Clayton v. State*, 235 S.W.3d 772, 779–80 (Tex. Crim.App.2007) (the defendant's bloody

and accessibility of the narcotic; (4) whether the defendant was under the influence of narcotics when arrested; (5) whether the defendant possessed other contraband or narcotics when arrested; (6) whether the defendant made any incriminating statements when arrested; (7) whether the defendant made furtive gestures or attempted to flee; (8) whether there was an odor of contraband; (9) whether other contraband or drug paraphernalia were present; (10) whether the defendant owned or had the right to possess the place where the drugs were found; (11) whether the place where the drugs were found was enclosed; (12) whether the defendant was found with a large amount of cash; and (13) whether the conduct of the defendant indicated a consciousness of guilt. *Evans*, 202 S.W.3d at 162 n. 12.

handprints at the scene); *King v. State*, 29 S.W.3d 556, 565 (Tex.Crim.App.2000) (the defendant's DNA on a cigarette butt found at the scene);

(2) whether any of the decedent's DNA or other forensic evidence was tied to the defendant, *see Gardner v. State*, 306 S.W.3d 274, 285–86 (Tex.Crim.App.2009) (fibers likely from the decedent's red robe found in the truck driven by the defendant); *King*, 29 S.W.3d at 565 (the decedent's blood on the defendant's sandals);

(3) whether the defendant had access to or possessed a weapon or ammunition of the type used to commit the murder; *see Guevara v. State*, 152 S.W.3d 45, 51 (Tex.Crim.App.2004) (shell casings matching the likely murder weapon found in the defendant's closet and car, and the defendant practiced firing a rented weapon of the same caliber shortly before the murder);

(4) whether the defendant was in possession of "fruits of the crime," *Padilla v. State*, 326 S.W.3d 195, 200–01 (Tex. Crim.App.2010) (money and jewelry from the decedent's home);

(5) whether the defendant made any incriminating statements, *see Guevara*, 152 S.W.3d at 51 (the defendant told a friend he was researching how to make a silencer); *King*, 29 S.W.3d at 564–65 (the defendant's letter indicating pride in the offense could be construed as an admission); *see also Smith v. State*, 332 S.W.3d 425, 437 (Tex.Crim.App.2011)

(the defendant told her ex-husband that she committed the murders);[7]

(6) whether the defendant attempted to conceal incriminating evidence, made inconsistent or implausible statements, or lied, *Guevara*, 152 S.W.3d at 50; *see also Padilla*, 326 S.W.3d at 201 (the defendant's untruthful statements may be considered in connection with the other circumstances of the case); *King*, 29 S.W.3d at 564–65 (the defendant's false statements to the media indicated consciousness of guilt and an attempt to cover up the crime);

(7) whether the defendant had a motive to murder the decedent, *see Clayton*, 235 S.W.3d at 781 (drug-related); *Guevara*, 152 S.W.3d at 50 (the defendant was having an affair and would receive substantial retirement benefits upon his wife's death); *King*, 29 S.W.3d at 565 (racial animosity); and

(8) whether the defendant attempted to flee or escape apprehension, *see Clayton* 235 S.W.3d at 780–81 (sudden flight from the crime scene and avoiding arrest for eight months).

Here, upon an analysis of these proposed links, the logical force of the evidence would not be sufficient. And, though the Court of Criminal Appeals has not suggested a list of affirmative links for murder cases, it is clear from the cases relied upon by the panel in this case that the court requires *some* link.

7. The primary issue in *Smith* was whether the trial court properly refused an accomplice-witness instruction in light of the ex-husband's handling of the murder weapon. *Smith* is remarkable in the context of this case because, when the conviction rests in part upon "accomplice" testimony, corroborating evidence beyond motive and opportunity must, by statute, exist. *See* Tex.Code Crim. Proc. Ann. art. 38.14 (West 2005). Thus, the

*Smith* court analyzed the evidence linking the defendant to the crime scene and the weapon at issue. Here, because there is no allegation of an accomplice, the evidentiary threshold applied by the panel was less. If the *Temple* panel's analysis is correct, the State would have needed *more* evidence to convict appellant if someone had come forward and claimed to have assisted appellant in murdering his wife.

**B. The circumstantial evidence to support appellant's murder conviction is nonexistent by comparison to the circumstantial evidence in the cases upon which the *Temple* panel relied.**

The *Temple* panel correctly set forth the current role of circumstantial evidence, even as to murder cases: It is as probative as direct evidence and it may, standing alone, be sufficient to establish guilt. *Temple*, 2010 WL 5175018, at *3 (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim.App.2007)). Then, the panel referenced three cases from the Court of Criminal Appeals to support the proposition that a murder conviction may rest solely upon inferences raised by circumstantial evidence. *Id.* (citing *Clayton*, 235 S.W.3d at 778–82; *Guevara*, 152 S.W.3d at 49–52; *King*, 29 S.W.3d at 564–65). Examination of the evidence necessary to affirm in these cases reveals the *Temple* panel's misapplication of the principles of circumstantial evidence.

In *Clayton*, the defendant's conviction rested upon, among other evidence, the following circumstantial evidence:

> The evidence at trial showed that there was a significant amount of blood inside the car [where Playonero was shot at close range] and a moderate amount on the outside of the car. A latent-fingerprint examiner with the Houston Police Department testified that he identified prints belonging to Playonero, Ayala, and Clayton. He testified that he identified three sets of prints, stamped in blood—one on the middle console, one on the gear shift, and one on the steering wheel. These prints belonged to Clayton. The prints identified as belonging to Playonero and Ayala were not bloody.

235 S.W.3d at 775. Thus, in *Clayton*, the circumstantial evidence affirmatively linking the defendant to the murder included the defendant's bloody handprint, to the exclusion of others, at the scene of the murder.

In *King*, the case about the dragging death of James Byrd, Jr., the defendant's conviction rested upon, among other evidence, the following circumstantial evidence:

> To summarize, the State presented several items of evidence that connect appellant to Byrd's murder: (1) DNA evidence from a cigarette butt at the crime scene—indicating appellant's presence during the murder, (2) DNA evidence on appellant's sandals—linking appellant to Byrd's injuries, (3) appellant's false statements to the media—indicating consciousness of guilt and an attempt to cover up the crime, (4) appellant's letter to Brewer—which could be construed as an admission that appellant participated in the crime, and (5) appellant's racial animosity—which supplies a motive for the murder.

29 S.W.3d at 565. Thus, in *King*, the circumstantial evidence linking the defendant to the murder included the presence of the defendant's DNA at the scene and the victim's DNA on defendant's shoes.

In *Guevara*, a case that is temptingly similar to this case on the facts, the defendant was convicted as a party to the murder of his wife. The defendant's mistress committed the actual murder—this fact was undisputed. 152 S.W.3d at 47. The jury heard evidence about the affair, about the defendant's lies about the affair, and about the defendant's convenient alibi for the time of the murder. *See id.* at 50–51. The defendant discovered his wife's body. *Id.* at 47. However, the jury also heard the following evidence:

- One month before the murder, the appellant took his wife to a shooting range to practice firing a rented 9mm

gun, the same caliber gun that was used in the murder.

- The defendant also told a friend, Paul Knauss, that he was researching how to make a silencer.
- Police found shell casings in the defendant's car that, according to the firearms expert, probably matched the murder weapon.
- Police found a box of shell casings under some clothes in the defendant's closet, thirty of which matched casings from the murder scene.

*Id.* at 51. Thus, in *Guevara*, the circumstantial evidence linking the defendant to the murder included shell casings from the likely murder weapon in his car and his closet.

In each of these cases, the State presented circumstantial physical evidence actually linking the defendant to the murder. In this case, it is undisputed that the State offered no circumstantial physical evidence linking appellant to the crime. *See Temple*, 2010 WL 5175018, at *32. The failure to do so is not attributable to a lack of physical evidence. The State had blood, brain matter, guns, and ammunition. None of it linked appellant to the crime.

With the framework of circumstantial evidence relied upon in the *Clayton, King*, and *Guevara* cases, the *Temple* decision falls far short. In its analysis of harm, the *Temple* panel specifically identified the "circumstantial evidence presented," which the panel concluded, "was not negligible":

- Appellant was involved in an extramarital affair with Heather, had left his pregnant wife and son during the New Year's holiday to spend two nights with Heather, and resumed his relationship with Heather a relatively short time after Belinda's death, including sending Valentine's Day flowers a month later.

- Appellant criticized Belinda's weight, housekeeping, and childrearing, and he detested Belinda's family.
- The scene of the murder was staged to make it appear burglarized.
- Appellant, his parents, and his brothers conspired to protect appellant by concealing the truth about the family's shotguns and appellant's affair.
- Appellant's explanation for his trip to Brookshire Brothers and then eastward to Home Depot was refuted by the length of time it took him to enter Home Depot after leaving Brookshire Brothers and Bernard Bindeman's testimony that he saw appellant heading south from an area near appellant's parents' house.
- Appellant's behavior and demeanor immediately following Belinda's death.
- Appellant's untruthfulness regarding taking E.T. to a park and placing E.T. in a child seat.
- Testimony from Quinton and Tammy that, following Belinda's death, appellant aggressively confronted them regarding their statements to the police and grand jury, even following them in his truck.

*Temple*, 2010 WL 5175018, at *32. Assuming that the matters recited above are circumstantial evidence at all, they fall far short of the quantum of circumstantial evidence necessary to support a rational jury in determining, beyond a reasonable doubt, that appellant caused Belinda's murder.

Some of the matters recited are not, however, circumstantial evidence. At best, they are inferences that the *Temple* panel attempted to draw from testimony—sometimes inappropriately. For example, the panel broadly concluded that the Temple family conspired to protect appellant, including concealing the truth about the family's shotguns. There is, however, no **evidence** that any member of the Temple

family lied about the shotguns. Members of the Temple family testified that: (1) appellant never owned a 12–gauge shotgun, though his brothers did; (2) in the mid–1980s, appellant owned a 20–gauge shotgun; and (3) appellant occasionally borrowed guns from his brother when he hunted. A friend of the family testified that he recalled seeing appellant shoot a 12–gauge shotgun when hunting in the mid–1980s.

This Temple-family testimony about the shotguns is not inconsistent with the other evidence. And it does not need to be inconsistent for the jury to disregard it because it is interested, family testimony. *See Evans*, 202 S.W.3d at 163 (holding that the jury is not required to believe even the uncontradicted testimony of the defendant's mother because "[s]he is, after all, the defendant's mother"). Yet, *Evans* does not suggest that the jury, when disbelieving the defendant's mother, may infer she was lying, and because she was lying, it is a circumstance of her son's guilt. If that were so, the State would only need to call the defendant's mother in every case to provide the silver-bullet inference. If the mother corroborated her son's innocence, the jury would be free to disregard her testimony, infer she was lying, and base its finding of guilt upon that inference. However, that is precisely the inference the *Temple* panel indulged in this case to fill the gap of evidence regarding appellant "causing the death of Belinda Temple."

Further, the Court of Criminal Appeals explains that

> an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be com-pletely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.

*Hooper*, 214 S.W.3d at 16. It cannot be overemphasized: This inference regarding the family members "conspiring" to protect appellant concerning gun ownership more than fifteen years before this murder does not arise from actual facts proven through testimony. It is worse than speculation about the meaning of facts. It is speculation about what happened if the jury chose to disbelieve Kenneth Temple when he testified that he never purchased a 12–gauge shotgun for appellant: The jury substituted in place of the actual shotgun testimony—without any alternative evidence—the conclusions that: (1) Kenneth Temple **did** purchase appellant a 12–gauge shotgun in the 1980s, (2) appellant still owned that gun, (3) appellant owned double-ought, reloaded buckshot to fit into that gun, and (4) appellant used that gun and ammunition to shoot Belinda. This trial could have been much shorter if that inference exercise is permissible.

## C. A rigorous and proper application of *Jackson v. Virginia* to all of the evidence, viewing it in the light most favorable to the conviction, reveals insufficient evidence for a rational jury to find beyond a reasonable doubt that appellant actually caused Belinda's death.

No rational jury could have found all of the elements of the offense charged against appellant. Specifically, there is no evidence, direct or circumstantial, to support even an inference that appellant actually caused Belinda's death.

There is evidence that supports an inference that appellant had a motive—he was having an affair. There is evidence that supports an inference that appellant had

the opportunity to commit the crime—within the eighteen minutes that appellant failed to account for his time on the date of his wife's death [8] with conclusive evidence. However, the State offered no evidence of any type that he actually committed the murder.

A review of the entire record of evidence yields the following *Jackson v. Virginia* analysis:

### 1. Conclusive evidence and agreed evidence

The Court of Criminal Appeals defines *conclusive evidence* as that evidence dispositive of the fact or element at issue. *Evans*, 202 S.W.3d at 163 n. 16. "Such evidence 'becomes conclusive (and thus cannot be disregarded) when it concerns physical facts that cannot be denied.'" *Id.* (quoting *City of Keller*, 168 S.W.3d at 815). The *Evans* court placed into this category evidence upon which the parties mutually agree or assume. *Id.*

The following evidence is conclusive or agreed in this case:

- Belinda called appellant at home from her cell phone at 3:32 p.m., and the call lasted 30 seconds.

- Belinda was murdered in her home at 22502 Round Valley on January 11, 1999, between 3:32 p.m. and 5:36 p.m.

- E.T., the three-year-old son of Belinda and appellant, did not witness the murder.

- Belinda was murdered by a shotgun blast to the back of her head while she was inside and facing the rear of the bedroom closet of the home she shared with appellant.

- Belinda was shot with a 12–gauge shotgun, and the shell contained double-ought, reloaded buckshot.

- Belinda was murdered with a contact shot—the shotgun was aimed at and touching her head when fired.

- The 12–gauge shotgun discharged at 22502 Round Valley between 3:32 p.m. and 5:36 p.m. on January 11, 1999.

- Appellant and E.T. were in a Brookshire Brother's grocery store (and on a video surveillance tape) twelve minutes from home from 4:32 p.m. to 4:38 p.m. on January 11, 1999. Accordingly, appellant was not home from 4:20 p.m. to 4:50 p.m.

- Appellant and E.T. were in a Home Depot store (and on a video surveillance tape) fourteen minutes from home at 5:13 p.m. to 5:14 p.m. on January 11, 1999. Accordingly, appellant was not home from 4:59 p.m. to 5:27 p.m.

- A contact gunshot to the back of Belinda's head would cause some back splatter or blow back of blood or brain matter.

- Forensic analysis revealed none of Belinda's blood, none of Belinda's brain matter, and no gunshot residue on appellant or any of his clothing—none that he was wearing and none recovered from the laundry, bathroom, or vehicle.

- Forensic analysis revealed none of Belinda's blood or brain matter within either of the Temple vehicles.

- The backdoor window, because it was tempered, was broken with a tool or a gun, but not a hand or fist.

**8.** The conclusive evidence (from video surveillance, cell phones, and 911 calls) in this case accounts for appellant's whereabouts—away from the murder scene—for all but eighteen to thirty-five minutes of the one-hundred-twenty-four-minute window in which the crime was committed.

- Forensic analysis revealed no glass fragments on appellant's clothing.
- Forensic analysis revealed none of appellant's fingerprints on the bedroom television that was "placed" on the floor as part of the "staging."
- An extensive search of the Temple residence and Temple vehicles revealed no 12–gauge shotgun, no 12–gauge shotgun shells, and in particular, no 12–gauge double-ought, reloaded shotgun shells.
- A multiple-day search that involved fifteen homicide officers, a dive team, ten to fifteen trustees, and a DPS plane with heat-seeking equipment scouring over four or five areas (including rice fields, reservoirs, canals, and ponds) of interest on the north side of Katy, where police believed appellant might have disposed of a weapon, revealed nothing.
- Subpoenaed emails between Heather and appellant revealed nothing beyond a flirtation—no murder plot, no discussions of weapon, no plans for the future that indicated a knowledge Belinda would be gone, etc.

## 2. Weighed evidence, including facts and inferences, with deference to the jury on credibility and conflict determinations

A rigorous and proper application of *Jackson v. Virginia*, as described by Brooks, requires an appellate court to defer to the jury on determinations of a witness's credibility and the weight to be given the testimony *by reviewing all of the evidence in the light most favorable to the conviction. Brooks*, 323 S.W.3d at 900.

*Brooks* acknowledges, however, that the Court of Criminal Appeals has never articulated precisely how much deference such determinations are due. *Id.* (noting that even the court's factual-sufficiency decisions have always required a reviewing court to afford a great amount of deference "(though this Court has never said precisely how much deference) to a jury's credibility and weight determinations"). Nevertheless, it is clear that "total deference" is not required. *See id.* at 902 n. 19.

The jury was entitled to weigh the disputed evidence of a relationship outside his marriage and disrespectful treatment of his wife and determine that appellant had a motive to kill his wife. *See Guevara*, 152 S.W.3d at 50. Former "friends" Tammy and Quinton Harlon and Belinda's twin sister Brenda testified that appellant criticized his wife's weight, housekeeping, and childrearing, and he detested Belinda's family. Heather Temple [9] admitted that she and appellant had a sexual relationship of a few encounters, and Heather and her roommate Tara gave testimony that appellant lied to his family and spent two nights with Heather in the two weeks prior to Belinda's death. The jury heard from investigators [10] that Heather told police appellant said he loved her. Quinton, who also had pursued Heather, testified that appellant was unsure if he was willing to leave Belinda for Heather. Appellant continued his relationship with Heather shortly after Belinda's death.

The jury was entitled to weigh the disputed circumstantial physical evidence of glass at the scene and officer testimony and conclude that the scene was staged to

9. By the time the State tried appellant for murder 8½ years after the murder, appellant and Heather had married.

10. Though Heather disputed this police account, as this evidence is in conflict, the jury was free to resolve it in favor of the police and, viewing the evidence in the light most favorable to the conviction, I assume they did.

appear that a robbery had occurred.[11] Investigators testified that the broken glass in the back door and the overturned television in the bedroom appeared to have been staged because the glass was not in the right place and the television appeared gently set on the floor. Detective Mark Schmidt felt that the Temple home was staged to make it appear to have been burglarized. Insurance agents testified about the stolen jewelry claim made by the Temple family, which did not precisely match the list given to police—however, the family consistently listed only Belinda's jewelry.[12]

The jury was entitled to weigh the disputed testimony to conclude that appellant was lying. Here, the evidence supports an inference that appellant lied on several occasions. First, evidence supports a conclusion that appellant did not take the route home from Home Depot north across Interstate 10 that he claimed. Appellant was observed by Bernard "Buck" Bindemann, who was familiar with appellant from high school (approximately fifteen years earlier) at the intersection of Katy Hockley Cut–Off and Morton Ranch Road between 4:50 p.m. and 5:00 p.m. on January 11, 1999. Appellant said he went to the park, then to Brookshire Brothers, then to Home Depot, and then home. Bindemann said he saw appellant at an intersection not on the described route home and not heading toward home. Second, appellant lied when he said he placed E.T. in a car seat before they drove north on Interstate 10. Crime scene photographs of appellant's vehicle do not show a car seat in the car. Third, appellant confronted his former best friends Quinton and Tammy Harlon about their grand-jury testimony and statements to police, and he told them to keep their mouths shut.

The jury was entitled to weigh the disputed testimony to conclude that appellant was not emotional about his wife's death. Police officers observed a lack of emotion in appellant following Belinda's death.[13]

### 3. All of the evidence, after appropriate deference

As discussed above, a reviewing court must consider all of the evidence. Brooks, 323 S.W.3d at 899. In the near one-month guilt/innocence phase of the trial, the parties presented more than sixty witnesses to the jury, including investigators, neigh-

---

11. It important to note the State advanced the theory that appellant must have staged the scene because his Chow, Shaka, would never have allowed a stranger into the backyard without at least barking. The Temple panel concluded, I believe correctly, that the jury was not free to indulge this inference because of the evidence that Shaka was in the garage at the time of the murder. Temple, 2010 WL 5175018, at *8 n. 3. The dog's bed, fresh food, and water were in the garage; the latch on the backyard fence was broken; no one heard Shaka barking; no one observed the dog in the backyard during the afternoon; and the dog was known to remain in the garage even when the door was opened for vehicles to enter. Without this inference, the most the jury was entitled to infer, without speculation, is that robbery was not the motive for the murder—not that appellant committed the murder.

12. Defense expert testimony and defendant's own testimony dispute that the scene was or could have been staged. However, as this evidence is in conflict, the jury was free to resolve it in favor of the police, and viewing the evidence in the light most favorable to the conviction, I assume they did.

13. All fact witnesses who had a history with appellant, even those adverse to appellant such as the Harlons, testified that appellant was emotional over the loss of his wife and child. However, as this evidence is in conflict, the jury was free to resolve it in favor of the police, and viewing the evidence in the light most favorable to the conviction, I assume that they did.

bors, family, police and medical responders, custodians of records, and others, directed almost exclusively to establishing the timeline of events. However, none of the investigators provided any link between appellant and the crime scene. The following evidence, falling into the categories I describe as "timeline evidence" and "RJS evidence," **omits** all evidence the jury was free to disbelieve, as previously outlined:

*a. Timeline evidence*

- Witnesses at the schools where Belinda and appellant worked, as well as the daycare where E.T. was enrolled, confirm that E.T. became ill in the morning, Belinda picked him up, and appellant came home to stay with E.T. so Belinda could go back to work. Belinda stopped by appellant's parents' house for soup on the way home, phoned appellant from her cell phone at 3:32 p.m., and then arrived home between 3:45 p.m. and 4:00 p.m..

- Appellant and E.T. were on a videotape at Brookshire Brothers from 4:32 p.m. to 4:38 p.m. Brookshire Brothers was at least twelve minutes from the Temple home without considering that his necessary path traveled across Interstate 10 at approximately rush hour when the freeway was under construction. A Brookshire Brothers manager recalled having a discussion with appellant outside the store after 4:38 p.m. Appellant had put a quarter in the mechanical hobby horse for E.T. to ride, but it would not work.

- Neighbor Natalie Scott drove by the Temple home at 4:30 p.m. but did not hear or see anything.

- At about 4:30 p.m., Mr. and Mrs. Parker's (adjacent-to-the-back-fence neighbors) dog went "crazy" in the backyard. Mr. Parker went outside to investigate and found no reason for

the dog's behavior but noticed their tool shed had been opened.

- At 4:38 p.m., Belinda's sister called the Temple home phone line. No one answered, and she left a message.

- At some point between 4:38 p.m. at 4:41 p.m., the Roberts brothers (adjacent neighbors to the Temples), ages nine, eight, and six, heard a gunshot. They specifically recalled the sound and comforting one another. They measured the time by the time they were dropped off by the bus, had a snack, did a few minutes of homework, and started a video, *Dr. Dolittle*. The boys were able to pinpoint within the movie where they heard the shot, and another witness confirmed the bus schedule that day. No other witnesses heard a gunshot at any time.

- At approximately 4:55 p.m. or 5:00 p.m., RJS's (a sixteen-year-old sophomore at Belinda's school and the Temples' across-the-street neighbor) dogs started barking in the house. He was sleeping after having smoked marijuana during the day, and the dogs woke him up. At the same time, between 4:50 p.m. and 5:00 p.m., Bernard "Buck" Bindemann observed appellant at the intersection of Katy Hockley Cut-Off and Morton Ranch Road.

- Natalie Scott drove by the Temple home at 5:10 p.m. She did not see or hear anything.

- At 5:10 p.m., Kenneth Temple called to see how E.T. was feeling. No one answered, and he left a message.

- At 5:14 p.m., appellant and E.T. were on videotape at Home Depot a few minutes away from Brookshire Brothers. Home Depot is at least twelve minutes from the Temple home without considering that his necessary path traveled across Interstate 10 at

approximately rush hour when the freeway was under construction.

- At around 5:25 p.m., Angela Vielma walked by the Temple home. She had a fight with her boyfriend and was walking to a friend's house. She observed appellant and E.T. drive into the garage. She did not see a dog or another vehicle in the garage.

- At approximately 5:35 p.m., appellant banged on the door of Mike and Peggy Ruggiero. They are adjacent neighbors on the garage side. Appellant was screaming, "Mike, Mike, it's me David. Let me in." When Mike opened the door, appellant said he needed them to keep E.T. because his house had been broken into. Peggy kept E.T. and phoned 911 at 5:36 p.m. while appellant and Mike returned to the Temple home. Appellant ran through the backyard and into the house, but Mike was stopped short by the Temple's dog. The dog did not like Mike and jumped on the fence at him—Mike stayed at the gate, holding it closed because of the broken latch, while appellant went into the house.

- At 5:38 p.m., appellant called 911 from inside the home.

- Sam Gonsoulin and Kathleen Johnson were the first responders. They were dispatched at 5:45 p.m. and arrived shortly thereafter. Johnson stayed outside with appellant while Gonsoulin went into the house. Gonsoulin was deceased by the time of the trial.

According to the *Temple* panel, the timeline evidence shows that appellant had eighteen minutes to commit the murder

and dispose of all physical evidence. *See* 2010 WL 5175018, at *6.[14] Further, there was evidence that a gunshot was heard in the neighborhood at a time when appellant could not have committed the murder, and there was no evidence that a gunshot was heard during the time appellant could have committed the murder.

### a. RJS evidence

As previously stated, RJS was the sixteen-year-old neighbor of the Temples. RJS and Belinda had a history: The jury heard of repeated run-ins with Belinda. She was one of his "counselors" at school and was constantly telling him to get to class because he was a class-skipper. In the fall of 1998, Belinda reported RJS's horrible school-attendance record to his parents, and they grounded him. Belinda also told RJS's parents about broken bottles in her yard, for which she suspected RJS. RJS stood and watched as his friends tore down the Temples' outdoor Christmas decorations less than a month before Belinda was murdered. These undisputed facts support a motive for RJS.

RJS and his family owned guns—12–gauge shotguns—and they used 12–gauge double-ought shotgun shells that they reloaded. Within days before Belinda's murder, RJS took a 12–gauge shotgun and some shells out with his friends to shoot. He knew that his buddy Casey had recently stolen a 12–gauge shotgun from his mother's boyfriend, so Casey and RJS decided to go shooting. Usually, after he shot his dad's guns, he would clean them, but he did not know whether these guns were cleaned. He recalled leaving his 12–

14. However, the *Temple* panel did not view the evidence in the light most favorable to the conviction in arriving at this timeline. Appellant testified at trial that Belinda arrived home "closer to 4:00 p.m." but admitted that his initial estimate to officers was 3:45 p.m., and thus, the window for appellant to commit

the murder and dispose of all physical evidence could have been thirty-five minutes: from 3:45 p.m. to 4:20 p.m. Appellant could have left his house no later than 4:20 p.m. to make the twelve-minute commute to Brookshire Brothers, where he appeared on a video camera at 4:32 p.m.

gauge shotgun with Casey. However, police records show that, several days after the murder, RJS's father voluntarily surrendered two 12–gauge shotguns. There was no blood detected on either. RJS's father also surrendered live, reloaded shotgun shells; none of those submitted contained wadding that matched the murder shell. However, these undisputed facts support RJS's possession of a weapon and ammunition consistent with those used to kill Belinda.

On the day of Belinda's death, RJS cut school after seventh period and was at his home, across the street from the Temple home, several times on the afternoon of Belinda's murder.

However, RJS testified that while he was skipping school, he and his friends hung out, went from house to house, and smoked marijuana. RJS admitted to being addicted to marijuana at the time. Further, though he was prohibited from driving, he nonetheless drove that afternoon. Initially he and his friends arrived at his home at approximately 3:30 p.m. after smoking a joint. When he arrived home, he was surprised to find one of his front doors cracked open. So, he and his friends looked around the house to be sure there had not been a burglary.

Later, he and his friends drove around in one of the boy's tan, four-door car looking for more marijuana, but could not find any. The Ruggerio's, taking their nightly walk through the neighborhood, saw a car matching that description, containing two teens, speed from the neighborhood at approximately 4:30 p.m. RJS believed he returned home around 4:20 p.m. or 4:30 p.m. He then fell asleep on the couch. He slept soundly because he was stoned; however, his dogs woke him between 4:55 p.m. and 5:00 p.m., as discussed above. These facts support RJS's opportunity to commit the crime.

RJS talked to the police on several occasions and "probably" smoked marijuana before going to the station to talk to them. He was interviewed more than once. RJS then provided grand jury testimony but smoked marijuana the night before. RJS unabashedly admitted that during this time he lied to his parents about driving the car, smoking marijuana, having marijuana in the house, skipping school, and shooting his father's guns. Accordingly, there is direct evidence that RJS lied and was sufficiently addicted to marijuana that he smoked marijuana even when it was likely his drug use would be discovered.

### 4. No rational jury could find guilt beyond a reasonable doubt

My conclusion about this record is straightforward. First, the absence of evidence should be dispositive. A rational jury cannot find, beyond a reasonable doubt, that one individual caused the death of another based solely upon (1) circumstantial evidence of motive, (2) circumstantial evidence of opportunity, and (3) inferences of guilt, none of which actually provide an affirmative link to the crime. If, as outlined herein, the State calls the defendant's mother, who says her son did not commit the crime, and we permit the jury to disbelieve it *and* infer from their disbelief that the defendant is guilty, we have allowed the irrational. Indeed, the *Temple* panel allowed the irrational.

Second, as to the evidence as a whole—deferring to the jury—appellant's conviction should be reversed. A rational jury could not hear of RJS's motive, opportunity, and possession of a weapon and ammunition consistent with those used to kill Belinda and, yet, form no reasonable doubt that RJS rather than appellant committed the crime. Moreover, a rational jury could not believe that appellant committed this murder in the manner that he did, whether

in *eighteen minutes or thirty-five*. In this short time period, appellant allegedly surprised his wife, forced her into a closet, with a telephone in her hand, made her turn around facing the rear, placed a 12–gauge shotgun to the back of her head, and pulled the trigger. Appellant cleaned up. He washed the blood and brain matter from himself (hair and clothing) and left no trace in any sink in the house or on any towel in the house. Or, he covered himself, so he was required to dispose of the covering, but not in the house because it was searched. Appellant drove the blood and brain-soaked clothing and dumped it during his outing, without leaving a trace in the car, and he did so in a manner that a massive hunt for the items turned up nothing. Appellant transported and disposed of the gun without leaving a trace of blood, brain matter, or gunshot residue in the car, and he did so in a manner that a massive hunt for the gun turned up nothing. Before he left home, appellant staged it to create an appearance of a burglary. He used a tool to break the tempered glass in the back door, without getting glass on himself or his shoes. He put the tool away. He slid the television off of its stand without leaving prints on it. He opened miscellaneous drawers. He did all of these things while: (1) his three-year-old son was waiting for him somewhere inside or outside the house; and (2) hoping no one in the neighborhood heard the blast and called for help. It is more than just hard to believe this actually happened; it is irrational to believe it.

### CONCLUSION

This court should grant appellant's motion for rehearing en banc. The *Temple* panel decision should not remain the Fourteenth Court of Appeals' last word on this case; our authoring colleague, Justice Seymore, agrees, although for different reasons.

The unrest that *Brooks* has created in intermediate appellate courts' application of the standard of review cost appellant his only appeal of right. *Brooks* eliminated a factual-sufficiency point of error because the standard that would apply is indistinguishable from the legal-sufficiency review. It was not the purpose of *Brooks* to ease the burden of intermediate appellate courts. Appellant is still entitled to a full-record review, a detailing of evidence sufficient to support a rational jury's determination to convict, and an evaluation of the process used to convict that generates a confidence that appellant's conviction will and should stand the test of time and technology. This court will continue to wrestle with circumstantial evidence, and inferences, and how to afford appropriate deference in the refining of *Brooks*. And, yet, just as appellant did not receive the benefit of a *Clewis* neutral-light review because the State was unable to indict in 1999, appellant will not receive the benefit of a proper *Brooks* standard of review if we do not grant this rehearing.

CHARLES W. SEYMORE, Justice, dissenting to denial of rehearing en banc.

While this case was pending, a plurality of the Court of Criminal Appeals issued *Brooks v. State* and abolished factual-sufficiency review in derogation of the Texas constitutional and statutory right to appellate review of questions of fact in criminal cases. 323 S.W.3d 893, 894–912 (Tex. Crim.App.2010) (Hervey, J., joined by Keller, Keasler, & Cochran, JJ., plurality op.) & *id.* at 913–26 (Cochran, J., joined by Womack, J., concurring); *see also* Tex. Const. art. V, § 6(a). In fact, the Court of Criminal Appeals recently acknowledged it had abolished factual-sufficiency review. *Howard v. State*, 333 S.W.3d 137, 138 n. 2 (Tex.Crim.App.2011) (citing *Brooks* and commenting, "The appellant

also argues that the evidence was factually insufficient, but since the appellant's brief was submitted we have abolished factual-sufficiency review"). Accordingly, I dissent to the majority's decision to deny my request for en banc reconsideration of this court's adherence to *Brooks* and the concomitant disregard of appellant's right to seek review of his questions of fact, guaranteed by the Texas Constitution.

## JURISDICTION

Ostensibly, this court is required to follow the dictates of vertical stare decisis by acceding to the opinions and mandates of the Court of Criminal Appeals. However, this court also has the duty to defend the Texas Constitution by asserting its conclusive appellate jurisdiction over questions of fact in criminal cases.

> [T]he decision of [Texas courts of appeals] shall be conclusive on all questions of fact brought before them on appeal or error.

Tex. Const. art. V, § 6(a). Early in Texas history, criminal defendants were afforded the protections of appellate review of questions of fact. The Supreme Court of the Republic of Texas recognized "the defendant in a criminal prosecution in the district court has the right of appeal to this court from the judgment or sentence of the court below, and *to have the facts* as well as the law, at his own election, *opened for re-examination." Republic v. Smith,* Dallam 407, 410–11 (Tex.1841) (emphasis added). In Texas, appellants may challenge as erroneous, a finding of fact on the ground the jury's verdict was against the preponderance of the evidence, i.e., the evidence was factually insufficient. *See, e.g., Choate v. San Antonio & A.P. Ry. Co.,* 91 Tex. 406, 44 S.W. 69, 70 (Tex.1898). The exclusive and conclusive jurisdiction of appellate courts was recently acknowledged by the Texas Supreme Court: "[A]

review of the evidence for factual sufficiency is a power committed *exclusively* to the court[s] of appeals." *Regal Fin. Co. v. Tex. Star Motors,* No. 08–0148 —— S.W.3d ——, 2010 WL 3277132, at *7 (Tex. Aug.20, 2010) (emphasis added).

There is a plethora of authority acknowledging the Texas constitutional imperative that intermediate courts of appeals have conclusive jurisdiction over factual-sufficiency issues in criminal cases, but the *Brooks* plurality disregarded their own precedent in derogation of that jurisdiction. *See Laster v. State,* 275 S.W.3d 512, 518–19 (Tex.Crim.App.2009); *Bigby v. State,* 892 S.W.2d 864, 872–75 & n. 3 (Tex. Crim.App.1994); *Ex parte Schuessler,* 846 S.W.2d 850, 852–53 (Tex.Crim.App.1993); *Meraz v. State,* 785 S.W.2d 146, 152–54 (Tex.Crim.App.1990); *see also Brooks,* 323 S.W.3d at 931 (Price, J., joined by Meyers, Johnson, & Holcomb, JJ., dissenting) (expressing that the plurality ignored stare decisis). Actually, the Court of Criminal Appeals previously cautioned against what happened in *Brooks:*

> [I]t [is] not appropriate for this Court to create a standard of review which is in conflict with the language of our State Constitution.

*Meraz,* 785 S.W.2d at 152; *see also* Susan Bleil & Charles Bleil, *The Court of Criminal Appeals Versus the Constitution: The Conclusivity Question,* 23 St. Mary's L.J. 423, 424 (1991).

The Court of Criminal Appeals further declared that the only way to preclude a Texas court of appeals from "determin[ing] if a jury finding is against the great weight and preponderance of the evidence," i.e., determining a question of fact, is for "the people of the State of Texas to amend the Constitution." *Meraz,* 785 S.W.2d at 152. Subsequently, the *Brooks* plurality conversely concluded: "As the Court with final appellate jurisdiction in this State, we

decide that the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt." *Brooks*, 323 S.W.3d at 912 (plurality op.) (citation omitted). The *Brooks* plurality attempts to justify this jurisdictional incursion with the implicit suggestion that their authority to establish standards of appellate review trumps any jurisdictional impediment. *Id.* at 911 (citing *Clewis v. State*, 876 S.W.2d 428, 431 (Tex.App.-Dallas 1994), *vacated*, 922 S.W.2d 126 (Tex.Crim.App.1996)). **However, I respectfully submit that our superior court has neither the jurisdiction nor constitutional authority to create or implement a standard of review that either explicitly or implicitly abolishes a Texan's right to appellate review of his questions of fact as questions of fact.**

This court and all intermediate appellate courts in Texas are presently faced with a fundamental question relative to the oath of office for members of the judiciary: whether to "protect and defend" the right, under the Texas Constitution, to appellate review of questions of fact as questions of fact in criminal cases. The question is not rhetorical because constitutionally mandated protection is at stake. Intermediate appellate courts in Texas have no inherent power to ignore an express constitutional mandate. *See Queen v. State*, 842 S.W.2d 708, 711 (Tex.App.-Houston [1st Dist.] 1992, no pet.). Moreover, in consideration of recent public acknowledgements that numerous Texans were actually innocent when convicted, our courts should be vigilant to insure that Texans are afforded all constitutional protections against erroneous conviction. The goal of our criminal justice system should be to convict the guilty and exonerate the innocent. *See*

*United States v. Nobles*, 422 U.S. 225, 230, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975).

## EN BANC RECONSIDERATION

This court is presented with an extraordinary circumstance necessitating en banc review: whether to adhere to the decision of the Court of Criminal Appeals to dictate a standard of review for factual sufficiency that "abolishes" appellate review of questions of fact. *See* Tex.R.App.P. 41.2(c) (allowing en banc review when extraordinary circumstances so require). En banc review is necessary because this court has already followed *Brooks* in several opinions. I separately called for en banc review to afford this court the opportunity to reverse course and fulfill a Texan's right to meaningful factual-sufficiency review. Unfortunately, a majority of my colleagues choose to disregard this affront to the Texas Constitution.

In my previous concurrence with the panel opinion, I lamented that I am constrained to follow this court's decision to deny appellant's request for appellate review of questions of fact. I declined to perform a factual-sufficiency review, concluding that any effort in this regard would contradict this court's precedent. Accordingly, for reasons outlined below, I dissent to this court's rejection of en banc reconsideration of the decision to deny appellate review of appellant's questions of fact as prescribed by Article 5, Section 6 of the Texas Constitution. Tex. Const. art. V, § 6(a).

## DOES THE *JACKSON* STANDARD FULFILL THE TEXAS CONSTITUTIONAL GUARANTEE OF APPELLATE REVIEW FOR FACTUAL SUFFICIENCY OF THE EVIDENCE?

In *Clewis v. State*, the Court of Criminal Appeals held that in determining factual

sufficiency of the evidence, an appellate court should view " 'all the evidence without the prism of "in a light most favorable to the prosecution," [and set] aside the verdict only if it is so contrary to overwhelming weight of the evidence as to be clearly wrong and unjust.' " 922 S.W.2d 126, 129 (Tex.Crim.App.1996) (adopting the standard prescribed by the court in *Stone v. State*, 823 S.W.2d 375 (Tex.App.-Austin 1992, pet. ref'd, untimely filed)). The *Brooks* plurality overruled Clewis, holding that the standard of review for any challenge to sufficiency of evidence is the *Jackson v. Virginia* legal-sufficiency standard in which an appellate court considers all of the evidence in the light most favorable to the verdict, and determines whether the jury was rationally justified in finding guilt beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 895 (plurality op.).

Apparently, following the Court of Criminal Appeals opinion in *Brooks*, a majority of this court concluded that there is an implicit factual-sufficiency component within the standard of review for legal sufficiency prescribed by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Accordingly, those members of this court must have concluded that protections afforded criminal defendants under Article 5, Section 6 of the Texas Constitution were not abrogated by *Brooks*. In her dissent to this court's denial of en banc review, Justice McCally bases some of her criticism regarding the panel opinion on what she considers to be failure to incorporate a factual-sufficiency component when reviewing all the evidence under the *Jackson* standard of review for legal sufficiency.[1] Risking redundancy, I remind my colleagues that the *Brooks* plurality adopted the unexpurgated *Jackson* standard of review for legal sufficiency as the standard for reviewing all challenges to sufficiency of evidence. *Brooks*, 323 S.W.3d at 895 (plurality op.).[2] Under *Jackson*, this court must totally defer to the jury's weight and credibility determinations. *Jackson*, 443 U.S. at 319 & n. 13, 326, 99 S.Ct. 2781. Accordingly, for reasons outlined below, I strongly disagree with the proposition that a type of factual-sufficiency review contemplated under *Clewis* is subsumed under *Jackson*.

First, under *Jackson*, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319, 99 S.Ct. 2781. The jury resolves conflicts in the testimony, weighs the evidence, and draws inferences from basic facts to ultimate facts, and the appellate court "impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.* If the *Brooks* plurality implicitly concluded that the *Jackson* standard for legal-sufficiency review covers any questions of fact raised by an appellant, those members of the Court failed to acknowledge the unique constitutional duty of Texas courts of appeals to decide questions of fact by weighing all of the evidence. *See* Tex. Const. art. V, § 6(a). This is true because a question of fact as described in the factual-conclusivity clause is a "legal term of art signifying 'questions of weight and preponderance of evidence.' " *Cain v. State*, 958 S.W.2d 404, 408 (Tex.Crim.App. 1997) (quoting *Combs v. State*, 643 S.W.2d

---

1. I address Justice McCally's criticisms of the majority opinion below.

2. Since the Brooks opinion, the Court of Criminal Appeals confirmed that factual sufficiency review has been "abolished." *Howard*, 333 S.W.3d at 138 n. 2.

709, 715 (Tex.Crim.App.1982)). Conversely, as noted above, under the *Jackson* standard, the appellate court completely and totally defers to the jury's weight and credibility determinations. *Jackson,* 443 U.S. at 319 & n. 13, 326, 99 S.Ct. 2781.

Second, under *Jackson,* "the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution." *Id.* at 319, 99 S.Ct. 2781. The evidence is not weighed, and a successful challenge to legal sufficiency of the evidence results in acquittal, not a new trial. *See Tibbs v. Florida,* 457 U.S. 31, 41–42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Whether the evidence is legally sufficient under Jackson "*is of course wholly unrelated to the question of how rationally the verdict was actually reached* .... [T]he standard announced today ... does not require scrutiny of the reasoning process" used by the fact-finder. *Jackson,* 443 U.S. at 319 n. 13, 99 S.Ct. 2781 (emphasis added). Succinctly, evidence is legally insufficient where the "only proper verdict" is acquittal. *Tibbs,* 457 U.S. at 42.

Third and conversely,

A reversal on [a factual-sufficiency] ground, unlike a reversal based on [legally-]insufficient evidence, *does not mean that acquittal was the only proper verdict.* Instead, the appellate court sits as a "thirteenth juror" and disagrees with the jury's resolution of the conflicting testimony. This difference of opinion no more signifies acquittal than does a disagreement among the jurors themselves. A deadlocked jury, we consistently have recognized, does not result in an acquittal barring retrial under the Double Jeopardy Clause. Similarly, an appellate court's disagreement with the jurors' *weighing of the evidence* does not

require the special deference accorded verdicts of acquittal.

A reversal based on the *weight of the evidence,* moreover, can occur *only after the State both has presented [legally-]sufficient evidence to support conviction and has persuaded the jury to convict.* The reversal simply affords the defendant a second opportunity to seek a favorable judgment. An appellate court's decision to give the defendant this second chance does not create "an unacceptably high risk that the Government, with its superior resources, [will] wear down [the] defendant" and obtain conviction solely through its persistence.

*Id.* at 42–43 (citations and footnotes omitted) (emphasis added). Thus, the United States Supreme Court expressly rejected the contention (accepted as true by the *Brooks* plurality) that a "distinction between the weight [ (factual sufficiency) ] and [legal] sufficiency of the evidence is unworkable," noting that "trial and appellate judges commonly distinguish between the weight [ (factual sufficiency) ] and [legal] sufficiency of the evidence" and the Due Process Clause "sets a *lower limit* on an appellate court's definition of evidentiary sufficiency." *Id.* at 44–45 (emphasis added). Under *Jackson,* the appellate court may not reweigh evidence or scrutinize the jury's reasoning in any way. *Jackson,* 443 U.S. at 319 & n. 13, 326, 99 S.Ct. 2781.

To employ such complete deference when reviewing factual sufficiency of the evidence contravenes a Texas criminal defendant's constitutional right to appellate review of fact questions. Accordingly, I strongly disagree with the conclusion by a plurality of the Court of Criminal Appeals and a majority of my colleagues on this court that the *Jackson* standard of review is sufficient to fulfill the Texas constitutional guarantee of appellate review of

questions of fact in criminal cases. I am not alone. In his comprehensive concurring opinion in *Ervin v. State*, Justice Jennings described what can only be denominated as jurisdictional usurpation by the Court of Criminal Appeals. 331 S.W.3d 49, 56–70 (Tex.App.-Houston [1st Dist.] 2010, pet. ref'd) (Jennings, J., concurring).

## THE CLEWIS CONUNDRUM

The *Brooks* plurality described the progression of previous opinions dealing with appellate standards of review for sufficiency of evidence in criminal cases. However, our colleagues on the Court of Criminal Appeals could not reconcile the concept of reviewing the evidence in a neutral light, as prescribed in *Tibbs*, with lengthy Texas jurisprudence, both civil and criminal, according much deference to the jury's determinations of weight and credibility. The *Brooks* plurality referred to *Lancon v. State*, 253 S.W.3d 699 (Tex.Crim.App. 2008), as the final nail in the coffin for factual-sufficiency review. *Brooks*, 323 S.W.3d at 901–02 (plurality op.); *see also id.* at 925–26 (Cochran, J., concurring). The plurality opined that requisite deference to the jury as the sole judge of a witness's credibility and the weight to be given testimony eliminates viewing the evidence in a "neutral light." *Brooks*, 323 S.W.3d at 902 (plurality op.) (overruling *Clewis*, 922 S.W.2d 126).

The *Brooks* plurality was so focused on resolving the analytical conundrum their court created by fashioning a standard of review for factual sufficiency in *Clewis* that they failed to acknowledge the difference between a constitutional guarantee of appellate review versus a standard of review gleaned under the principles of stare decisis. For example, the plurality concluded: "We believe that these and the reasons given by the Florida Supreme Court for abandoning its factual-sufficiency standard are good reasons for discarding the confusing and contradictory *Clewis* factual-sufficiency standard." *Id.* at 905. The plurality failed to acknowledge the fact that Florida does not have a similar constitutional guarantee of appellate review for questions of fact. The Florida Supreme Court simply exercised its jurisdictional and state constitutional authority to change the standard of review in order to eliminate confusion and avoid disparate results. *Tibbs v. Florida*, 397 So.2d 1120, 1125 (Fla.1981) (per curiam). The Texas Court of Criminal Appeals does not have authority to amend the Texas Constitution. *See Meraz*, 785 S.W.2d at 152, 154.

Moreover, the *Brooks* plurality's stated reasons for discarding factual-sufficiency review are unsupportable: (1) troubling double jeopardy problems are presented because the *Clewis* factual-sufficiency standard is barely distinguishable from the *Jackson* legal-sufficiency standard and (2) the non-deferential standard in Clewis could violate the right to trial by jury under the Texas Constitution. *Brooks*, 323 S.W.3d at 902–06 (plurality op.). First, relative to double jeopardy, a court may set aside a conviction for any unspecified reason and order a new trial because initial jeopardy continues and the case is restored to its position before the former trial. *See Lofton v. State*, 777 S.W.2d 96, 97 (Tex.Crim.App.1989). The risks of double jeopardy following reversal based on factual insufficiency were fully clarified by the United States Supreme Court in *Tibbs*. When an appellate court sits as a "thirteenth juror" and, after weighing the evidence in a neutral light without deference to the jury's resolution of conflicting evidence, determines the evidence is factually insufficient to support conviction, an acquittal has not occurred, but a "deadlocked jury." *Tibbs*, 457 U.S. at 42. Therefore, there is no double jeopardy risk. *Id.* The Double Jeopardy Clause does not prevent

an appellate court from granting a convicted defendant an opportunity to seek acquittal through a new trial. *Id.* Consequently, it is acutely ironic that the Court of Criminal Appeals refers to the Double Jeopardy Clause to "protect" a defendant from the new trial he desires! The Court might have sound reasons to overrule *Clewis,* but it is without jurisdiction or authority to abolish a constitutionally protected right. *See Meraz,* 785 S.W.2d at 152.

Second, there is persistent irony relative to the *Brooks* plurality's concern that application of "a nondeferential standard could violate the right to trial by jury under the Texas Constitution." *Brooks,* 323 S.W.3d at 905 (plurality op.). The *Brooks* plurality placed unnecessary emphasis on the statutory provisions establishing the jury as the exclusive judge of the facts and weight to be given evidence. *Id.* at 908 (citing Tex.Code Crim. Proc. Ann. arts. 36.13 (West 2007), 38.04 (West 1979); *Watson v. State,* 204 S.W.3d 404, 409 (Tex.Crim.App.2006)). Their analytical error results from an overbroad interpretation contrary to the statute authorizing this court to reverse a criminal conviction "as well upon the law as upon the facts." *See* Tex.Code Crim. Proc. Ann. art. 44.25 (West 2006). Obviously, a criminal defendant is not concerned about preserving the jury's guilty verdict. On appeal, he seeks acquittal or a new trial and will be entitled to remand for a new trial if the court of appeals concludes that the evidence is factually insufficient.

It is axiomatic that a court of appeals does not substitute its judgment for that of the jury by sustaining a challenge to a question of fact and remanding for a new trial. *Cropper v. Caterpillar Tractor Co.,* 754 S.W.2d 646, 651–52 (Tex.1988) (quoting *Hopson v. Gulf Oil Corp.,* 150 Tex. 1, 237 S.W.2d 352, 358 (Tex.1951)). "The fact that the court of appeals might engage in 'thought processes' akin to the jury's ... does not establish a violation of the right of trial by jury." *Id.* at 651.

As noted above, the United States Supreme Court cut a broad path for state jurisdictions that provide appellate review for a defendant's questions of fact. An appellate court may weigh the evidence and act as a "thirteenth juror." *Tibbs,* 457 U.S. at 41–42, 102 S.Ct. 2211. The *Brooks* plurality was troubled that this broad authority contradicts the "appropriate deference" standard in *Clewis.* **However, the United States Supreme Court recognized that state courts have the power to fulfill their state constitutional and statutory requirements of appellate review of questions of fact (with latitude for review of the evidence in a neutral light much wider than prescribed under *Clewis* ), but the *Brooks* plurality chose to overrule *Clewis* and abolish appellate review for factual sufficiency of the evidence!** Denial of a Texan's state constitutional and statutory rights to appellate review for factual insufficiency through erroneous interpretation or application of United States Supreme Court authority implicates due process of law protections under the Fifth and Fourteenth amendments to the United States Constitution. *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (concluding in states which provide for appellate review, a criminal defendant is entitled to the protections afforded under the Due Process and Equal Protection Clauses of the United States Constitution). The Supreme Court subsequently opined: "This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of ***unreasoned distinctions*** that can only impede open and equal access to the courts." *M.L.B. v. S.L.J.,* 519 U.S. 102, 111, 117 S.Ct. 555, 136 L.Ed.2d

473 (1996) (emphasis added) (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966)).

*Clewis* represented a compromise between long-standing deference to the jury's verdict and a criminal defendant's constitutional right to appellate review of questions of fact. The appellate court entertained qualified deference to the jury's assessment of the weight, credibility, or reliability of the admittedly legally-sufficient evidence. *Brooks*, 323 S.W.3d at 928 (Price, J., dissenting). When viewing the evidence in a neutral light, an appellate court was not required to resolve every conflict in the evidence, or draw every inference from ambiguous evidence, in favor of the defendant's guilt just because a rational jury could have drawn such an inference; the court accepted the proposition that qualified deference does not convert factual-sufficiency review into legal-sufficiency review. *See id.* at 929. Consequently, for many years, appellate courts concluded there is no inherent conflict in the factual-sufficiency standard of review when an appellate court is "deferential" to the jury's verdict while neutrally considering and weighing all of the evidence in the record. The *Brooks* plurality concluded that the *Clewis* standard of review for factual sufficiency is indistinguishable from the standard of review for legal sufficiency

prescribed in *Jackson. Brooks*, 323 S.W.3d at 895, 901 (plurality op.). Their analytical conundrum was resolved, but they threw the baby out with the bathwater!

I respectfully submit that each member of this court has a sworn duty to provide appellate review responsive to David Temple's contention that the evidence is factually insufficient to support the jury's verdict of guilt beyond a reasonable doubt.[3]

## FACTUAL INSUFFICIENCY

As previously mentioned in my concurring opinion, any effort to perform a factual sufficiency review required by the Texas Constitution would be unavailing because a majority of this court has followed *Brooks* without reservation. After another exhaustive review of the record, and in consideration of Justice McCally's explication of the evidence, my concern about this court's reticence to address the constitutional crisis created by *Brooks* is heightened. In the panel opinion, we acknowledged that the circumstantial evidence supporting the jury's verdict is not negligible. After reviewing the entire record, this is the highest attribution we could muster. However, constrained by the Court of Criminal Appeals's opinion in *Brooks*, the panel ultimately concluded

---

**3.** In his concurring opinion to denial of en banc review, Justice Brown expresses concern that we would somehow defy "hierarchical precedent" by refusing to adhere to the dictates of the *Brooks* plurality. However, we have a sworn duty to address the constitutional crisis created by the *Brooks* decision. As Justice Frankfurter succinctly expressed: "A timid judge, like a biased judge, is intrinsically a lawless judge." *Wilkerson v. McCarthy*, 336 U.S. 53, 65, 69 S.Ct. 413, 93 L.Ed. 497 (1949) (Frankfurter, J., concurring). The *Brooks* plurality did not distinguish or overrule *Meraz*, in which the Court of Criminal Appeals acknowledged that it simply has no jurisdiction to fashion a standard of review

that conflicts with the Texas Constitution. *Meraz*, 785 S.W.2d at 152. The *Brooks* plurality did not directly address the constitutional issue which is now squarely before this Court. However, even if the *Brooks* plurality had sufficiently addressed the constitutional issue and overruled *Meraz*, we should not remain silent. Our former colleague on the First Court of Appeals, Justice Taft, stated my position with clarity: "Judicial restraint requires that I be bound, but I will not be gagged." *Windom v. State*, 961 S.W.2d 267, 270 (Tex. App.-Houston [1st Dist.] 1997) (Taft, J., concurring), *rev'd*, 968 S.W.2d 360 (Tex.Crim. App.1998).

that the evidence was sufficient under the *Jackson* standard of review for legal sufficiency. It is my considered opinion that, after weighing all the evidence in a neutral light, a majority of this court would likely conclude the evidence of guilt beyond a reasonable doubt is so obviously weak as to undermine confidence in the jury's verdict.[4]

## RESPONSE TO JUSTICE MCCALLY'S DISSENT TO DENIAL OF EN BANC REVIEW

Having expressed strong disagreement with this court's unwillingness to prevent erosion of the Texas constitutional right to factual-sufficiency review, I now address Justice McCally's concerns about the panel opinion which I authored. I agree with Justice McCally that this case does not involve strong circumstantial evidence and that other cases cited by the panel in which murder convictions were upheld involved stronger circumstantial evidence.

Apparently, Justice McCally's concerns are predicated on her interpretation of the degree of deference required after the *Brooks* plurality concluded that the standard of review for factual sufficiency under *Clewis* is the same standard of review adopted by the United States Supreme Court in *Jackson*. Regretfully, it appears that much of my disagreement with Justice McCally's interpretation of *Brooks* stems from the *Brooks* plurality's effort to transmogrify a *Jackson* standard of review for legal sufficiency into appellate review for factual sufficiency uniquely guaranteed by the Texas Constitution. Referring to footnote 19 in *Brooks*, Justice McCally contends there is a factual-sufficiency component in the *Jackson* standard for legal sufficiency. My colleague suggests that the "plain language of *Brooks* demonstrates that, although the light in which we view the evidence has changed, the court has not eliminated the requirement that appellate courts review all of the evidence and, 'albeit to a very limited degree, to act in the capacity of a so-called "thirteenth juror"' to perform a factual-sufficiency review." J. McCally's Dissent to En Banc Review (quoting *Watson v. State*, 204 S.W.3d 404, 416–17 (Tex.Crim.App.2006) (explaining standard for *factual-sufficiency review*)). The incongruity of this postulate should be apparent: How does an appellate court follow the clear dictate of *Jackson* and view all of the evidence in a light most favorable to the prosecution, *but* "*to a very limited degree*" act as a thirteenth *juror?* If an appellate court renders a judgment of acquittal after acting as a thirteenth juror to any degree, the State would have a valid claim that the Court did not follow the *Jackson* standard of review for legal sufficiency. However, if an appellate court reverses for factually insufficiency and remands for a new trial after reviewing the evidence under the Jackson standard with some degree of deference to the jury's findings, the appellant may have a valid double jeopardy defense. The Supreme Court admonished state appellate courts not to confuse these two standards of review. *Tibbs*, 457 U.S. at 43–45, 102 S.Ct. 2211.

Justice McCally posited the robbery-at-a-convenience-store hypothetical in support of her contention that the panel majority did not follow *Jackson*, and disregarded dispositional evidence. In that scenario, the store clerk identified A, who

---

4. *See Vodochodsky v. State*, 158 S.W.3d 502, 510 (Tex.Crim.App.2005) (acknowledging the requirement to set-aside a verdict for factual insufficiency after viewing the evidence in a neutral light and finding the proof of guilt is so obviously weak as to undermine confidence in the jury's verdict); *see also* W. Wendell Hall, *Standards of Review in Texas*, 38 St. Mary's L.J. 47, 265 (2006).

was convicted by a jury for robbing the store. A properly authenticated videotape was admitted showing B committed the robbery. In that instance, the jury's finding of guilt would not be rational, and the appellate court should reverse for legal insufficiency. However, that scenario is not presented in this case. Here, there is no conclusive, exculpatory evidence which is objectively measurable by an appellate court. In other words, no objectively measurable evidence conclusively negates the jury's implicit findings regarding disputed evidence. The scenario here is better represented by the proverbial twenty nuns hypothetical, in which the State's sole witness, a paid informant, testifies that he saw the defendant commit the crime. Twenty nuns testify that the defendant was with them at the time, far from the scene of the crime. Twenty more nuns testify that they saw the informant commit the crime. Under this scenario, if the defendant is convicted, he has no remedy under *Jackson* because the informant's testimony, however incredible, is legally sufficient to support his conviction. *See Clewis,* 876 S.W.2d at 444.

Justice McCally further opines that the panel did not properly apply the *Jackson* standard of review because "the panel did not review all of the evidence" and "the only 'no-rational-jury' analysis applied by the panel in any way was not to all of the evidence, but rather to individual pieces of evidence." However, this is a circumstantial evidence case, with dozens of complimenting and competing items of evidence the jury was required to compare and weigh. In compliance with instructions in the *Brooks* opinion, the panel invoked the well-established standard of review for legal sufficiency that courts "view *all of the evidence in the light most favorable to the verdict* to determine whether the jury was rationally justified in finding guilt beyond a reasonable doubt." *Temple v. State,* 342

S.W.3d 572, at 90, No. 14–08–00074–CR, 2010 WL 5175018, at *3 (Tex.App.-Houston [14th Dist.] Dec. 21, 2010, no pet. h.) (emphasis added). As the panel recognized, no single circumstance in this case provided a sufficient evidentiary basis to support the verdict. *Id.* at *10 (quoting *Swearingen v. State,* 101 S.W.3d 89, 97 (Tex.Crim.App.2003)). When the panel reviews all of these circumstances in the light most favorable to the verdict—which, of course, means the panel must defer to the jury's resolution of conflicting evidence unless a rational jury could not—their weight and consistency " 'provide[d] the girders to strengthen the evidence and support a rational jury's finding the elements beyond a reasonable doubt.' " *Id.* (quoting *Swearingen,* 101 S.W.3d at 97).

Although all of the evidence in the record was reviewed and considered in a light most favorable to the prosecution, the panel did not detail all of the evidence. The panel was not required to provide such intricate detail in affirming the jury's verdict. Before *Brooks* abrogated factual-sufficiency review, courts were required to detail all relevant evidence during factual-sufficiency review only when reversing. *See Steadman v. State,* 280 S.W.3d 242, 247 (Tex.Crim.App.2009) ("Before reversing a conviction on the basis of factual insufficiency, an appellate court must detail all the relevant evidence and must explain in exactly what manner the evidence is factually insufficient."). Contrarily, when courts overruled a factual-sufficiency challenge, they were required to detail the evidence only to the extent necessary to explain why it was factually sufficient to support the verdict. *See Scott v. State,* 934 S.W.2d 396, 402 (Tex.App.-Dallas 1996, no pet.). The rationale for this rule is even more applicable when a court overrules a legal-sufficiency challenge because it views the evidence, not in a neu-

tral light, but in the light most favorable to the jury's verdict. Accordingly, after an appellate court determines and explains why the evidence is legally sufficient to support the jury's verdict, there is no requirement to meticulously detail all remaining evidence and inferences. The absence of such surplus analysis in the panel opinion should not be misconstrued as the panel's failure to consider all of the evidence.

As an example of the panel's failure to review all of the evidence, Justice McCally argues the panel did not properly consider the Roberts brothers' testimony that they heard a gunshot at 4:38 p.m., a time when appellant was undisputedly not home. The panel acknowledged that the Roberts brothers' testimony supported appellant's defense. *Temple,* 2010 WL 5175018, at *6. However, we also recognized that "the jury was free to disbelieve [this testimony] and rationally could have done so because the Roberts brothers were children and no other witness testified that a gunshot was heard that day." *Id.* In other words, although the jury was free to believe the Roberts brothers' testimony, there was no requirement to do so because their statements were not conclusively proved. The jury is the sole judge of the credibility and

demeanor of a witness. *See Johnson v. State,* 23 S.W.3d 1, 8 (Tex.Crim.App.2000) ("Unless the available record clearly reveals a different result is appropriate, an appellate court must defer to the jury's determination concerning what weight to give contradictory testimonial evidence because resolution often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered."); *Jones v. State,* 984 S.W.2d 254, 258 (Tex.Crim.App.1998) ("[A] jury is permitted to believe or disbelieve any part of a witness' testimony[.]"). In considering the cold record, we cannot discern whether the Roberts brothers were nervous, confident, or credible. Thus, under the *Jackson* standard of review, we are precluded from attributing credence to their testimony simply because it was not directly contradicted.[5] Accordingly, the panel properly deferred to the jury's implicit decision not to believe the Roberts brothers' testimony.[6]

I also disagree with Justice McCally's criticism that the panel reviewed the evidence in piecemeal fashion. The panel began its sufficiency analysis by noting the evidence conclusively established "that someone intentionally and knowingly

5. Justice McCally also contends the panel's analysis of testimony from the Roberts brothers was inadequate because the panel did not consider testimony from the Parkers who lived next-door to the Robertses that their dogs inexplicably 'went crazy' near the time the Roberts brothers heard a gunshot. Although the Parkers' testimony that their dog was barking during the time the Roberts brothers heard a gunshot arguably supports the contention that there was a shotgun blast at that time, it does not render the Roberts brothers' testimony conclusive relative to the exact time a shotgun was fired inside appellant's house. Therefore, under the *Jackson* standard, we cannot conclude that the jury acted irrationally by finding the Roberts brothers not credible on this point.

6. Additionally, Justice McCally contends the panel improperly applied the "rational jury" requirement by concluding "no rational jury could credit Vielma's testimony," because the panel purportedly did not consider Vielma's testimony in conjunction with all the evidence in the record. *See Temple,* 2010 WL 5175018, at *8 n. 3. While I agree rationality of a jury's fact finding is to be determined from all the evidence, the panel correctly concluded it would be irrational for a jury to believe Vielma's testimony that a dog was not inside the Temple's garage. Vielma admitted she was unable to see or determine the dog's location within a particular area inside the garage, rendering her testimony that a dog was inside the garage sheer speculation. *Id.*

caused Belinda's death." *Temple*, 2010 WL 5175018, at *4. Thus, the panel was required to determine whether legally-sufficient evidence supported the jury's finding that appellant was the killer. Viewed in the light most favorable to the verdict, the evidence supports the following findings and inferences:

- Appellant could have been in his house when the murder occurred.[7]
- Someone staged the house to make it appear that it had been burglarized. Appellant had ample opportunity to stage a burglary while he was watching E.T., and Belinda was still at school.
- Appellant testified that he drove directly to Home Depot after leaving Brookshire Brothers. The drive time between Brookshire Brothers and Home Depot was approximately ten to fifteen minutes. Cameras captured appellant leaving Brookshire Brothers at 4:38 P.M. and arriving at Home Depot at 5:14 P.M. During this thirty-six minute window, a witness observed appellant driving from the opposite direction a person would choose when leaving Brookshire Brothers headed to Home Depot. Thus, the jury could have concluded that appellant lied about his activities after leaving Brookshire Brothers. The jury could have also rationally concluded that the thirty-six minute window afforded appellant ample opportunity to hide a gun and bloody clothing before arriving at Home Depot.[8] A finding that appellant misrepresented his activities during the afternoon Belinda was murdered rationally supported a finding of guilt because there is no explanation for appellant's prevarication other than to thwart police from discovering his activities.

- Appellant engaged in an extramarital affair with Heather for several months before the murder. He told Heather he loved her and expressed to a friend that he was unsure if he was willing leave Belinda for Heather. Within a very brief period of time after Belinda was murdered, appellant resumed his relationship with Heather, and later they were married.[9]

- While police were investigating the murder, appellant threatened certain friends to "keep [their] damn mouth[s] shut" and stop talking to police and prepare for quick-cleaning of the murder scene, particularly in light of other evidence that the actor or actors staged a burglary.

---

7. In fact, as Justice McCally notes, the jury could have rationally believed appellant and Belinda were together inside their house for over half-an-hour after she arrived home from school. Thus, the jury could have rationally concluded there was ample time for appellant to commit the shooting.

Additionally, I agree the fact that blood spatter was confined to the closet is odd. Appellant's expert opined there must have been back-spatter because the shotgun was discharged close-range, and Belinda's blood was never found on appellant, his clothing, or in his vehicle. However, the absence of blood evidence in the house does not necessarily support appellant's contention that someone else committed the crime. A rational jury could have inferred that appellant had adequate time while Belinda was at work to

8. The police conducted thorough searches of Katy and specifically the area around appellant's parents' house but never found a weapon or other evidence linking appellant to the murder. However, many of these searches occurred days after the murder, thereby allowing the jury to reasonably conclude appellant was afforded sufficient time to dispose of evidence.

9. A rational jury could have found it shocking that a mere month after his wife was murdered, appellant sent Valentine's Day flowers to the woman with whom he had been having an affair.

658

also followed them in his car while they were driving.

Viewed cumulatively, through the prism "in a light most favorable to the jury's verdict," these facts sufficiently link appellant to the murder to support a non-speculative finding that he was the killer because he had motive and opportunity, his house was staged to appear burglarized, he misrepresented his activities during the afternoon of the murder, he quickly resumed a relationship with the woman who was the object of an illicit affair, and he threatened friends who were speaking with the police.[10] Admittedly, the circumstantial evidence supporting guilt beyond a reasonable doubt is not great, but it is also not negligible. Accordingly, constrained by the *Jackson* standard of review, the panel correctly concluded that a rational

jury could have found appellant guilty of murdering his wife beyond a reasonable doubt.[11]

Finally, I am impressed by Justice McCally's detailed explication of the evidence, which I believe supports reversal for factual insufficiency. Accordingly, I urge my colleagues to abjure the decision to abolish factual-sufficiency review in criminal cases. This court did not create a constitutional crisis relative to the decision to abolish factual-sufficiency review; the crisis is identifiable by simply reviewing prior opinions by the Court of Criminal Appeals, acknowledging that it is without constitutional authority to determine whether the evidence is factually sufficient, and admitting it does not have jurisdiction to determine questions of factual insufficiency until or unless the Texas Constitu-

**10.** As described by Justice McCally, there was evidence linking the Temples' teenage neighbor, R.J.S., to the murder. *See Temple*, 2010 WL 5175018, at *11, *33. However, whether the majority panel or another jury would have believed that this evidence created reasonable doubt regarding Temple's guilt is superfluous—the inquiry is whether a rational jury could have disregarded this evidence. R.J.S. testified that he did not murder Belinda. Because no evidence rendered this testimony unbelievable (in fact, this testimony was supported by evidence that none of the double-ought shells recovered from R.J.S.'s family contained wadding matching that found near Belinda's body), the jury was free to believe R.J.S. Therefore, we were mandated to defer to the jury's implicit finding that R.J.S. was not the killer. *See Clayton v. State*, 235 S.W.3d 772 (Tex.Crim.App.2007) (explaining that we defer to the jury's resolution of conflicting evidence).

**11.** Justice McCally also expresses concern about the panel's resolution of appellant's *Brady* issue and the cumulative harm analysis pertaining to evidentiary and jury-charge errors.

However, we determined appellant waived his *Brady* issue by failing to complain about the State's nondisclosure of Brady material

until *twenty-one days after he became aware of the nondisclosure. Temple*, 2010 WL 5175018, at *11. Considering the fact that the Court of Criminal Appeals has recognized a Brady violation "must be made as soon as the grounds for complaint is apparent or should be apparent," appellant's twenty-one-day lull constitutes a clear waiver of the issue. *See Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim.App.1999). Stated differently, appellant was not entitled to a three-week delay to determine whether the belatedly disclosed R.J.S. evidence necessitated a trial-halting continuance.

Regarding the panel's harm analysis, appellant argued in over seventy-five issues that the trial court erroneously admitted evidence and permitted improper closing argument. Most of these issues were not preserved or did not support error. *Temple*, 2010 WL 5175018, at *12–30. After determining that roughly ten non-constitutional errors were properly preserved, we conducted a cumulative-error harm analysis pursuant to rule 44.2(b) of the Texas Rules of Appellate Procedure. In light of the evidence supporting appellant's guilt, the immaterial nature of several of the errors, and particularly the effect of the many unpreserved errors, we determined the preserved errors did not have a substantial and injurious effect on the jury's verdict. *Id.* at *37.

tion is amended! *See Meraz*, 785 S.W.2d at 152; *see also Laster*, 275 S.W.3d at 518–19. This court has a constitutional duty not to ignore usurpation of its conclusive jurisdiction over factual-sufficiency issues in criminal cases, and each member of this court is under a sworn duty to defend Article 5, Section 6 of the Texas Constitution. Accordingly, I respectfully dissent to denial of rehearing en banc.